

# AFTAB PUREVAL
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

```
ELECTRONICALLY FILED
March 16, 2020 04:31 PM
     AFTAB PUREVAL
    Clerk of Courts
  Hamilton County, Ohio
  CONFIRMATION 930814
```

**NOVI DALE CARMEN**  **A 2001283**

**vs.**
**HEALTH CAROUSEL LLC**
**DBA PASSPORT USA**

## FILING TYPE: INITIAL FILING (OUT OF COUNTY) WITH JURY DEMAND

## PAGES FILED: 19

EFR200



# IN THE COURT OF COMMON PLEAS
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| Novie Dale Carmen, individually and<br>as a representative of the Class,<br>234 Sparrow Rd.<br>Hummelstown, PA 17036<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Health Carousel, LLC, *dba* Passport USA<br>1700 Madison Road Suite 100<br>Cincinnati, OH 45208<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Demand Endorsed Hereon** |

Novie Dale Carmen ("Plaintiff" or "Carmen"), by and through her attorneys and on behalf of herself, the Class set forth below, and in the public interest, brings this Class Action Complaint against Health Carousel, LLC *dba* Passport USA ("Defendant" or "Health Carousel"), seeking relief for Defendant's violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.*, and Ohio's human trafficking law, Ohio Rev. Code § 2905.32.

## INTRODUCTION

1. Defendant is a foreign labor recruiter that recruits nurses from the Philippines and elsewhere to work essentially as indentured servants in healthcare facilities in the United States. Once here, the nurses are contractually barred from leaving their employment for a period of more than three years. To keep its nurses working, Defendant threatens them with stiff financial penalties and lawsuits, and seeks to isolate them from other potential employers.

2. By so doing, Defendant seeks to continue to profit from the nurses' labor under Defendant's contracts with the various healthcare facilities at which the nurses work. This lawsuit seeks to end Defendant's illegal practices and to compensate the victims of those practices.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction because Ohio's common pleas courts are endowed with "original jurisdiction over all justiciable matters." Article IV, Section 4(B), Ohio Constitution.

4. This Court has personal jurisdiction over Defendant, and venue is proper in this Court, because Defendant's headquarters are in Hamilton County.

5. Additionally, Defendant has contractually "consent[ed] to the exclusive jurisdiction and venue" in the courts of Hamilton County, Ohio.

## PARTIES

6. Plaintiff Novie Dale Carmen is a Registered Nurse who was formerly employed by Defendant. She is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. She lives in Pennsylvania.

7. Defendant is a limited liability company organized in Ohio, with its headquarters at 1700 Madison Road, Suite 100, Cincinnati, Ohio 45208.

## FACTS

**Defendant's Business**

8. Part of Defendant's business involves recruiting trained nurses from the Philippines and elsewhere, bringing them to the United States, and selling their labor to healthcare facilities. These healthcare facilities serve the healthcare needs of their communities, but need additional nurses to accomplish that.

9. Defendant profits, in part, by selling the nurses' labor to the healthcare facilities for a higher price than the nurses' wages. Therefore, the longer Defendant can make the nurses continue to work for it, the more Defendant can profit from the nurses' labor.

2

10. Defendant accomplishes this with the help of a separate entity, Health Carousel Philippines, Inc. Health Carousel Philippines has offices in Manila and Cebu City in the Philippines. Health Carousel Philippines recruits nurses in the Philippines for Defendant.

11. Defendant refers to its above-described business as the "Passport USA" program. Through the Passport USA program, Defendant enters into uniform contracts with the international nurses Defendant recruits.

12. Under Defendant's uniform contract, the nurses work at healthcare facilities that have entered agreements to pay Defendant for the nurses' labor. Defendant characterizes some nurses as employees of Defendant; Defendant calls this arrangement the "Passport USA Global *Express* Program." Defendant characterizes other nurses as direct employees of the healthcare facility; Defendant calls this arrangement the "Passport USA Global *Direct* Program."

