## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**NOVIE DALE CARMEN, et al.,**

     **Plaintiffs,**

                            **Case No. 1:20-cv-313**

     **v.**                    **JUDGE DOUGLAS R. COLE**

**HEALTH CAROUSEL, LLC,**

     **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on Defendant Health Carousel, LLC's ("Health Carousel") Motion to Dismiss Plaintiff Novie Dale Carmen's ("Carmen") Amended Complaint and to Strike Carmen's Class Allegations contained in that Amended Complaint. (Doc. 12). For the reasons set forth below, the Court **DENIES** Health Carousel's Motion to Dismiss and **DENIES** Health Carousel's Motion to Strike, albeit on relatively narrow grounds. In short, the Court concludes that the issues that Health Carousel presents in its Motions are more appropriately addressed at the summary judgment and class certification stages, when the factual record is more fully developed. The Court also **DENIES AS MOOT** Health Carousel's earlier Motions to Dismiss and Strike (Doc. 5) as directed at Carmen's Original Complaint. (Doc. 1-1).

## BACKGROUND

This putative class action challenges the legality of Health Carousel's labor recruiting practices. More specifically, Carmen claims that Health Carousel engaged

in "human trafficking," as that term is defined in 18 U.S.C. § 1589 and "involuntary servitude," as defined in O.R.C. § 2905.32.

## A. Health Carousel Recruits Foreign Nurses Like Carmen And Places Them In American Health Facilities.

Health Carousel is a recruiting and staffing company headquartered in Hamilton County, Ohio, that enlists foreign nurses, primarily from the Philippines, to work in healthcare facilities across the United States. (Carmen's First Am. Compl., Doc. 11, ("Compl."), ¶¶ 1, 9, #134–35). The healthcare facilities that employ the nurses pay Health Carousel an amount in excess of the nurse's hourly wages. (*Id.* at ¶ 11, #136). Health Carousel then pays the nurses the wages to which they are entitled, keeping the difference for itself. (*Id.*). As the description suggests, the amount of return that Health Carousel generates for a given nurse depends on how many hours that nurse works through the auspices of the Health Carousel program.

The nurses receive several benefits from Health Carousel in exchange for their participation in the arrangement. Beyond the obvious benefit of placing the nurses in a job, Health Carousel also sponsors the nurses' permanent U.S. resident visa petitions; pays related expenses, including examination, filing, and attorney's fees; pays airfare to the United States; provides free temporary housing in the United States; pays cash bonuses when participating nurses arrive in the United States; and provides medical benefits and life insurance. (Emp. Cont., Doc. 1-2, #30, 36).

Those benefits last, however, only while the nurse is employed through Health Carousel. So, for example, if a nurse is residing in Health Carousel-supplied housing, that nurse must leave such housing within 48-hours after her last shift as a Health

2

Carousel employee. (*Id.* at #35). Health Carousel calls its business model the "Passport USA" program. (Compl., ¶¶ 11, 13, #136).

Each nurse executes two agreements as part of this business arrangement. The first is a form contract, the "Employment Contract,"[1] which each foreign nurse signs to initiate her employment relationship with Health Carousel. (*Id.* at ¶ 13, #136). As this agreement is executed before Health Carousel begins the visa process, nurses will almost always sign this contract while still abroad.

As relevant to this case, the Employment Contract includes four provisions that set forth a participating nurse's obligations. First, the contract contains a "Commitment Period" provision. This term requires the participating nurse to work "for a period of time commencing upon the completion of [the nurse's] orientation … *and* becoming fully licensed and ending upon the later of (i) 36 months or (ii) 6,240 regular-time work hours." (Emp. Cont., Doc 1-2, #31; *Id.*, Exs. A & B, #35, 38). In other words, the period starts upon the later of orientation or licensure, and then continues for at least three years of 52-week-per-year, forty-hour work weeks (i.e., 3 x 52 x 40 = 6,240). Moreover, any hours of overtime do not count toward the 6,240-hour target. And, if a nurse takes any vacation, of course, that time off likewise will not accrue any hours in regard to the contractually-specified Commitment Period.

---

[1] The Court can properly consider both the Handbook (Doc. 12-1) and the Employment Contract (Doc. 1-2) as part of this motion to dismiss because Carmen referred to both documents in her Complaint and those documents are central to her TVPA claims. *See Hivner v. Active Elec., Inc.*, 878 F. Supp. 2d 897, 901 (S.D. Ohio 2012) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)).

Second, each Employment Contract contains an "Exclusivity" provision. Here, a participating nurse acknowledges that Health Carousel will invest "a significant amount of time, effort, and money" into the participating nurse's licensing and visa processing. Based on that, the nurse agrees not to seek sponsorship or accept any employment in the United States from another company, without Health Carousel's written consent, before that nurse has fulfilled his or her obligations under the Employment Contract. (*Id.* at #31).

Third and relatedly, each Employment Contract contains a non-compete and non-solicitation clause. This term prohibits a nurse from "seek[ing] employment … with any other healthcare provider within 50 miles of [the nurse's] Client facilities for one year after [the date the nurse leaves Health Carousel if the nurse violated the terms of the Employment Contract]." (*Id.* at #32). A nurse who left Health Carousel before the end of the Commitment Period, for example, would trigger this non-compete obligation.

Fourth and finally, each of Health Carousel's Employment Contracts contains a "Breach Obligation" provision. This clause states that, in the event of a given nurse's breach, "[the nurse] agree[s] that damages sustained by Health Carousel … are impossible, or at least very difficult, to estimate accurately and, for that reason, [the nurse] agree[s] that the [liquidated damages] amount is a reasonable forecast of fair compensation for any such breach." (*Id.*). The Employment Contract does not specify a dollar figure for the liquidated damages, but rather sets forth a list of expenses and potential lost profit items that both parties agree will be used to

4

determine the liquidated damages amount in a given case.[2] And rather than provide a precise computation, the term merely states, if the nurse breaches the Employment Contract, the nurse "shall pay the liquidated damages to be agreed upon and shall be settled amicably by the parties without prejudice of filing the case in the proper court." (*Id.*).