13. The contract Defendant uses in the "Express" program is, in all relevant respects, identical to the contract it uses in the "Direct" program. And all nurses in Defendant's Passport USA program—whether in the "Express" or the "Direct" program—are treated in the same manner by Defendant. There is no meaningful distinction between the programs, from the nurses' perspective.

14. Defendant's uniform contract selects the courts of Hamilton County, Ohio as a forum where disputes pertaining to the contract may be brought. And the contract states that Ohio law will govern.

15. Defendant is a corporation registered to do business in Ohio since 2004. Defendant has operated and done business in Ohio under the following trade names: Tailored Healthcare Staffing, Global Scholarship Alliance, Theropolis Staffing Service and Passport USA. Defendant can be served through its Statutory Agent, Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, OH 43215.

3

**Carmen begins working for Defendant**

16. Carmen is an experienced Registered Nurse. She had worked as a nurse in an emergency room setting for four years in the Philippines prior to immigrating to the United States.

17. Carmen, like many nurses in the Philippines, wanted to come to the United States for a better and more prosperous life. Lured by that possibility, Carmen contacted Defendant in late 2014. Thereafter, Carmen joined Defendant as part of its Passport USA Global Express Program. On April 5 or 6, 2015, Carmen signed Defendant's contract. (The April 2015 contract between Carmen and Defendant will be referred to herein as the "Carmen Contract.")

18. After Carmen received her immigrant visa and prepared to permanently relocate to the United States, Defendant sent Carmen to work at UPMC Muncy hospital in Muncy, Pennsylvania. Carmen moved to Muncy in January 2018 and began working in February 2018.

**Term of indentured servitude**

19. Defendant's contract (including the Carmen Contract) requires nurses to work for Defendant for a term of "(i) 36 months [3 years] or (ii) 6,240 regular-time work hours," whichever is longer. Until that term is satisfied, the nurses are not permitted to "pursue [their] own career opportunities" outside of Defendant's organization.

20. This term of indentured servitude will *always* be longer than three years. That is because 6,240 hours constitutes full-time work of 40 hours per week, for 52 weeks per year, for three full years. Therefore, if a nurse takes time off for any reason, or is scheduled to work less than 40 hours per week, the period of indentured servitude could be significantly longer than three years.

21. Further, not all work performed under Defendant's contract is counted toward these hours of indentured servitude. For example, Carmen, like many of Defendant's nurses, worked significant amounts of overtime, but those overtime hours did not count toward the 6,240-hour requirement.

4

22. Additionally, the contract provides that only work performed after "orientation" and once the nurse is "fully licensed" will count toward these hours. For Carmen, that meant she had been working for Defendant for approximately *seven months* before her work started to count toward the 6,240-hour requirement.

23. Defendant controlled the process of obtaining Carmen's nursing license from Pennsylvania. Defendant initially obtained a temporary license for Carmen. But Defendant delayed applying for Carmen's permanent nursing license until the temporary license was near its expiration, despite requests from Carmen to expedite the process. Defendant delayed applying for Carmen's full license so that it could extract as much work as possible from Carmen that would not count toward her 6,240-hour requirement. Defendant similarly delayed seeking full licensure for other nurses, as well.

24. Defendant does not explain to its nurses during the recruitment process that, for the reasons described above, their period of indentured servitude will last significantly longer than three years and 6,240 hours.

**<u>Penalty for nurses who do not complete the term of indentured servitude</u>**

25. To compel the nurses to stay for the entire term of indentured servitude, Defendant's contract contains a harsh monetary penalty, which the contract calls "liquidated damages." Under the provision, after a nurse's visa is issued, the nurse must pay at least a $20,000 penalty if they stop working for Defendant before the term of indentured servitude ends. This amount ranged from $20,000 for some nurses all the way to $35,000 or more for other nurses. The amount of the nurses' penalty is easily determinable from the contract.