But the Employment Contract at issue here also includes an Addendum that further amends the Breach Obligation provision. Through the Addendum, the parties agree to a range of specifically identified liquidated damages figures. The applicable figure in each case depends on when the breach occurs in relation to the progress on the nurse's visa application. More specifically, the liquidated damages are set at: $1,000 if the breach occurs before Health Carousel filed for the visa; $10,000 if the breach occurs after filing but before issuance of the visa; and finally, $20,000 if the breach occurs after the issuance of the visa but before the end of the "Commitment Period." (Addendum to Emp. Cont., Doc. 1-2, #29). The Complaint further alleges that Health Carousel amended the Addendum over time to increase the liquidated damages figures for nurses who were recruited later—for example, raising the top amount from $20,000 to $35,000. (Compl. at ¶ 38, #140).

---

[2] Those factors include "(i) exam review, testing and travel expenses; (ii) attorney fees, document filing fees and other miscellaneous fees associated with such visa petition; (iii) pre-employment costs and expenses such as those related to cash or salary advances, relocation and housing arrangements; (iv) the loss of placement income that Health Carousel would have received from its Client(s) for the duration of this Agreement as well as other lost income and revenue resulting from your early termination of employment; (v) the substantial amount of time, effort, and cost that Health Carousel likely would incur in order to recruit, hire, train, and develop a replacement employee; and (vi) other factors relating to Health Carousel's goodwill and the relationship between Health Carousel and its Clients." (Emp. Cont., Doc. 1-2, #32).

Upon arrival in the United States, a nurse receives and signs various agreements that, together, form a 183-page "Employee Handbook." (Employee Handbook, ("Handbook"), Doc. 12-1). The Handbook mostly consists of Health Carousel's workplace policies and employee benefits information. Some of these policies simply notify Health Carousel employees of standard safety practices, like how to react in the case of a fire or how to safely transport a patient. Other policies provide rules that govern the nurse's workplace behaviors. For example, the Handbook prevents nurses from discussing the terms and conditions of their employment and prohibits "gossip" at work. (*Id.* at #316). Still other policies further describe the relationship between Health Carousel and the nurses. The Handbook, for instance, explains that "[a]s long as [a nurse] remain[s] in good standing with Health Carousel, we will continue to be [that nurse's] advocate for immigration purposes." (*Id.* at #213).

The Handbook also revises some provisions in a nurse's earlier Employment Contract. Two of those revisions are relevant to Health Carousel's Motion. First, while the Employment Contract provides that a nurse's "Commitment Period" does not begin until the nurse obtains full licensure, the Handbook explains that "[s]ecuring and maintaining [a] licensure or certification is each [nurse's] responsibility." (*Id.* at § 9.2, #340). Second, the Handbook tweaks the Breach Obligation provision from the Employment Contract. The Handbook does not alter the liquidated damages figures, but it does use different language when describing other consequences that flow from a breach. Specifically, while the Employment

6

Contract provides that the liquidated damages shall be "settled amicably," the Handbook drops that language and states only that any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment. (*Id.* at #282). Further, the Handbook indicates that Health Carousel will file suit and seek damages from any nurse who breaches the Employment Contract and fails to pay liquidated damages. (*Id.*). The Handbook then warns nurses that if they "*leave the country, Health Carousel can still obtain a judgment that will be enforceable abroad.*" (*Id.*).

## B.    Health Carousel Employs Carmen.

Carmen is a citizen of the Republic of the Philippines. She worked there as an emergency-room nurse from approximately 2014 to 2018. (Compl., ¶¶ 8, 18, #135, 137). "Lured" by the opportunity to come to the United States, in late-2014, Carmen contacted Health Carousel about its Passport USA programs. (*Id.* at ¶¶ 19, 20, #137). A few months later, on April 6, 2015, Carmen and Health Carousel executed an Employment Contract. Under the terms of that Contract, Carmen joined Health Carousel's Global Express Program. (*Id.* at ¶ 20, #137).

In her Employment Contract, Carmen agreed to the (1) non-compete agreement; (2) Breach Obligation provision; and (3) Commitment Period. The Addendum in her agreement specified that Carmen would owe $20,000 in liquidated damages if "[e]arly termination occurs after the issuance of [her] visa but prior to completing [her] Commitment Period." (Emp. Cont., Doc. 1-2, #29).

7

After Carmen executed her Employment Contract, nearly three years passed before she received the visa that she needed to enter the United States. Carmen arrived in this country on January 17, 2018. (*Id.* at ¶ 23, #138). The day after her arrival, Health Carousel presented Carmen with the Handbook, and required her to sign it at the time that she received it. (Compl., ¶ 26, #138). Carmen alleges that many of the terms in the Handbook "surprised" her, including, for example, the Handbook's threat to litigate if Carmen breached the agreement. (*Id.*). In any event, Carmen signed the Handbook and began working at The University of Pittsburgh Medical Center ("UPMC") in Muncy, Pennsylvania, less than a month later, i.e., the second week of February 2018. (*Id.* at ¶ 27, #138). Carmen officially became a Health Carousel employee on her first day of work with UPMC Muncy. (Emp. Cont., Doc. 1-2, #35).