26. The contract does not allow the penalty amount to be prorated to account for how long the nurse has been working under contract with Defendant. Therefore, the contract requires a nurse that has worked for Defendant for two-and-a-half years, for example, to pay the *entire*

5

penalty if she stops working for Defendant. Even where contractual penalties allow for proration, they may still run afoul of the TVPA. *See United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2020 WL 435490, at *18 (D.D.C. Jan. 28, 2020) (denying defendant's motion to dismiss TVPA claim where contract required repayment of prorated costs of training and certification); *Paguirigan v. Prompt Nursing Employment Agency LLC*, No. 17-CV-1302-NG-JO, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) (granting plaintiff's motion for summary judgment on her TVPA claim and enjoining defendant from enforcing its contractual penalty, where penalty was prorated).

27. The contract threatens that the penalty will be "**due immediately** and **in full on or before the last day**" worked. (Emphasis in original.) The contract emphasizes that "[t]here will not be any payment plans or partial payment options."

28. Defendant's contract is very clear that if it does not receive this money, "Health Carousel will prepare to immediately file a lawsuit for the full damages failure to comply with the terms and conditions of the Agreement causes Health Carousel. Be advised that *if you leave the country, Health Carousel can still obtain a judgment that will be enforceable abroad.*" (Emphasis in original.)

29. True to its threats, Defendant has sued nurses who left before their terms of indentured servitude ended. For example, Defendant recently sought judgment against its former nurse employee in the amount of $77,435, plus interest and costs. *Health Carousel, LLC v. Agang*, No. 1:19-cv-00102 (S.D. Ohio filed Feb. 8, 2019). Defendant has also sued other nurses who left before the end of their term of indentured servitude.

30. The penalty provision in Defendants' contract is not a valid liquidated damages provision under Ohio law, and it is unenforceable. The penalty provision is not designed to estimate Defendant's actual damages, which would not be difficult to determine. Instead, it

6

imposes a lump-sum penalty, which will be the same if the nurse quits on the first day of work as it will be if the nurse quits after completing 6,239 hours of work.

31. Further, Defendant has increased the amount of the penalty from $20,000 to $35,000 over the course of two years. It is inconceivable these figures are a reasonable estimate of Defendant's damages when the amount has increased so quickly. Rather, Defendant seems to be increasing the amount of the penalty in order to exert still greater force to keep nurses working for it. Defendant's damages, if any, would be much lower than either of these penalty amounts. *See Paguirigan*, 2019 WL 4647648, at *11 (finding, in TVPA case brought by a nurse recruited from the Philippines, that defendants had shown damages caused by the nurse leaving employment early of less than $5,000, and finding unenforceable defendants' $25,000-penalty provision).

32. If Defendant suffered any damages from a nurse leaving before completing the period of involuntary servitude, those damages would be easily calculable. *See id.* (finding penalty provision unenforceable, in part because the amount of the defendants' damages was ascertainable at the time of contract).

33. In *Health Carousel, LLC v. Agang*, No. 1:19-cv-00102 (S.D. Ohio filed Feb. 8, 2019), Health Carousel sought default judgement against an early-departing nurse. It submitted an affidavit purporting to state a simple calculation for determining Health Carousel's damages caused by a nurse leaving employment early. When the *Agang* court denied Health Carousel's motion for default judgment and requested an affidavit with more detail of its purported damages, Health Carousel voluntarily dismissed the case to avoid submitting the requested affidavit. This demonstrates that Defendant considers its purported damages from early-departing nurses to be easy to calculate. It also demonstrates that those damages likely come nowhere near the $77,435 Defendant requested in the *Agang* case.

34. Carmen and the other Health Carousel nurses she worked with knew that Defendant had sued other nurses that left Defendant before completing their terms of indentured servitude.

35. Carmen and Class members continued to work for Defendant for longer than they wanted because of the monetary penalty, because of threats that the penalty would be strictly and immediately enforced, and because they knew Defendant had sued other nurses.

**Defendant isolates its nurses from other potential employers**

36. The nurses' ability to leave is further restricted by the contract's non-compete provision. Under that provision, nurses are prohibited from working for Health Carousel's clients, or any other healthcare facility within 50 miles, for one year.