When Carmen began at UPMC, she had not yet obtained her permanent nursing license from Pennsylvania, but instead was working under a temporary license. (*Id.* at ¶ 33, #139). According to Carmen, from May to August 2018, Health Carousel communicated with Pennsylvania's licensing agency without including Carmen in those communications. (*Id.* at ¶ 33, #139). Carmen claims that Health Carousel strategically left her out of the loop so that it could delay the licensing process in an effort to "extract as much work as possible from Carmen." (*Id.* at ¶ 34, #139). Pennsylvania officially awarded Carmen her full and permanent nursing license in August 2018. (*Id.*). Given that the Commitment Period provision in her Employment Contract only began to run when Carmen was fully licensed, Carmen's

work before August 2018 did not count against her Commitment Period, although it did benefit Health Carousel. (*Id.* at ¶¶ 32, 33, #139).

## C.    Carmen Leaves Health Carousel.

Not long after Carmen began working for Health Carousel, she learned that her colleagues who were working directly for UMPC (i.e., not through Health Carousel) were earning more than her. (Compl., ¶¶ 26, 27, #147). Her salary, among other factors, led Carmen to conclude that she wished to terminate her employment with Health Carousel.

Carmen claims that the terms in Health Carousel's contracts, however, forced her to continue working. Her first, and apparently most pressing, concern was that Health Carousel would sue her for $20,000 in liquidated damages under the Breach Obligation provision of her Employment Contract if she left her position before the expiration of the Commitment Period. (*Id.* at ¶¶ 52, 54, #143). Second, Carmen alleges that she felt forced to continue working for Health Carousel because the non-compete in her Employment Contract limited her employment options. (*Id.* at ¶¶ 55, 56, 61, #143–44).

Finally, Carmen claims that she hesitated to terminate her employment because the Handbook "implies" that any nurse who leaves before the end of the Commitment Period will suffer adverse immigration consequences. (*Id.* at ¶¶ 72–75, #146–47). The relevant section of the Handbook states "[a]s long as you remain in good standing with Health Carousel, we will continue to be your advocate for immigration purposes." (Handbook at #213). Carmen reasons that the opposite is also

9

true: that if she leaves early, Health Carousel will try to send her back to the Philippines.

Despite her claimed fears, Carmen terminated her employment with Health Carousel in November 2019. (*Id.* at ¶ 82, #148). At the time she quit, Carmen had worked for Heath Carousel for 22 months—i.e., since February 2018. As Carmen did not gain her full license until August 2018, only about sixteen of those months counted toward Carmen's three-year Commitment Period. When Carmen left, she borrowed $20,000 from her boyfriend to pay Health Carousel the liquidated damages for her early termination due under both the Employment Contract and the Handbook. (*Id.* at ¶ 82, #148). Carmen alleges that she has experienced hardship, stress, anxiety, guilt, and depression as a result of having to borrow this money from her boyfriend. (*Id.* at ¶ 83, #148). At some point after paying Health Carousel, Carmen moved to Hershey, Pennsylvania, where she found a nursing job that pays more than her old position at Health Carousel. (*Id.* at ¶ 87, #149).

**D.     Carmen Brings This Putative Class Action, And Health Carousel Moves Both To Dismiss The Action And To Strike The Class Allegations.**

Carmen brings this action against Health Carousel alleging that Health Carousel violated the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, *et seq.*, and Ohio's human trafficking law, Ohio Revised Code § 2905.32. In addition to her own claims, she sues on behalf of a putative class that she defines as "[a]ll nurses [who] entered the United States through [Health Carousel]'s Passport USA program and paid a financial penalty within the ten years prior to the filing of this

10

action in order to be released from their employment with or through [Health Carousel]." (Compl., ¶ 91, #149).

Carmen originally sued in the Hamilton County Court of Common Pleas. Health Carousel then removed the case to this Court on April 20, 2020, and immediately filed a Motion to Dismiss the Complaint and Strike the Class Allegations. (Doc. 5). About two weeks later, on May 6, 2020, Carmen filed an Amended Complaint. (Doc. 11). Two weeks after that, on May 20, 2020, Health Carousel filed its Motion to Dismiss the Amended Complaint and to Strike the Class Allegations. (Doc. 12). The Court held oral argument on the later Motions to Dismiss and Strike on August 7, 2020. (Doc. 18). Those Motions are now fully briefed and ripe for resolution.

## DISCUSSION

### A. Carmen Has Plausibly Alleged That Health Carousel Violated The Trafficking Victims Protection Act.

The Trafficking Victims Protection Act ("TVPA") provides both criminal and civil liability to anyone who "knowingly … obtains the labor or services of a person by … threats of serious harm … or by means of the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589 (a)(2)–(3). The TVPA broadly defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." § 1589(c)(2). The Act also defines "abuse of law" as "the

11

use or threatened use of a law or legal process … in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person." § 1589(c)(1). In short, the TVPA makes it illegal for a company like Health Carousel to leverage serious financial pressure or threats of inappropriate legal action against Carmen in a way that would press a reasonable nurse in her position into its service.

The TVPA casts a wide net, criminalizing and providing civil penalties even for those who merely associate, or attempt to associate, with human trafficking as defined above. For example, the TVPA prohibits anyone from "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture" which is illegal under the statute. § 1589(b). Similarly, the TVPA makes it illegal to "knowingly recruit … or obtain[] by any means, any person for labor or services in violation" of the Act. § 1590(a). Any person who *attempts* to violate any of these prohibitions is also liable as though he or she had actually violated that section. § 1594(a).

Carmen's Complaint sets fourth four counts under the TVPA. Count I, which forms the basis of Carmen's claim, is that, through abuse of legal process and threats of non-physical harm, Health Carousel compelled Carmen to provide nursing services against her will in violation of 18 U.S.C. § 1589(a). (Compl., ¶¶ 101–08, #152–53). The other three counts stem from this first count: Count II alleges that Health Carousel knowingly benefited from a violation of the TVPA (*id.* at ¶¶ 109–14, #153–54); Count III alleges that Health Carousel knowingly recruited Carmen in violation of the TVPA (*id.* at ¶¶ 115–19, #154); and Count IV alleges that Health Carousel

12

attempted to violate the TVPA (*id.* at ¶¶ 120–24, #155). All four claims turn on whether the conditions of Carmen's employment violated the TVPA.