37. Defendant's nurses have all recently arrived in the United States from abroad, and are unlikely to have professional connections in this country other than in the healthcare facility at which they are placed by Defendant. As such, a nurse who is prohibited from seeking employment with the healthcare facility that she's been working in, and from seeking employment anywhere in the town she's been working in, will likely have difficulty finding employment anywhere in the country.

38. Defendant's nurses know that if they leave Defendant's employment early, not only will they be immediately liable for the liquidated damages, but they will also have difficulty finding any work in their field for an entire year.

39. Additionally, the contract's non-compete provision is unenforceable under Ohio law because, for the reasons stated above, it imposes an undue hardship on Defendant's former employees.

40. The non-compete provision hindered Carmen's ability to stop working for Defendant. Carmen believes she could have gotten a job directly with UPMC Muncy, where she had been working under contract with Defendant. She also could have worked as a full-time nurse

8

for another healthcare facility approximately 30 miles from UPMC Muncy. But she was unable to pursue either employment opportunity because of the non-compete provision. And in phone calls with her contact in Defendant's organization, Defendant made a point to remind Carmen about the non-compete provision.

**Defendant isolates the nurses in other ways**

41. Defendant's contract also restricts and isolates its nurses in other ways. For example, the contract contains a "no gossip" policy: "Gossip is strictly forbidden. Gossip is defined as rumor or talk of a personal, intimate, and often sensational nature. Gossip is rarely positive in nature, and is usually harmful."

42. The contract gets more specific about the types of information Defendant does not wish its employees to discuss: "Confidential information includes personal information or relationships, salary information, or any information concerning a co-worker's relationship with Health Carousel. Discussing what you or a co-worker earns is considered indiscreet because salary is a personal matter."

43. Similarly, the contract states that: "The terms and conditions of your employment are confidential and should not be shared with anyone except an authorized Health Carousel Representative. Any issues regarding our relationship are to be confidentially kept between us."

44. Defendant carefully enforced these secrecy provisions. Carmen observed that when she discussed the contract with Defendant, Defendant would reiterate that Carmen was not permitted to talk about it with anybody, even with her fellow Health Carousel nurses.

45. These secrecy provisions hinder the nurses' ability to pursue their careers outside of Defendant's organization. For example, nurses that want to (and can afford to) leave Defendant are unable to discuss their planned departure with supervisors at their healthcare facility. From the perspective of the healthcare facility, a departing nurse would just be replaced one day with a

9

different nurse. That makes it difficult for a departing nurse to obtain a positive reference from the healthcare facility without breaching Defendant's contract. And the contract stresses the point: "In America, a bad reference can follow you and can inhibit Health Carousel's ability to find a new client assignment for your [*sic*] and even to continue your employment."

46. These secrecy provisions have the effect of further isolating the nurses and shielding from scrutiny Defendant's business practices.

**Other draconian terms in Defendant's contract**

47. The contract contains various other draconian terms, as well. For example, the contract states that if a nurse is terminated from employment, she will be forced to vacate her home if housing has been provided by Defendant. The nurse must vacate within 48 hours after the earlier of the termination or her last shift worked. This provision, of course, further restricts nurses from leaving Defendant: They may be homeless two days after leaving.

48. Additionally, the contract requires nurses, "[a]s a condition of . . . participation in the Passport USA Program," to take courses in "acculturation/acclimation." Though these courses are mandatory, the contract states that nurses "are not entitled to compensation" for their time taking them.

49. Finally, Defendant implies that if a nurse is terminated, she will suffer adverse immigration consequences. For example, the contract states that "[a]s long as you remain in good standing with Health Carousel, we will continue to be your advocate for immigration purposes," implying that failure to remain "in good standing" may result in negative immigration consequences.

50. And the contract states that if a nurse is terminated from employment, she will be given a one-way plane ticket back to her home country. That provision led Carmen and other

10

nurses to believe they may be made to leave the United States if they left Defendant before the period of involuntary servitude ended.

**Carmen leaves her employment with Defendant**

51. Not long after starting employment with Defendant and well before her term of indentured servitude was over, Carmen desired to stop working for Defendant.