At this stage of the litigation, of course, Carmen does not need to *prove* that Health Carousel employed unlawful financial or legal pressure. Rather, under Federal Rule of Civil Procedure 8(a)(2), Carmen need only make a "short and plain statement of the claim showing that [she] is entitled to relief." This "short and plain statement" requirement, in part, serves a notice function, alerting Health Carousel not only to the nature of the claim against it, but also to the "grounds upon which [the claim] rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). As part of Carmen's obligation to provide notice of the "grounds" for relief, her Complaint must include "[f]actual allegations" that are "enough to raise a right to relief above the speculative level." *Id.* These factual allegations must support a claim that is "plausible on its face." *Id.* at 570. In sum, then, Carmen must provide sufficient facts to make out a plausible claim that Health Carousel obtained her services in violation of the TVPA.

Carmen presents several facts in an attempt to establish plausibility. For example, she points to: (1) the $20,000 liquidated damages provision; (2) the non-compete agreement; (3) Health Carousel's policy of retracting temporary housing within 48 hours of a nurse's last shift; (4) the disputed clarity of the Commitment Period; (5) Health Carousel's allegedly purposeful delay in obtaining Carmen's permanent license; (6) Health Carousel's allegedly hidden litigious nature; (7) Health Carousel's "isolating" no-gossip policy; and (8) the "implied threat" that Health

13

Carousel would advocate for negative immigration outcomes if Carmen left. For her Complaint to move forward, Carmen must show that these facts, considered either separately or in combination, suffice to plausibly show that a reasonable immigrant in Carmen's position would feel a threat of "serious harm" if she were to leave Health Carousel. *United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011); *see also* 18 U.S.C. § 1589 (c)(2) (requiring courts to consider "all the surrounding circumstances" in evaluating serious harm).

In terms of that assessment, there are certain things on which the parties agree. For example, no party disputes that financial pressure, including the threat of financial harm, could constitute "serious harm" within the meaning of the TVPA. 18 U.S.C. § 1589 (c)(2); (Oral Arg. Tr., Doc. 18, #515). That being said, there are all sorts of financial pressures that can arise in the employment setting, and not all of them serve to establish a TVPA violation. Start with the easy example—if a person leaves a job, the employer typically stops paying that person. That is a "financial harm" to the (now-former) employee in some sense. And it may well be that the threat of losing one's paycheck is "sufficiently serious" to "compel a reasonable person" to keep working a job that she does not like. *See* 18 U.S.C. § 1589(c)(2). But no one would suggest—or at least no one should suggest—that an employer violates the TVPA simply by refusing to continue paying employees who have quit. Rather, to constitute "financial harm" under the TVPA, the threatened harm must be in some way improper or illicit.

14

Employment contracts can complicate, rather than simplify, the analysis. As a general matter, "involuntary servitude" refers to situations where an employee is not free to leave her employment. But all contracts—at least all contracts with a stated duration—have that effect to some extent. When an employee signs a contract, the employee undertakes various obligations, including promissory obligations that may make it difficult for the employee to later leave that job. To be sure, the employee also receives benefits (including promises of future benefits) in exchange, but no one can dispute that a contract may make it more difficult for an employee to leave a position. Still, reading the TVPA as prohibiting *any* contractual limitations that might impact an employee's ability to leave her job would be absurd. For example, it is difficult to conceive that a corporate CEO who has a $10 million annual salary under an employment contract that forbids her from taking employment with a competitor in the industry for some period of time after leaving her current employer, thereby arguably "capturing" her in her current role, would constitute a human trafficking victim.

At the same time, Health Carousel's argument—that a freely entered contract, because it is voluntary, can *never* serve as the basis for a TVPA claim—also seems wrong. Contracts sometimes contain exit terms that are so one-sided or egregious that a reasonable person may feel compelled to remain in a position out of a fear of the consequences that will follow if the employee leaves. Imagine, for example, if the contract at issue here contained a $500,000 liquidated damages provision. To be sure, such a provision, or sufficiently egregious provisions of *any* type, may well be

15

unenforceable as a matter of contract law. But a foreign citizen recruited to a job opportunity in this country may not have a deep (or any) understanding of the legal system or their rights under that system, and thus might not anticipate that unenforceability. As a result, the *in terrorem* effect of such a provision may well provide a form of "compulsion" for that foreign citizen to remain in their job, no matter how distasteful that job has become to them.

As this discussion suggests, distinguishing between contract provisions that merely impose a hardship on an employee, on the one hand, versus those that may constitute "compulsion" under the TVPA, on the other, can lead to difficult line drawing exercises. To be sure, in many cases a financial consequence spelled out in a contract will not violate the TVPA. Take, for example, *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015). In *Panwar*, two foreign physical therapists alleged that a $15,000–$20,0000 liquidated damages clause in their employment contract was a financial harm that violated the TVPA. *Id.* at *3. The court disagreed (although it is perhaps worth noting that it did so on a motion for summary judgment). In doing so, the court highlighted the tension between the plaintiff's claim of a "forced labor scheme" under the TVPA, and the fact that the therapists "voluntarily entered into the employment contracts." *Id.* "The contract terms were plainly written, … the liquidated damages provision was … conspicuous … and [the therapists] understood the agreements and their obligations under the agreements, including the consequences of early termination." *Id.*

Therefore, the *Panwar* Court concluded, the "bona fide liquidated damages provision" did not violate the TVPA. *Id.* at *4.