52. First, Carmen and the other nurses working for Defendant were underpaid, earning substantially less than nurses working in the same facility but not for Defendant.

53. Additionally, Carmen and the other nurses working for Defendant were overworked. After working a scheduled 12-hour shift, the nurses would regularly be asked to stay on and work for an additional four hours due to understaffing.

54. Also due to this understaffing, Carmen and the other nurses working for Defendant were required to be responsible for too many patients. The low nurse-to-patient ratio was dangerous for both the nurses and their patients.

55. Despite her desire to leave Defendant, Carmen nevertheless had to continue working for Defendant for all of the reasons discussed above. Carmen's inability to leave Defendant caused her substantial distress.

56. Eventually, however, after nearly two years of working for Defendant, Carmen was able to come up with the money to pay Defendant's penalty. In November 2019, Carmen was able to borrow $20,000 from her boyfriend to pay Defendant's penalty and leave Defendant.

57. Coming up with the money to pay Defendant's penalty caused Carmen substantial hardship and distress. Defendant paid her too little for her to be able to save up the penalty amount from her wages. And Carmen could not borrow such a large sum from any of her family in the Philippines.

58. With no other option, Carmen borrowed the money from her boyfriend. Carmen's boyfriend had been saving up to make a down payment on a home. But because Carmen was desperate to leave Defendant, he loaned her the money to pay Defendant's penalty instead of using it as a down payment. They have not been able to again save up enough for a down payment, and they continue to rent housing.

59. Carmen continues to suffer stress, anxiety, guilt, and depression as a result of owing this debt to her boyfriend.

60. Carmen's penalty amount was not prorated, despite the fact that she had completed well over a year of her involuntary servitude period.

61. After paying Defendant's penalty, Carmen moved to Hershey, Pennsylvania. There, she found a nursing job earning more than she had been earning with Defendant.

62. Other nurses have been able to come up with the money necessary to pay Defendant's penalty and leave before the expiration of their terms of involuntary servitude, though at significant personal hardship.

63. At least twenty nurses in Pennsylvania alone have paid Defendant's penalty in order to leave Defendant. The number of nurses nationwide who have paid Defendant's penalty is likely much greater. Many of those have had to get bank loans in order to pay Defendant's penalty. Others have left but have been unable to come up with the money to pay the penalty, and have been sued by Defendant.

## CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action as a class action pursuant to Rule 23 of the Ohio Rules of Civil Procedure.

65. Plaintiff asserts her claims on behalf of the Class defined as follows:

> All nurses that entered the United States through Defendant's Passport USA program and paid a financial penalty within the ten years prior to the filing of this action in order to be released from their employment with or through Defendant.

66. <u>Numerosity</u>: The Class is so numerous that joinder of all class members is impracticable. Defendant's social media posts indicate that it brings hundreds of nurses per year into the United States through its Passport USA program. Further, at least twenty nurses in Pennsylvania alone have paid Defendant's financial penalty in the past few years. Although the precise number of putative Class members is currently unknown, Plaintiff believes that the Class includes over forty members. These members can be identified based on Defendant's records.

67. <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members, including but not limited to:

   a) Whether Defendant obtains the labor of foreign nurses by using serious harm or threats of serious harm in violation of the TVPA;

   b) Whether Defendant knowingly recruits nurses and knowingly benefits by its violations of the TVPA and Ohio trafficking law;

   c) The proper measure of damages; and

   d) The proper measure of punitive damages.

68. <u>Typicality</u>: Plaintiff's claims are typical of the members of the Class. Defendant uses a uniform contract in its Passport USA program, and the Carmen Contract, as one of those uniform contracts, is typical of the Class's contracts. Further, Defendant treated Plaintiff consistent with other class members, in accordance with its standard policies and practices.

69. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to the prosecution of this action and has retained counsel that numerous

13

courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiff and the Class she seeks to represent.

70. Class certification is appropriate under Ohio Civ. R. 23(B)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant uses a uniform contract and uniform policies and practices, resulting in common violations of law. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum, and Defendant's contract selects this forum for resolving disputes.