But it would overread *Panwar* to suggest that the court's conclusion there means that, as a matter of law, a liquidated damages provision can never violate the TVPA. To the contrary, the court's observation that it was a "bona fide liquidated damages provision" mattered. Indeed, the court specifically noted that the liquidated damages provision at issue was "lawful under both the H-1B [immigration] regulations and under Indiana law." *Id.* Further, both *Panwar* employees fully "understood … their obligations under the [legal] agreements," and the employer had itself acted in accordance with the terms of the agreement. *Id.* at *3.

Where those characteristics are not present, courts have found that the financial consequences a contract imposes on leaving can be so egregious that they run afoul of the TVPA. In *Carter v. Paschall Truck Lines, Inc.*, 324 F. Supp. 3d 900 (W.D. Ky. 2018), for example, the employees at issue leased their trucks from Paschall Truck Lines. The terms of employment required that each truck driver work only for Paschall, and if the employee violated that agreement, Paschall required the employee to immediately pay the entire remaining balance of the lease, which could amount to over $100,000. *Id.* at 903–04. The Court denied a motion to dismiss, finding that this potential financial harm was "sufficiently serious" to state a plausible TVPA claim. *Id.* at 915–16.

Other courts have held that even smaller financial consequences can constitute "serious harm" for TVPA purposes. For example, in *Javier v. Beck*, the Southern

District of New York held that a complaint alleged a plausible TVPA violation when an employer "threatened to enforce a $15,000 confession of judgment if [the employee] left," and the $15,000 damages figure "represented six months' gross wages at [the employee's] … pay rate." No. 13cv2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014). The Eastern District of New York came to a similar conclusion in *Paguirigan v. Prompt Nursing Employment Agency, LLC*, 286 F. Supp. 3d 430, 438–39 (E.D.N.Y. 2017). There, the Court held that the defendant's attempt to enforce a $25,000 contract termination fee, even though the New York state court had found that fee unenforceable, might violate the TVPA. *Id.* These cases suggest that it is not the amount of liquidated damages, per se, that controls the analysis. Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances—such as the enforceability of the term, or the employee's pay rate, or other aspects of the arrangement. *See id.* at 439 (considering the enforceability of the damages); *see also Javier*, 2014 WL 3058456, at *6 (considering the employee's pay rate).

Beyond cases where the employment contract expressly imposes financial consequences for leaving employment, courts have also found that TVPA violations can arise when the financial consequences that the employer seeks to impose, or other aspects of the employment, are not as described in the contract—what one might refer to as bait-and-switch situations. For example, in *Dann*, the defendant brought a Peruvian national to the United States to serve as a nanny and housekeeper, promising to pay her $600 per month. 652 F.3d at 1163. Although the nanny worked

continuously caring for the defendant's home and her three children, the defendant never made good on her promise to pay. The nanny worked for a year and a half without pay until she announced that she wanted to return to Peru. *Id.* at 1165. After a "heated argument," the defendant agreed to send the nanny back to Peru, but only after the nanny paid her $8,000 for the nanny's food, room, and clothes. *Id.* To avoid this harm, the nanny agreed to stay in the defendant's household. The court held that this unexpected bill was "financial harm" within the meaning of the TVPA. *Id.* at 1171.

The Central District of California found that a similar bait-and-switch tactic violated the TVPA in *Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011). There, two Filipino math teachers paid a non-refundable recruitment fee of $5,000 to have the defendant bring them to the United States for work. *Id.* at 1138. Once the teachers had received their visas, the defendant announced to the teachers for the first time that they would have to pay $10,000 in additional fees or they would both forfeit their original fee and not get to come to the United States. *Id.* This put the teachers in a difficult situation: either take on additional debt or absorb the $5,000 in sunk costs. As $5,000 is over 1.5 times the average household income in the Philippines, the teachers had only one tenable way out: to agree to the additional fees and come to work for the defendant to pay off the debt. *Id.* at 1144. This labor practice violated the TVPA, the court concluded, because it "created a situation where ceasing labor would cause [the teachers] serious harm." *Id.* at 1145.

In short, it is not the existence or non-existence of an employment contract that controls. Rather, the key questions relate to the substantive terms of the alleged contract (e.g., are they too one-sided?), as well as the parties' conduct in the formation and performance of the agreement. Indeed, in some ways, it is not unlike the contractual unconscionability framework, which also has both a substantive and procedural component. *Whirlpool Corp. v. Grigoleit Co.*, 713 F.3d 316, 321 (6th Cir. 2013) (Michigan law); *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (California law); *Eastham v. Chesapeake Appalachia, LLC*, 754 F.3d 356, 365 (6th Cir. 2014) (Ohio law). But unlike the unconscionability analysis, in which a plaintiff is typically required to show *both* procedural and substantive unconscionability to obtain unenforceability, case law suggests that either substantive or procedural shortcomings may be enough to satisfy the standard for "serious harm" for TVPA purposes, at least if those shortcomings are sufficiently egregious.

Carmen alleges both forms of harm here. Let's start with alleged procedural shortcomings. Carmen alleges that Health Carousel engaged in several types of bait-and-switch behavior. Of particular importance to this Motion, Carmen alleges that Health Carousel misrepresented information concerning the start and scope of her Commitment Period. The Employment Contract states that the Commitment Period does not start until "the completion of [the nurse's] orientation … *and* [the date that nurse becom[es] fully licensed." (Emp. Cont., Doc. 1-2, #31; *id.*, Exs. A & B, #35, 38). The Employment Contract also specifies that only "regular-time work hours" count against the Commitment Period clock. (*Id.*). Later, the Handbook explains that

"[s]ecuring and maintaining [a] licensure or certification is each [nurse's] responsibility." (Handbook, §9.2, #340).