71. Plaintiff intends to send notice to all members of the Class to the extent required by Ohio Civ. R. 23(C)(2). The names and addresses of the class members are available from Defendant's records.

## COUNT I

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1589(a)**
**(On behalf of Carmen and the Class)**

72. Plaintiff incorporates the above allegations by this reference.

73. It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

14

74. The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

75. Defendant obtained the labor of Carmen and the Class members through threats of serious harm, through a scheme to make Carmen and the Class believe they would suffer serious harm, and through threatened abuse of legal process, through the terms and administration of its contract with the nurses.

76. Defendant kept Carmen and the Class working for it against their wills with the contract's term of indentured servitude, with an unenforceable monetary penalty masquerading as liquidated damages, with threats of litigation, with contractual provisions that caused the nurses to fear deportation, and with the other isolating and otherwise draconian terms of the contract, as described herein.

77. Defendant's use of such means to obtain the labor of Carmen and the Class was knowing and intentional.

78. Carmen and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

79. Carmen and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT II

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1589(b)**
**(On behalf of Carmen and the Class)**

80. Plaintiff incorporates the above allegations by this reference.

15

81. It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

82. Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

83. Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

84. Carmen and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

85. Carmen and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT III

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1590(a)**
**(On behalf of Carmen and the Class)**

86. Plaintiff incorporates the above allegations by this reference.

87. It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

88. Defendant knowingly recruited Carmen and Class members in violation of the TVPA through the means described herein.

89. Carmen and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

90. Carmen and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT IV

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1594(a)**
**(On behalf of Carmen and the Class)**

91. Plaintiff incorporates the above allegations by this reference.

92. Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

93. Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

94. Carmen and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

95. Carmen and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT V

**Violation of Ohio's human trafficking law**
**Ohio Rev. Code § 2905.32**
**(On behalf of Carmen and the Class)**

96. Plaintiff incorporates the above allegations by this reference.

97. It is a violation of Ohio's human trafficking law to "knowingly recruit . . . or knowingly attempt to recruit . . . another person if . . . [t]he offender knows that the other person will be subjected to involuntary servitude." Ohio Rev. Code § 2905.32(A)(1). Victims of a violation may bring a civil claim against the trafficker. Ohio Rev. Code § 2307.51.

17

98. Defendant knowingly recruited Carmen and Class members knowing that they would be subjected to involuntary servitude, in violation of Section 2905.32, as described herein.

99. Carmen and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

100. Carmen and the Class are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## PRAYER FOR RELIEF

101. WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

   a) determining that this action may proceed as a class action under Ohio Civ. R. 23(B)(3);

   b) designating Plaintiff as representative for the Class and designating Plaintiff's counsel as counsel for the Class;

   c) issuing proper notice to the Class at Defendant's expense;

   d) declaring that Defendant committed violations of the TVPA and Ohio's human trafficking law;

   e) awarding damages as provided by the TVPA and Ohio's human trafficking law, including punitive damages;

   f) awarding reasonable attorneys' fees and costs as provided by law; and

   g) granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR A JURY TRIAL

102. Plaintiff, pursuant to Ohio Civ. R. 38(B), demands a trial by jury.

Respectfully submitted,

Dated: March 16, 2020

**BARKAN MEIZLISH DEROSE WENTZ MCINERNEY PEIFER, LLP**

By: *Robert E. DeRose*
Robert E. DeRose (OH Bar No. 0055214)
bderose@barkanmeizlish.com
250 East Broad Street, 10th Floor
Columbus, OH 43215
Phone: (614) 221-4221
Fax: (614) 744-2300

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362*
aprakash@nka.com
Charles A. Delbridge, MN Bar No. 0386639*
cdelbridge@nka.com
Nicole J. Schladt, MN Bar No. 0400234*
nschladt@nka.com
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

**DONATI LAW**

Bryce Ashby, TN Bar No. 026179*
bryce@donatilaw.com
1545 Union Avenue
Memphis, TN 38104
Phone: (901) 209-5500

*pro hac vice* motion forthcoming

*Attorneys for Plaintiff and the Putative Class*