Carmen says that, when she arrived in the United States, Health Carousel began to impose additional, and importantly, previously undiscussed, conditions onto her obligations during this Commitment Period. First, Carmen claims that, contrary to the Handbook's admonition that obtaining a license would be Carmen's responsibility, Health Carousel in fact took control of the licensing process, and then purposefully delayed the process in an effort to "extract as much work as possible from Carmen that would not count toward her" Commitment Period. (*Id.* at ¶¶ 32–34, #139). Specifically, Carmen alleges that, in May 2018, she "learned that [Health Carousel] has been communicating about [her] full license with the licensing agency without including Carmen in those communications." (*Id.* at ¶ 33, #139). Further, "[t]hough [Health Carousel] was in contact with the licensing agency, it had not sought or obtained Carmen's full license." (*Id.*). Carmen then says that she tried to intervene to expedite the process, but Health Carousel ignored her and "continued to delay the process." (*Id.* at ¶ 34, #139). Second, and relatedly, Carmen alleges that Health Carousel never indicated that she would be required to work significant overtime (recall that this overtime creates a benefit for Health Carousel, but does not count toward Carmen's Commitment Period). (Compl., ¶ 30, #139).

These facts, if true, bear at least some resemblance to the bait-and-switch tactics in *Dann* and *Nunag-Tanedo*, both of which involved a plausible claim under the TVPA. The nanny in *Dann* came to the United States to work for $600 per month,

21

but, later, the employer not only refused to pay, but also demanded an unexpected $8,000 from the nanny before she could leave. 652 F.3d at 1171. Similarly, the employer in *Nunag-Tanedo* forced the foreign teachers to take on additional debt, which the teachers "could not possibly repay absent continued employment by the school districts." 790 F. Supp. 2d at 1144. The common denominator in these cases is that an employer cannot create ever-evolving obligations in an effort to trap an employee into providing additional services to the employer. Carmen alleges that Health Carousel did that by creating additional hurdles to prevent her from completing her Commitment Period, while at the same time reconfiguring the job (through compelled overtime) to increase the benefit that Health Carousel would receive during the pendency of that Commitment Period.

It bears noting, of course, that this Court is not saying that Health Carousel in fact *did* delay Carmen's licensing process, or even that Health Carousel controlled that process in any way. Nor has Carmen established that Heath Carousel did in fact mislead her about overtime, or that she was even forced to work such overtime. But discovery and a factual record, not argument in a motion to dismiss, is the proper means to address such factual uncertainties.

The same is true of Carmen's allegations of substantive egregiousness. On that front, Carmen points to the liquidated damages provision, claiming that it is a "penalty" designed to compel nurses to stay for the entire Commitment Period. (Compl., ¶ 38, #140). Health Carousel claims that the liquidated damages provision cannot serve as the basis for Carmen's TVPA claim because it is "enforceable, and

22

Carmen freely consented to that provision when she entered the Contract." (Mot. to Dismiss, Doc. 12, #184). But as *Paguirigan*, *Javier*, and *Carter* illustrate, an employer cannot escape TVPA liability merely because the employee "agreed" to the term in their employment contract. Rather, the Court must evaluate the effect of the damages provision in the context of "all the surrounding circumstances," as applied to a reasonable person in the plaintiff's position. 18 U.S.C. §1589. At this point, it is unclear whether Health Carousel's $20,000 liquidated damages provision is akin to the permissible financial consequence in *Panwar*, or more like the problematic penalties in *Paguirigan*, *Javier*, and *Carter*.

The parties dispute, for example, whether the liquidated damages provision is valid under Ohio law. (*See, e.g.*, Compl., ¶ 47, #142 (asserting that the term "is not a valid liquidated damages provision under Ohio law")). The answer to that question may impact the TVPA analysis. *Compare Panwar*, 2015 WL 1396599, at *4 (finding that a liquidated damages provision did not violate the TVPA when it was "lawful … under Indiana law"), *with Paguirigan*, 286 F. Supp. 3d at 439 (finding a plausible TVPA claim when an employer attempted to enforce a liquidated damages provision against an employee "even after the New York Supreme Court found the fee unenforceable"). But, under Ohio law, the answer to that question depends heavily on the facts surrounding a given contract. *Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E. 2d 392, 394 (Ohio 1984) ("Whether a particular sum specified in a contract is intended as a[n unenforceable] penalty or as [an enforceable] liquidated damages

[provision] depends upon the operative facts and circumstances surrounding each particular case."). And discovery is necessary to assess those facts.

In sum, the Court concludes that Carmen has alleged enough to get past the motion to dismiss stage in this case. Whether she can prevail on her TVPA claim is an entirely different question, but not one the Court is currently in a position to answer, absent a more well-developed factual record.

## B.    Carmen Has Plausibly Alleged That Health Carousel Violated The Ohio Human Trafficking Statute.

Ohio's human trafficking law prohibits both sex trafficking and labor trafficking. *Ohio v. Brown*, 134 N.E.3d 783, 795 (Ohio Ct. App. 2019). On the labor trafficking front, the statute makes it unlawful for any person to "knowingly recruit, lure, entice, isolate … or maintain, or knowingly attempt [any of those actions] … if … [t]he offender knows that the other person will be subjected to involuntary servitude." O.R.C. § 2905.32(A)(1). Like the TVPA, Ohio's human trafficking law is primarily a criminal statute that also provides for civil liability. *See* O.R.C. § 2307.51(A) (creating a private right of action for victims of trafficking for "harm that resulted from the violation of section 2905.32 of the Revised Code").

The Ohio human trafficking law requires a showing that the offender pressed the victim into "involuntary servitude," which the statute defines as a situation where the victim is "compelled to perform labor or services for another against one's will." O.R.C. § 2905.31(A). The "compulsion" element does not require an express or executed threat. O.R.C. § 2905.32(B). Rather, a plaintiff can establish "compulsion"

with evidence that "the victim's will was overcome by force, fear, duress, intimidation, or fraud." *Id.*

As relevant here, Ohio's human trafficking law expressly contemplates that "fraud," which leads to "compelled … labor," could establish a claim. Carmen's Complaint satisfies both the fraud and compelled labor elements. On the fraud front, Carmen alleges that Health Carousel purposefully delayed her full licensure despite its representations in the Handbook that Carmen, as the employee, would get to control the licensing process. (Handbook, #340 ("[s]ecuring and maintaining [a] licensure or certification is each [nurse's] responsibility")). Not only that, but Carmen also alleges that Health Carousel attempted to deceive her throughout the licensing process. In May 2018, Carmen says that she "learned that [Health Carousel] had been communicating about Carmen's full license with the licensing agency without including Carmen in those communications." (Compl., ¶ 33, #139). According to the Complaint, when Carmen tried to intercede to "expedite the process," Health Carousel ignored her, and continued to control the licensing procedure behind Carmen's back. (*Id.* at ¶ 34, #139). As for the "compulsion" point, Carmen claims that Health Carousel delayed her licensure with the intent to obtain additional months of service (by expanding the Commitment Period). These allegations create a plausible violation of the Ohio human trafficking law.

Health Carousel's arguments to the contrary focus primarily on the compulsion argument. Specifically, Health Carousel claims that Carmen cannot show compulsion because she "concedes that she both *freely entered* and *freely terminated* the

employment relationship with Health Carousel." (Mot. to Dismiss, Doc. 12, #200). As support, Health Carousel cites *Ross v. Jenkins*, a rare case interpreting Ohio's human trafficking law in the civil context. 325 F. Supp. 3d 1141, 1161 (D. Kan. 2018). *Ross* involved egregious levels of coercion. The offender in that case forcibly transported the victim to the United States, and then forced her to work long hours both as a waitress and as a housekeeper for no pay. *Id.* at 1166.

Health Carousel contends that Carmen's employment cannot be coercive under the Ohio human trafficking law because it "bears no resemblance" to the employment situation at issue in *Ross*. The problem with that argument is that *Ross* merely provides *an example* of conduct that violates Ohio's human trafficking law; the case does not purport to set the minimum level of coercion necessary to state a claim.

In short, while Health Carousel is correct that the alleged facts arguably appear to show that Carmen voluntarily chose to join, and then voluntarily chose to leave, her employment with Health Carousel, those facts do not render her claim invalid as a matter of law. Rather, the issue at this stage of the proceedings is whether Health Carousel attempted, or succeeded, to use fraudulent means to compel Carmen into extending the length of her employment. She has plausibly alleged that Health Carousel did. Whether that is in fact true is once again a question better answered after discovery.

**C.     The Court Denies Health Carousel's Motion To Strike Carmen's Class Allegations.**

To obtain class certification in federal court, claimants must satisfy three requirements. The first, and threshold requirement, is that claimants provide a class definition that is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012) (quotation omitted). Next, the claimant must meet the dual requirements of Fed. R. Civ. P. 23, the federal rule which governs class actions. Specifically, the claimant must show "(1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions provided for by Rule 23(b)." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945–46 (6th Cir. 2001). A failure on any of these fronts "dooms the class." *Id.* at 946.

Before considering those issues, though, there is the threshold matter of timing. Rule 23 requires the Court to determine "whether to certify the action as a class action" at "an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). Federal Rule of Civil Procedure 12(f), meanwhile, authorizes the Court to "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." "The function of the motion [to strike] is to 'avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with' them early in the case." *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 575 (M.D. Tenn. 2020) (quoting *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015)).

27

Parties can use a Rule 12(f) motion to attack class certification. But a movant who moves to strike class allegations bears the burden of demonstrating that, "from the face of the ... complaint[,] ... it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Id.* (quoting *Schilling v. Kenton Cnty, Ky.,* No. 10-143-DLB, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011)). In other words, the Court may decide the issue before discovery only if the Court is "'convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claims' succeed in class action form." *Id.* (quoting *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009)). In all other cases, "[t]he court should defer decision on certification pending discovery." *Id.* (quoting *Am. Med. Sys.,* 75 F.3d 1069, 1086 (6th Cir. 1996) (brackets omitted)).

With that in mind, let's turn to Health Carousel's specific challenges to class certification here. That analysis starts with Carmen's proposed class definition:

> All nurses that entered the United States through Defendant's Passport USA program and paid a financial penalty within the ten years prior to the filing of this action in order to be released from their employment with or through Defendant.

(Compl., ¶ 91, #149). Health Carousel argues that this definition is "overbroad," and thus fails to adequately identify the class. (Mot. to Dismiss, Doc. 12, #201–03). A proposed class is overbroad, and thus not adequately defined, "if it 'would include members who have not suffered harm at the hands of the defendant and are not at risk to suffer such harm.'" *Chaz Concrete Co. v. Codell,* No. 3:03-52-KKC, 2006 WL 2453302, at *6 (E.D. Ky. Aug. 23, 2006) (quoting *McGee v. East Ohio Gas Company,* 200 F.R.D. 382, 388 (S.D. Ohio 2001)).

Health Carousel claims that Carmen's proposed class definition is overbroad because it will include those nurses who "did not hesitate to pay the liquidated damages and terminate their employment with Health Carousel before their Commitment Period ended." (Mot. to Dismiss, Doc. 12, #203). The nurses who readily paid the liquidated damages, Health Carousel reasons, did not experience coercion, and thus cannot properly be part of a proposed class in a TVPA action.

But that argument fails to contemplate the TVPA's full breadth. Recall first that the standard under the TVPA is not subjective. The question is whether the conduct at issue would compel a *reasonable person* of the plaintiff's background to continue working. And second, under 18 U.S.C. § 1594(a), an *attempt* is sufficient to establish a TVPA claim. Putting those together, so long as the liquidated damages provision meets the objective compulsion standard, it does not matter if a given nurse did not in fact feel compelled to continue working. And, even if the nurse quit—and thus Health Carousel did not actually obtain any additional labor—that would not necessarily preclude a finding that Health Carousel attempted to do so. Therefore, Carmen's proposed class is not necessarily overbroad, as it includes all nurses in the class who were subject to the potentially coercive measure.

If anything, Carmen's proposed class is potentially underinclusive because it excludes a number of Health Carousel employees who may have experienced coercion for reasons other than the liquidated damages clause. For example, Carmen's proposed class does not mention employees who, like Carmen, allegedly felt compelled to remain with Health Carousel while it purposefully delayed their permanent

licensure. Carmen's exclusion of these nurses, however, might have been a conscious choice designed to avoid the difficulties involved in ascertaining which nurses allegedly experience delays in licensing as a result of Health Carousel's interference in the licensing process.

While ascertainability is met, Carmen also must meet Federal Rule of Civil Procedure 23(a)'s specified prerequisites of numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). In its Motion to Strike, Health Carousel zeros in on the commonality requirement. The commonality element requires that the proposed class members share "questions of law or fact." *Id.* "Although Rule 23(a)(2) speaks of 'questions' in the plural," "there need only be one question common to the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (citing *Am. Med. Sys.,* 75 F.3d at 1080). That said, the commonality requirement demands more than just any shared issue. "[A]t a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Id.* Instead, the commonality requirement looks only for important questions, the answer of which "will advance the litigation." *Id.*

Here, the proposed class members do share at least some common issues of fact and law. Perhaps most notably, the question of whether the liquidated damages provision in the nurses' respective contracts is coercive within the meaning of the TVPA is likely a common issue. The question, after all, is not the actual impact of that term on Carmen, but rather the impact of such a term on a "reasonable person of the same background and in the same circumstances," and it appears likely that

the nurses here may well have similar backgrounds and circumstances. But the existence of one such shared issue is not necessarily dispositive on this element, as Federal Rule of Civil Procedure 23(b)(3) adds an additional wrinkle to the commonality requirement. Specifically, Rule 23(b)(3) requires that, before a court can certify a class under that subsection, the district court must find both (1) that common issues of law or fact "predominate over any questions affecting only individual members"; and (2) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The Court is not in a position to conclude that these latter two elements are met here. The definition of "serious harm" under the TPVA highlights the problem. Under the statute, the Court must analyze "all [of] the surrounding circumstances" in determining whether a reasonable person would feel compelled to perform labor. 18 U.S.C. §1589(c)(2). Here, at least some of those "surrounding circumstances" could vary, at least as to some aspects of Carmen's claim. For example, Carmen alleges that Health Carousel's policy of retracting temporary housing within 48 hours of a nurse's last shift is financially coercive. (Compl., ¶ 72, #146). But that policy is relevant only if the nurse was living in Health Carousel-provided housing at the time of her termination. (*Id.* (noting that a nurse is forced to vacate her home only "if housing has been provided by Defendant.")). Each nurse's living situation may have been different. In fact, Carmen's Complaint suggests that she did not share that experience, because she is "renting" an apartment with her boyfriend. (*Id.* at ¶ 84, #148).

31

That being said, some aspects of Carmen's allegations may be more easily generalizable. She claims, for example, that Health Carousel had a policy of acting to delay licensing, thereby purposefully extending a nurse's Commitment Period. If Health Carousel in fact had such a policy, the TVPA implications of that policy would likely be the same across putative class members, even if the actual amount of delay varied among nurses.

Carmen's allegations of forced overtime likewise fall into this camp. To be sure, in her Complaint, Carmen alleges that her hospital, not Health Carousel, forced her to work overtime (*Id.* at ¶ 78, #147). But Carmen also intimates that such overtime was financially beneficial to Health Carousel (which apparently received a premium for each hour she worked). Thus, it is plausible that Health Carousel had a policy of seeking to place nurses with facilities where extensive overtime was expected, thereby maximizing Health Carousel's return during the Commitment Period (and, as those overtime hours did not count toward satisfying that period, any such overtime premium merely increased the margin that Health Carousel earned on a given nurse placement). Again, the Court notes that, in offering this observation, the Court is not finding that Health Carousel in fact had any such policy, or indeed that Health Carousel did anything that violated the law. At this stage, the Court's job is to assess predominance against the backdrop of the potential legal issues at stake.

At bottom, the Court concludes that Carmen may, or may not, be able to make the requisite showings to establish that class certification is appropriate. But Health Carousel is preemptively seeking to prevent her from even attempting to do so. And

on that front, Health Carousel has not met its burden of showing, as a matter of law, that Carmen will be unable to make the necessary showings. Thus, the Court concludes that the matter of class certification is better resolved on full briefing on the issue after further record development.

*    *    *

The Court's hesitance to grant dismissal, or reach certification, based solely on the pleadings should not be read as suggesting that wholesale discovery on every aspect of this case is necessary, or even appropriate. The parties may well wish to consider the possibility of early motions for summary judgment, or motions opposing class certification, supported by affidavits or documents, as appropriate. But pending further factual information, the Court declines to foreclose further discovery and development of class issues at this juncture.

## CONCLUSION

For the reasons discussed above, the Court **DENIES** Health Carousel's Motion to Dismiss, and **DENIES** Health Carousel's Motion to Strike. (Doc. 12). The Court also **DENIES AS MOOT** Health Carousel's earlier Motions to Dismiss and to Strike Carmen's Original Complaint. (Doc. 5).

**SO ORDERED.**

June 17, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**