# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| Novie Dale Carmen and Jerlin C. Amistoso, individually and as Representatives of the Classes, | Case No. 1:20cv00313 |
| | Judge Douglas R. Cole |
| Plaintiffs, | **PLAINTIFFS NOVIE DALE CARMEN AND JERLIN C. AMISTOSO'S SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| Health Carousel, LLC, | |
| Defendant. | **Demand for Jury Trial** |

Novie Dale Carmen and Jerlin C. Amistoso ("Plaintiffs"), by and through their attorneys and on behalf of themselves, the Classes set forth below, and in the public interest, bring this Class Action Complaint against Health Carousel, LLC ("Defendant" or "Health Carousel"), seeking relief for Defendant's violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq*., Ohio's human trafficking law, Ohio Rev. Code § 2905.32, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, the Ohio Corrupt Practices Act ("OCPA"), Ohio Rev. Code §§ 2923.31-36, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

## INTRODUCTION

1.      This case is about labor trafficking and fraud.

2.      Health Carousel is a labor recruiter that hires nurses, physical therapists, and other healthcare workers primarily from the Philippines to work in healthcare facilities in the United States.

3.      But Health Carousel's "employment" is essentially indentured servitude. Health

1

Carousel mandates that its workers not leave the company for years unless they pay the company tens of thousands of dollars. And the company follows through on its threats by suing workers who dare to leave anyway. The company knows its workers must undergo lengthy orientation sessions and work overtime, but it does not count those hours towards their required employment term, i.e., "commitment period." To make these workers feel even more vulnerable to Health Carousel, Health Carousel isolates them, barring from them discussing their pay or working conditions with others.

4.     Health Carousel maintains its scheme through fraud. It defrauds the United States government, which approves the company's visa petitions without knowing that it routinely fails to pay its workers the prevailing wage it promises. And it defrauds the workers themselves, who arrive in the United States and find themselves subject to unexpectedly harsh employment terms, difficult workplace conditions, requirements that they work for Health Carousel much longer than they initially agreed, and stringent rules designed to isolate and control them.

5.     Health Carousel has profited and continues to profit from its fraudulent scheme. The healthcare facilities at which Defendant places the workers it recruits pay Defendant substantially more than what Defendant pays the workers. Defendant recoups even more money from workers who dare to leave before Defendant determines they have completed their commitment period. This lawsuit seeks to end Defendant's illegal practices and to compensate the victims through three categories of claims.

6.     First, Plaintiffs assert forced labor claims under federal and state law. Employers are not permitted to use or to attempt to use the threat of substantial harm, including financial harm, or abuse of legal process to keep their workers trapped in their jobs. Health Carousel's threat of extraordinary financial penalties, litigation, and immigration consequences violates

federal and state forced labor laws and contravenes the spirit of a competitive labor market to the detriment of Health Carousel's workers and its competitors who play by the rules.

7.      Second, Plaintiffs assert claims under RICO and its state analogue OCPA. Those claims arise from Health Carousel's management and operation of an enterprise of corporate entities engaged in the recruitment and employment of foreign healthcare workers. Plaintiffs allege that Defendant operates this enterprise through a pattern of illegal conduct, including repeated instances of fraud directed at American immigration authorities and recruited foreign workers. Health Carousel's fraud allows it to recruit a constant stream of qualified foreign healthcare workers to whom it pays less than prevailing wage and whom it does not employ on a permanent and full-time basis as is required by applicable immigration regulations.

8.      Third, Plaintiff Carmen asserts a claim under the FLSA based on the penalties Health Carousel required her and other healthcare professionals to pay to leave Health Carousel before their "commitment period" expired. These penalties do not compensate Health Carousel for anything the company did to benefit the employees; rather, Health Carousel uses the money to pay its own business expenses. In other words, the penalties amount to a "kickback" to Health Carousel. The kickbacks reduced the wages paid to Carmen and other similarly situated Health Carousel employees in their final workweek of employment to substantially less than federal minimum wage.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this matter arises under the laws of the United States—specifically, the TVPA, FLSA, and RICO.

10.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendant, and venue is proper in this Court, because Defendant's headquarters are within the Southern District of Ohio.

12.     Plaintiff Carmen originally filed this action in the Court of Common Pleas of Hamilton County, Ohio, and Defendant removed to this Court.

**PARTIES**

13.     Plaintiff Novie Dale Carmen is a Registered Nurse who was formerly employed by Defendant. She is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. She lives in Pennsylvania.

14.     Plaintiff Jerlin C. Amistoso is a licensed physical therapist who was formerly employed by Defendant. She is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. She lives in Colorado.

15.     Defendant is a limited liability company organized in Ohio since 2004, with its headquarters at 3805 Edwards Road, Suite 700, Cincinnati, Ohio 45209.

16.     Defendant has operated and done business in Ohio under various trade names and can be served through its Statutory Agent, Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, OH 43215.

**FACTS**

I.     **DEFENDANT'S BUSINESS**

17.     Health Carousel recruits trained nurses, physical therapists, and other healthcare workers, including speech language pathologists and occupational therapists, from the Philippines and elsewhere, bringing them to the United States, and selling their labor to healthcare facilities. These healthcare facilities often lack sufficient staff to serve the healthcare needs of their communities, so they turn to Health Carousel.

18.     Defendant profits by charging healthcare facilities more for healthcare workers' labor than it pays the workers in wages. Therefore, the longer Health Carousel can make healthcare workers continue to work for it, the more it can profit from their labor. Health Carousel's clients (the healthcare facilities) benefit from the arrangement through, among other things, the labor of expert healthcare workers at a time when providers across the country are facing increasingly serious challenges attracting workers. Defendant and similar companies that recruit foreign healthcare workers can provide labor that is less expensive than domestic travel nurse companies, a common source of healthcare workers.

19.     Defendant recruits foreign healthcare workers with the help of a separate corporate entity, Health Carousel Philippines, Inc. ("Health Carousel Philippines").

20.     Health Carousel Philippines has offices in the Philippines, including in Manila and Cebu City.

21.     Defendant and Health Carousel Philippines are distinct corporate entities.

22.     They also play different roles within the recruitment process. Health Carousel Philippines is principally responsible for recruiting healthcare workers when they are in the Philippines. But Health Carousel Philippines does not itself employ healthcare workers. Instead, Defendant Health Carousel, LLC employs the healthcare workers that Health Carousel Philippines recruited in the United States.

23.     Defendant uses Health Carousel Philippines for its recruitment activities because Health Carousel Philippines is licensed to conduct recruitment activities by the Philippine Overseas Employment Administration ("POEA").

24.     Health Carousel Philippines provides its recruitment services exclusively for Passport USA, a brand of Health Carousel, LLC.

5

25.     Health Carousel operates "Passport USA" through a fictitious name registered with the State of Ohio.

26.     Through the Passport USA program, Defendant recruits and enters into form contracts with international healthcare workers.

27.     Defendant's form contract has remained substantially the same for years.

28.     Under Defendant's form contract, Health Carousel assigns healthcare workers to healthcare facilities that have entered agreements to pay Defendant for the workers' labor.

29.     Defendant's form contract states that Ohio law will govern.

## II.     RELEVANT FOREIGN LABOR CERTIFICATIONS

30.     Employers sponsoring green card workers employed in healthcare occupations under the EB-2 and EB-3 visa categories must make various attestations to the federal government to obtain those workers.

31.     EB-2 and EB-3 visas are employment-based green cards for foreign nationals who perform work not of a temporary or seasonal nature for which qualified workers are not available in the United States.

32.     In obtaining the required Department of Labor ("DOL") employment certification to obtain an EB-2 or EB-3 green card visa, an employer must typically complete and sign Form ETA-9089 and obtain DOL certification that there are no U.S. workers willing and capable of doing the job before then petitioning the United States Citizenship and Immigration Services ("USCIS") to seek such a visa.

33.     For certain occupations, DOL has predetermined there are insufficient U.S. workers who are willing and capable. These occupations are referred to as "Schedule A" occupations and include nurses and physical therapists.

6

34.     Thus, when petitioning for green card visas for workers in "Schedule A" occupations, petitioners file the Form I-140, Immigrant Petition for Alien Workers and the ETA-Form 9089 directly with USCIS.

35.     As part of Form 9089, the employer must attest that the employer will pay at least the prevailing wage, which is determined by the DOL based on the "average wage paid to similarly employed workers in a specific occupation in the area of intended employment." The purpose of the prevailing wage requirement is to ensure that the hiring of a foreign worker will not adversely affect the wages and working conditions of U.S. workers comparably employed.

36.      The employer must also attest that the employer will be able to place the green card worker on payroll on or before the date of proposed entry into the United States.

37.     The employer must certify that the job opportunity's terms, conditions and occupational environment are not contrary to federal, state, or local law.

38.     Additionally, when petitioning for a green card visa for Schedule A occupations, a petitioner attests that the job opportunity involves full-time and permanent employment, meaning that it will employ the beneficiary full-time, guarantee a full-time wage, and pay them that wage.

## III.     RECRUITMENT, HIRING, AND WORK CONDITIONS

### A. Carmen, Amistoso, and other healthcare workers come to work for Defendant.

39.     Carmen is an experienced Registered Nurse. She had worked as a nurse in an emergency room setting for four years in the Philippines prior to immigrating to the United States.

40.     Amistoso is an experienced licensed physical therapist. She worked in the Philippines for ten years prior to immigrating to the United States.

41.     Carmen and Amistoso, like many healthcare workers in the Philippines, wanted to

7

come to the United States for a better life. Lured by that possibility, Carmen contacted Defendant in late 2014, and Amistoso contacted Defendant in early 2015.

42.     Thereafter, both Carmen and Amistoso became employed by Defendant with the support and through the recruiting efforts of Health Carousel Philippines.

43.     Specifically, on April 5, 2015, Carmen signed Defendant's form contract for nurses and, on April 26, 2015, Amistoso signed Defendant's form contract for physical therapists.

44.     The form contracts signed by Carmen and Amistoso are not materially different. In fact, most terms in the various versions of Defendant's form contracts for foreign healthcare workers recruited through the Passport USA program are substantially similar.

45.     Defendant's form contracts are nonnegotiable multi-page documents, which Defendant requires healthcare workers to sign as a condition of employment. Defendant presents the contract on a take-it-or-leave-it basis to healthcare workers, including both Carmen and Amistoso. Defendant did not advise Carmen or Amistoso to consult with an attorney prior to signature.

46.     Even after signing the contract, Health Carousel requires healthcare workers, including Carmen and Amistoso, to spend time in the Philippines fulfilling administrative requirements for placement, including licensure and English proficiency requirements. Carmen and Amistoso spent well over two years in the Philippines before Defendant assigned Amistoso to work as a physical therapist for Defendant's client AccentCare in Denver, Colorado, and assigned Carmen to work for Defendant's client UPMC Muncy hospital in Muncy, Pennsylvania.

47.     Amistoso arrived in the United States on March 19, 2018, and began working on March 26, 2018.

48.     Health Carousel planned for Carmen to arrive in the United States on January 17, 2018, even though it knew that UPMC would not hold an orientation session until mid-February and that Carmen could not begin working until orientation started.

49.     Health Carousel's contract with UPMC Muncy allowed the facility to delay starting healthcare workers on the job for up to 30 days after they arrive in the United States and are otherwise able to start working.

50.     Carmen arrived in the United States on January 17, 2018. It was only then that she learned she could not start working with UPMC Muncy until mid-February 2018 and would not get paid by Health Carousel until then.

51.     Carmen began orientation at UPMC Muncy in the second week of February 2018, and Health Carousel did not pay her until then. As a result, Carmen was without work in a new country with no income for approximately one month.

52.     The day after Carmen and Amistoso arrived in the United States, Defendant presented them, for the first time, with nearly 200 pages of documents in a "New Employee Binder." The New Employee Binder contains various employment forms, rules, and handbooks that are substantially similar to the policies Health Carousel imposes on all its healthcare workers upon their arrival in the United States.

53.     The binder includes standardized forms that do not vary from employee to employee. Rather, these forms purport to apply to all healthcare workers in Defendant's Passport USA program, and they do not reference any particular work location.

54.     Defendant required Carmen and Amistoso to sign the New Employee Binder the day after arriving in the United States from the Philippines. Later, when Carmen had time to review the binder in detail, she was surprised to find terms that substantially varied from those

9

included in form contract she had signed in the Philippines years earlier. For the reasons described below, Amistoso was also surprised by Health Carousel's policies and practices upon her arrival in the United States.

### B. The misleadingly long term of the "commitment period"

55.     Defendant's form contracts require healthcare workers to work for Defendant for a set period of time, which Defendant calls a "commitment period."

56.     For example, Carmen's form contract required her to work for Defendant for a term of "(i) 36 months [3 years] *or* (ii) 6,240 regular-time work hours," whichever is longer. (Emphasis added.) Until that term is satisfied, the nurses are not permitted to "pursue [their] own career opportunities" outside of Defendant's company.

57.     Similarly, Amistoso's form contract required her to work for Defendant for a term of (i) 48 months [4 years] *or* (ii) 8,320 regular-time work hours," whichever is longer. (Emphasis added.) Until that term is satisfied, workers are not permitted to "pursue [their] own career opportunities" outside of Defendant's company.

58.     For all healthcare workers subject to Defendant's chosen commitment period, the term of employment will always be longer than Health Carousel's contract states.

59.     For example, where the form contract states the worker is required to work for Defendant for "(i) 36 months [3 years] *or* (ii) 6,240 regular-time work hours," the "commitment period" will *always* be longer than three years (or 36 months). That is because 6,240 hours would require full-time work of 40 hours per week, for 52 weeks per year, for three full years. Therefore, if a healthcare worker takes time off for any reason, or is ever scheduled by the healthcare facility to work less than 40 hours per week, the commitment period will be longer than three years. Even though the contract specifically states that a set number of years (three or

four) will suffice, Defendant does not explain to the healthcare workers that the period will in fact *always* be longer.

60.     Further, not all work is counted toward the commitment period. For example, Carmen and Amistoso, like many of Defendant's healthcare workers, worked significant amounts of overtime, but those overtime hours did not count toward their "commitment period."

61.     Amistoso, for example, was required to work at least two weekend days per month beyond her scheduled 40 hours. Health Carousel did not count these extra workdays toward her "commitment period."

62.     Similarly, UPMC, with Defendant's knowledge, required Passport USA nurses, including Carmen, to work extended shifts or overtime while not requiring the same for nurses hired in the U.S. These hours, too, did not count towards Carmen's 6,240-hour requirement.

63.     Neither Carmen nor Amistoso knew, before emigrating from the Philippines, that they would be required to work significant overtime that would not count toward their commitment period.

64.     Additionally, the form contract provides that only work performed after "orientation" and once the healthcare worker is "fully licensed" will count toward the employee's commitment period.

65.     But Defendant misrepresented to Carmen and Amistoso the consequences of orientation and licensing requirements on their commitment periods.

66.     While Defendant's contract provides that orientation time does not count toward the commitment period, Health Carousel does not tell workers that orientation may not begin for weeks, if not longer, after they arrive in the U.S. Nor does it tell workers exactly how long orientation will be.

67. For example, Health Carousel told Amistoso when she was departing the Philippines that orientation time would be approximately two weeks. In truth, Amistoso's orientation period was three months. None of her work time during those three months counted toward her commitment period.

68. Similarly, after arriving in the United States as a Health Carousel employee, Carmen was without pay for one month and then started orientation, which lasted three months. None of that time—the four months from arrival through the end of orientation—counted towards her commitment period.

69. Further, after Carmen started working for Health Carousel, Defendant consciously declined to expedite Carmen's permanent licensing process because her temporary license was not set to expire for a few months and therefore, according to Health Carousel, the matter was not urgent.

70. Though Defendant apparently decided that Carmen's post-orientation work (but still not overtime work) would count towards the 6,240-hour requirement even though she did not yet have her permanent license, that was unclear to Carmen. In fact, after orientation, when Carmen inquired about when her commitment period began, Defendant again referred her to her contract, which suggested to her that work performed before she was licensed would not count toward her commitment period. To this day, Carmen is unsure when her commitment period actually started.

71. Contrary to Defendant's representations, it was always Defendant's decision when work performed by Carmen or any other healthcare worker would begin to count toward the commitment requirement. That would either be after orientation if Defendant chose not to impose the permanent license condition or after extracting as much work as possible by not

12

expediting permanent licenses during the period before a temporary license expired.

72.     When they signed their employment contract, Amistoso believed she had to work for Defendant for four years, and Carmen believed she had to work for Defendant for three years. It was not until after their arrival in the United States that Health Carousel's plan to extract as much labor from them as possible became clear. Only then did they realize their terms of indentured servitude would be significantly longer than stated.

73.     Defendant's misrepresentations to Carmen and Amistoso regarding the terms of their employment and Defendant's actions described above are part of a pattern of misconduct and deception designed to attract foreign healthcare workers and keep them trapped in Defendant's contracts for longer than one would reasonably understand from the contractual language.

74.     Defendant does not explain to its healthcare workers during the recruitment process that, for the reasons described above, their commitment period will last significantly longer than the years or hours stated. Rather, Defendant's tactics—its misleadingly-worded contract; failure to count the workers' many overtime hours toward the hourly requirement; and control over when work begins and when that work starts to count towards the requirement— only become known to Health Carousel's workers after they arrive in the United States.

### C.  The penalty for workers who do not complete their "commitment period"

75.     To compel healthcare workers to keep working for the company, Defendant's form contracts contain a harsh monetary penalty, which the contracts call "liquidated damages." Under the provision, after a worker's visa is issued, the worker must pay at least a $20,000 penalty if they stop working for Defendant before their commitment period ends. This amount ranged from $20,000 all the way to $50,000 for some workers depending on the version of the

form contract in use at the time.

76.     Nearly all versions of Defendant's form contracts do not permit the penalty amount to be prorated based on how long the healthcare worker has worked for Defendant. As a result, the contracts require a healthcare worker who has worked one day under the contract to pay the exact same penalty as a healthcare worker who has completed all but one day of their term.

77.     Defendant's form contracts disclosed to workers before they come to the United States also misrepresent the purpose of the penalty and how Defendant enforces it.

78.     For example, the contract states that the healthcare worker shall pay "the liquidated damages to be agreed upon and shall be ***settled amicably*** by the parties without prejudice of filing the case in the proper court." (Emphasis added.)

79.     The New Employee Binder drops all pretense of amicability. It threatens that the penalty will be "***due immediately*** and ***in full on or before the last day***" worked. (Emphasis in original.) And it emphasizes that "[t]here will not be any payment plans or partial payment options."

80.     Defendant's New Employee Binder then threatens that if it does not receive the money, "Health Carousel will prepare to immediately file a lawsuit for the full damages failure to comply with the terms and conditions of the Agreement causes Health Carousel. Be advised that ***if you leave the country, Health Carousel can still obtain a judgment that will be enforceable abroad***." (Emphasis in original.)

81.     Before arriving in the United States and receiving the New Employee Binder, Carmen had no inkling of Defendant's aggressive litigation tactics or that it had sued many healthcare workers.

82.     Similarly, only after moving to the United States did Amistoso become aware of the punitive and coercive nature of Defendant's liquidated damages provision. Only after coming to the United States did she learn that Defendant aggressively enforces the penalty.

83.     In fact, Defendant has sued dozens of its nurses who left their employment with Defendant before the commitment period ended. For example, Defendant sought judgment against its former nurse employee in the amount of $77,435, plus interest and costs. *Health Carousel, LLC v. Agang*, No. 1:19-cv-00102 (S.D. Ohio filed Feb. 8, 2019).

84.     In another instance, one of Defendant's nurses emailed Defendant and indicated they were thinking of taking legal action to leave early. Defendant did not wait for the nurse to do so, and instead promptly sued the nurse.

85.     The cases in which Defendant sues its early-departing workers are not usually decided on the merits. Instead, Defendant regularly obtains judgment by default or stipulated judgment.

86.     The penalty stated in Defendant's form contracts is not a valid liquidated damages provision under Ohio law because it is not designed to estimate Defendant's actual damages. Rather, the penalty is wholly disproportionate to any actual damages suffered by the Defendant, which would not be difficult to determine.

87.     In fact, Defendant tracks how much it spends on each of its healthcare workers, what those expenses (or purported expenses) are for, and the revenue it receives from the healthcare facilities for each worker. Its stated "liquidated damages" are not reasonable estimate those amounts.

88.     Additionally, the penalty provision is manifestly unreasonable and disproportionate to any actual damage suffered by Defendant because, among other things, it

imposes a lump-sum penalty that will be the same if the healthcare worker quits on the first day of work as it will be if the healthcare worker quits after completing all but one day of the commitment period.

89.     Further, Defendant has set the penalty in its form contracts at anywhere from $20,000 to $50,000 depending on the version of the contract in use. It is inconceivable that any reasonable estimate of Defendant's damages would vary so dramatically during the time between the roll out of each new version of the form contract. Rather, Defendant sets its penalty amount with the goal of coercing nurses through the threat of substantial financial harm to continue working for Health Carouse. Defendant's damages, if any, would be much lower than either of these penalty amounts.

90.     As Defendant's International Recruiter for Passport USA told Carmen, the liquidated damages are "a penalty of 20,000 dollars." But "[t]here is never any expense like that along the way."

91.     Even if Defendant suffered any damages from a nurse leaving before completing the period of involuntary servitude, those damages would be easily calculable.

92.     *Agang*, cited above, indicates any claimed "actual damages" are spurious. When the *Agang* court denied Health Carousel's motion for default judgment and requested an affidavit with more detail of its purported $77,435 in damages, Health Carousel voluntarily dismissed the case.

93.     Defendant's lawsuits against others who try to end their employment are not disclosed before they agree to work for Defendant. Carmen and Amistoso, for example, had no idea and no reason to believe, before coming to the United States, that Defendant would strictly enforce its liquidated damages provision against those who attempt to leave their employment.

16

But once healthcare workers have agreed to work for Health Carousel and arrive in the United States, they are informed that Health Carousel sues those who attempt to leave for tens of thousands of dollars.

94.     Carmen, Amistoso, and class members continued to work for Defendant for longer than they wanted because of the monetary penalty, because of threats that the penalty would be strictly and immediately enforced, and because of fears that the Defendant would sue them.

### D. Defendant prevents its healthcare workers from working elsewhere and isolates them from potential employers.

95.     Healthcare workers' ability to leave is further restricted by the contract's non-compete provision. Under that provision, workers are prohibited from working for Health Carousel's clients, or any other healthcare facility within 50 miles for one year.

96.     In nearly all versions of Defendant's form contract, the non-compete provision is only applicable if the worker does not complete the commitment period as determined by Health Carousel. Therefore, the non-compete serves as an additional penalty for workers who want to leave Defendant before their period of servitude ends.

97.     Defendant drives this point home in a section of the New Employee Binder entitled "Summarized Implications of Failing to Comply with the Terms and Conditions of the Agreement." Within that section, Defendant reiterates the non-compete and states that it remains in effect even if the worker pays Defendant the monetary penalty to leave early.

98.     Defendant's healthcare workers have all recently arrived in the United States from abroad and are unlikely to have connections in this country other than in the healthcare facility where Defendant places them. Therefore, a worker who is prohibited from seeking employment with the healthcare facility that they have been working in, and from seeking employment

17

anywhere in the town they have been working in, will likely have difficulty finding subsequent employment.

99.     Defendant's healthcare workers know that if they leave Defendant's employment early, not only will they be immediately liable for the penalty, but they will also not be able to find other work in their field for an entire year within 50 miles of their home.

100.     Additionally, the contract's non-compete provision is unenforceable because it is unreasonable, is broader than necessary to protect any legitimate interest that Defendant may have an imposing the non-compete agreement, and because it creates an undue hardship for Defendant's healthcare workers. The non-compete is designed not to protect Defendant's reasonable interests in protecting trade secrets or skills and training acquired on the job, but rather as an additional tool to keep workers trapped in their jobs.

101.     The non-compete provision hindered Carmen's ability to stop working for Defendant. Carmen believes she could have gotten a job directly with UPMC Muncy, where she had been working under contract with Defendant. She also could have worked as a full-time nurse for another healthcare facility approximately 30 miles from UPMC Muncy. But she was unable to pursue either employment opportunity because of the harsh financial penalty and the non-compete provision that would have kicked in even after she paid the penalty. And in phone calls with her contact in Defendant's organization, Defendant made a point to remind Carmen about the non-compete provision.

102.     Amistoso, too, could have worked as a full-time physical therapist for another facility within the Denver-metro area but was barred from pursuing alternative employment, not only because of the harsh financial penalty that she would face for leaving, but because even if she paid that penalty, Defendant's non-compete provision would prevent her from working

18

elsewhere. As with Carmen, Defendant made a point to remind Amistoso of the non-compete provision when she inquired about terminating her contract. Health Carousel reminded her that even if she paid $20,000 in liquidated damages, she would still not be able to work as a full-time physical therapist elsewhere without having to move.

### E. Defendant imposes policies to isolate and control healthcare workers.

103. Defendant imposes rules that restrict and isolate healthcare workers. For example, Defendant imposes a so-called "no gossip" policy. As stated in the New Employee Binder, "Gossip is strictly forbidden. Gossip is defined as rumor or talk of a personal, intimate, and often sensational nature. Gossip is rarely positive in nature, and is usually harmful."

104. The New Employee Binder gets more specific about the types of information Defendant does not wish its employees to discuss: "Confidential information includes personal information or relationships, salary information, or any information concerning a co-worker's relationship with Health Carousel. Discussing what you or a co-worker earns is considered indiscreet because salary is a personal matter."

105. Similarly, the binder states that: "The terms and conditions of your employment are confidential and should not be shared with anyone except an authorized Health Carousel Representative. Any issues regarding our relationship are to be confidentially kept between us."

106. And "[d]iscussing wages . . . with employees or representatives of your assigned facility" is even listed among the items of "[u]nacceptable behavior[]" that are "grounds for disciplinary action that may include termination."

107. Defendant enforces these rules strictly. After she was placed in the United States, Amistoso was subject to surprising working conditions, including having to work substantially more than 40 hours per week and often driving more than 100 miles per day to cover a territory

that was larger than any of her AccentCare coworkers. Amistoso complained to her Health Carousel supervisor about these matters. Health Carousel repeatedly reminded Amistoso that she was prohibited from speaking to any of her coworkers about the problems that she was confronting at work. Amistoso asked if she could raise these problems with her supervisor at AccentCare, and Health Carousel told her that Health Carousel policy prohibited from talking to her AccentCare supervisor about these or other problems at work.

108.    Told by Health Carousel that she could not complain to her AccentCare supervisors or her colleagues, Amistoso raised a complaint with her recruiter in the Philippines from Health Carousel Philippines. Her Health Carousel supervisor learned she had contacted Health Carousel Philippines and informed Amistoso that she was prohibited from complaining to Health Carousel Philippines or from complaining to anyone about her working conditions except Health Carousel. Health Carousel told Amistoso that her continued complaints amounted to insubordination.

109.    As another example, when Carmen discussed her contract with Defendant, Defendant reiterated that Carmen was not permitted to talk about it with anybody, even with her fellow Health Carousel nurses.

110.    These secrecy requirements hinder workers' ability to pursue their careers outside of Defendant's organization and contribute to healthcare workers feeling isolated and trapped in their employment with Health Carousel. For example, if anyone risked leaving their job, they would be unable to discuss their planned departure with supervisors at their healthcare facility, making it difficult for a departing nurse to obtain a positive reference from the healthcare facility without breaching Defendant's rules. The New Employee Binder stresses how these challenges contribute to healthcare workers' indentured status: "In America, a bad reference can follow you

and can inhibit Health Carousel's ability to find a new client assignment for your [*sic*] and even to continue your employment."

111.    Defendant also seeks to monitor and control its workers by requiring them to inform Defendant if they travel out of the town or state in which they are living. This requirement made Carmen and Amistoso feel trapped and like Health Carousel controlled their movement within the United States, as well as their ability to return to the Philippines to visit family and friends.

112.    These secrecy and control provisions and policies are also designed to make it difficult for Health Carousel employees to learn how much less they are being paid than similarly situated employees who work directly for the Health Carousel's clients and perform substantially the same work as Health Carousel's employees.

113.    The secrecy and control provisions and policies have the effect of further isolating healthcare workers and shielding Defendant's business practices from scrutiny.

114.    Defendant applies these secrecy and control provisions and policies uniformly, creating a coercive environment.

**F.  Other draconian terms in Defendant's contract**

115.    Defendants' form contracts contain various other draconian terms, as well. For example, the contract states that if a healthcare worker is terminated from employment, they will be forced to vacate their home if housing has been provided by Defendant. The worker must vacate within 48 hours after the earlier of the termination or their last shift worked, even if that requirement conflicts with eviction protections in states in which Defendant's employees live. Defendant uses the illegal threat of immediate homelessness as an additional threat to keep some workers in their jobs.

116.    Additionally, the contract requires workers, "[a]s a condition of . . . participation in the Passport USA Program," to take courses in "acculturation/acclimation." Though these courses are mandatory, the contract states that nurses "are not entitled to compensation" for their time taking them.

117.    Finally, Defendant's policies, which are provided to healthcare workers after they arrive in the United States, imply that termination will result in adverse immigration consequences. For example, the New Employee Binder states that "[a]s long as you remain in good standing with Health Carousel, we will continue to be your advocate for immigration purposes," implying that failure to remain "in good standing" may result in negative immigration consequences.

118.    Defendant's communications with workers also suggest and are designed to suggest that there would be immigration consequences for healthcare workers who terminate their contracts before the end of their commitment period. For example, Health Carousel told Amistoso that Health Carousel was the reason that she was in the United States, suggesting that if she was not still working for Health Carousel, she could not remain in the United States.

**G.  Carmen and Amistoso wanted to end their employment with Defendant.**

119.    For all of the reasons described above, not long after starting employment with Defendant and well before the end of her commitment period, Carmen desired to stop working for Defendant.

120.    Carmen learned through signs posted in her workplace that she and the other nurses working for Defendant were underpaid, earning substantially less than nurses working in the same facility but not for Defendant. Health Carousel billed UPMC $52 per hour of Carmen's work during orientation; $57 per hour for her work after orientation through approximately

September 27, 2018; and $58.71 per hour for her work from approximately September 27, 2018, until Carmen left. And signs in Carmen's place of employment suggested that the pay rate for similarly situated Health Carousel nurses in 2019 should have been almost $29 per hour. Carmen, however, received $25.50 per hour and, after a year of work, a mere $0.50 raise. Health Carousel told her the disparity was because her pay in 2018 and 2019 was based the prevailing wage when Defendant petitioned for Carmen's green card in 2014.

121. Carmen did not know, before immigrating to the United States, that she would be earning substantially less working for Defendant than her nursing colleagues were earning. She also did not know that, despite Health Carousel informing her otherwise, her pay would not be based on her experience and specialty.

122. Further, due to understaffing, Carmen and the other nurses would regularly be required to stay on and work for additional hours after working their scheduled 12-hour shifts. Defendant was aware of the understaffing issues but did nothing to correct the situation, even though these additional hours would not count toward Carmen's "commitment period" if they amounted to overtime hours.

123. Also due to this understaffing, Carmen and the other nurses working for Defendant were required to be responsible for too many patients. The low nurse-to-patient ratio was dangerous for both the nurses and their patients.

124. Carmen wanted to leave Defendant's employ, especially after it became clear that her period of indentured servitude was going to last far longer than the expected three years. But she was unable to leave because of the severe financial penalty and the other reasons discussed above. Other nurses who worked with Carmen were in the same predicament.

125. Carmen's inability to leave Defendant caused her substantial distress.

23

126.    Amistoso also suffered from unsafe and burdensome working conditions. Although Health Carousel had assured Amistoso that she would be making wages similar to similarly qualified professionals, after arriving in the United States, she quickly learned that while she was earning $45.56 per patient visit, physical therapists who were hired directly by the facility were earning $105 per visit for start of care and $75 per visit for routine care. The pay disparity was particularly troubling because Amistoso had more experience than many of the therapists who were being paid a much higher rate.

127.    Health Carousel told Amistoso that she was not paid as much as other workers because she went to school in the Philippines and not in the United States. Health Carousel reminded her to never speak to her coworkers about how much money they were making.

128.    Amistoso also earned substantially less money per hour of work than she anticipated. It was only after arriving in the United States that she learned that for each patient she saw she would be required to perform hours of paperwork unpaid. Often, she worked past midnight completing paperwork for visits she conducted during the day.

129.    Defendant also failed to inform Amistoso until she began working that she would be required to hit a weekly target of 30 visits, and, if she was unable to meet the target during her regular weekday hours, she would not receive overtime pay for hours in excess of 40. Her visits with patients were spread out over one of the largest geographic regions in the company. She sometimes drove more than 100 miles per day. Because Amistoso was paid per visit, she was not compensated for this extra travel time.

130.    Despite representations to the contrary from Health Carousel before she began work, Amistoso also learned after she began working that she was not entitled to holiday pay or to any reprieve from the minimum 30-visit per week requirement. Rather, when holidays

24

prevented her from reaching her quota, she was instructed to use personal time off to satisfy her quota obligations.

131.    Amistoso was miserable working for Health Carousel, and she knew that she could have found higher paying employment elsewhere, but she felt trapped in her contract because of the illegal penalty provision and the other draconian policies that isolated her and prevented her from finding gainful employment anywhere else to support her family, including her baby daughter.

132.    Amistoso's inability to leave Defendant caused her substantial distress. Many nights when she returned from work, she cried. She felt desperate, helpless, and depressed. She knew she could make more money and receive better treatment elsewhere, but she could not terminate her contract. She thought that America was a free country, but she felt trapped and scared.

### H.  Carmen's employment ends.

133.    Eventually after nearly two years of working for Defendant, Carmen informed Defendant that she was going to leave. Defendant then reminded Carmen of the form contract's "breach obligations," told her that if she did not pay $20,000 on or before her last day, Health Carousel would "pursue legal action" for "full damages," and reminded her of the form contract's non-compete clause.

134.    Coming up with the money to pay Defendant's penalty caused Carmen substantial hardship and distress. Defendant paid her too little for her to be able to save up the penalty amount from her wages. And Carmen could not borrow such a large sum from any of her family in the Philippines.

135.    With no other option, Carmen borrowed $20,000 from her boyfriend to pay

25

Defendant's penalty. Carmen's boyfriend had been saving up to make a down payment on a home. But because Carmen was desperate to leave Defendant, he loaned her the money to pay Defendant's penalty instead of using it as a down payment. They have not been able to again save up enough for a down payment, and they continue to rent housing.

136.    Carmen continues to suffer stress, anxiety, guilt, and depression as a result of owing this debt to her boyfriend.

137.    Carmen's penalty amount was not prorated, despite the fact that she had worked for Defendant for well over a year.

138.    Much, if not all, of Carmen's penalty was not meant to cover costs specifically associated with Carmen. To the contrary, it was merely additional income to Health Carousel, used by the company to cover its ordinary business expenses.

139.    Defendant's contracts with healthcare facilities indicate that the amount Defendant bills the facility (for UPMC, $52 to $57 for each hour of Carmen's work) is meant to compensate Defendant for a worker's wages, benefits, and, according to the contracts, state licenses or permits, initial visa sponsorship and any other visa-related costs. This further suggests that a substantial proportion of any out-of-pocket expenses, if not all of those expenses, that Defendant could theoretically have incurred for its employees' benefits are recouped through the contracts with Defendant's clients.

140.    Carmen's last full week working for Health Carousel was the week ending on November 16, 2019. During that week, Carmen worked just over 51 hours, and based on her $26 hourly wage, earned approximately $1,300.

141.    Carmen's last day working at Health Carousel was November 20, 2019. She worked approximately 4 hours and 40 minutes that day and earned around $120.00.

142. On or around November 20, 2019, Carmen sent a wire transfer to Health Carousel for $20,000.

143. Subtracting this $20,000 penalty from Carmen's last week of wages, Health Carousel paid Carmen negative wages in Carmen's final workweek, meaning Carmen paid Health Carousel for the opportunity to work for it, in blatant violation of federal minimum wage requirements.

144. Even if *some* of that penalty was in theory meant to reimburse Health Carousel for costs incurred for Carmen's benefit, Carmen was still paid below minimum wage. This is because most of the penalty amount was designed to or did in fact cover Health Carousel's expenses incurred for Health Carousel's benefit, for example for "back office administrative support fees."

145. After paying Defendant's penalty, Carmen moved to Hershey, Pennsylvania. There, she found a nursing job earning more than she had been earning with Defendant.

146. Other healthcare workers have been forced to continue working for Defendant, despite a desire to leave, because of the financial penalty and other onerous conditions discussed above. Some have been able to come up with the money necessary to pay Defendant's penalty and leave before the expiration of their terms of involuntary servitude, though at significant personal hardship.

147. At least twenty nurses in Pennsylvania alone have paid Defendant's penalty to leave Defendant. Given that Defendant places immigrant workers all over the United States, the number of healthcare workers nationwide who have paid Defendant's penalty is likely far more than double that of the at least twenty nurses in Pennsylvania who have paid the penalty. Many of those have had to get bank loans to pay Defendant's penalty. Others have left but have been

unable to come up with the money to pay the penalty and have been sued by Defendant.

## I. Amistoso's employment ends.

148. In January 2020, Health Carousel told Amistoso that AccentCare, the facility where Health Carousel had placed her, was terminating her contract early because of downsizing.

149. Notwithstanding that Amistoso had a young baby in Colorado and Health Carousel did not have any other work placements in Colorado, Health Carousel did not release Amistoso from her indenture. On February 11, 2020, Defendant informed Amistoso that her options were to: (1) wait, without pay, for Health Carousel to find her a new placement, and because that placement would not be in Colorado, relocate her family out of state; or (2) pay the $20,000 penalty. Defendant informed Amistoso that payment was due immediately.

150. Amistoso asked Health Carousel whether she would be paid for any time waiting for an assignment outside of Colorado—what she called "benching pay"—and Defendant told her that it was Health Carousel's policy not to pay for this time.

151. Amistoso was unable to pay Defendant the $20,000 and terrified about the crippling financial consequences of not accepting her next placement with Health Carousel.

152. Amistoso also worried that leaving prior to the end of her term of indentured servitude would impact her immigration status.

153. Notwithstanding her fears about the potential ruinous consequences of leaving Health Carousel, Amistoso decided to put stability for her baby above all else and declined to relocate. She told Health Carousel that they were requiring her to choose between her contract with Health Carousel and her family.

154. On February 20, 2020, Health Carousel informed Amistoso that it would seek

$20,000 from her unless she relocated her entire family outside of Colorado. Health Carousel also purported to disclose to her an accounting of the damages justifying the $20,000 penalty. Those "damages," as described by Health Carousel, included more than $8,000 in "back office administrative support fees."

155.    Defendant's ongoing attempts to enforce the liquidated damages provision against Amistoso caused Amistoso to seek legal help in the hopes she could avoid being sued like so many other Health Carousel employees. She contacted the non-profit legal organization Towards Justice, based in Denver.

156.    On behalf of Ms. Amistoso, Towards Justice sent a letter to Health Carousel on February 26, 2020, stating that Towards Justice represented Amistoso and that the liquidated damages provision was illegal. Health Carousel did not respond to Towards Justice's letter and never suggested to Towards Justice or Ms. Amistoso that Defendant was forfeiting its purported right to pursue legal action against Amistoso.

157.    Amistoso's inability to leave her employment with Defendant without devastating financial consequences caused her substantial distress and damages. She continues to face ongoing harm because of Defendant's ongoing threat to enforce the illegal contract terms to which it claims Amistoso is bound.

## IV.    DEFENDANT'S MISREPRESENTATIONS REGARDING VISA PETITIONS

158.    On October 14, 2015, Health Carousel submitted an I-140 Immigrant Petition for Alien Worker for Carmen. This was a Schedule A petition under the EB-3 visa category.

159.    In 2015, Health Carousel submitted an I-140 Immigrant Petition for Alien Worker for Amistoso. This was a Schedule A petition.

160.    To obtain those visas and those of other healthcare workers, Health Carousel

29

attested that, among other things (1) the terms and conditions of employment did not violate federal, state, or local law; (2) the job opportunity was for full-time, permanent employment; and (3) that Health Carousel intended to pay the prevailing wage rates listed in the visa petition.

161.    Health Carousel knew that each of those attestations was false.

162.    First, Health Carousel knowingly misrepresented that the terms of its employment were consistent with federal, state, and local law. Health Carousel knew, for example, that its penalty provision was not based on a real estimate of any actual damages it could sustain if the healthcare worker, including Carmen and Amistoso, left employment early. It therefore knew that its "liquidated damages" provision was an illegal penalty provision.

163.    Second, Health Carousel misrepresented that it was petitioning for a job opportunity that was for full-time, permanent employment. Health Carousel knew that it was not offering full-time, permanent employment but was instead offering employment contingent on the worker being placed with a Health Carousel client. It was not Health Carousel's intention to pay workers, including Carmen and Amistoso, for any periods in which they were not placed with and actively working for a Health Carousel client. Instead, it intended to "bench" workers during periods in which they were not actively working for a Health Carousel client.

164.    For example, it was always Health Carousel's intention to pay Carmen only when she was placed with a Health Carousel client *and* began working for that client. And Health Carousel knew that would not happen until well after her entry into the United States. Well before Carmen's arrival in the U.S., Health Carousel knew that she would be arriving on January 17, 2018, but that she would not begin working for UPMC until after orientation in mid-February.

165.    As another example, when Defendant told Amistoso that AccentCare was

terminating her employment, Amistoso asked whether she would be paid during "benching time" while she waited for an assignment. Health Carousel told her it was Health Carousel's policy not to pay for this time. And, in fact, she was not paid after her assignment with AccentCare ended.

166.    Defendant thus maintained the ability to "bench" Carmen, Amistoso, and other healthcare workers, while telling USCIS it was doing no such thing. Its liquidated damages provision and non-compete agreements allowed Health Carousel to maintain control over these workers and place them with clients when needed without fear that those workers would find employment elsewhere, even though Health Carousel would not be paying them before or between their placements and active assignments with Health Carousel clients.

167.    Third, while Health Carousel attested in its filings that it would pay its employees, including Carmen and Amistoso, the listed prevailing wage, this was a misrepresentation. Health Carousel was not offering wage payments free and clear. Rather, Health Carousel intended to subject workers, including Carmen and Amistoso, to the threat of having to kickback those wages to cover Health Carousel's own business costs, including back-office expenses. And in cases where Health Carousel collected penalties for early-departing healthcare workers, wages paid to those workers fell substantially below the promised prevailing wage. Health Carousel also knew that it was not going to pay prevailing wages during periods in which its workers were "benched" before or between their assignments.

168.    Furthermore, it is illegal for Health Carousel to recoup costs "incurred in preparing or filing" permanent labor certification applications or receiving "payment of any kind for any activity related to obtaining permanent labor certification," 20 C.F.R. § 656.12(b). Costs and expenses related to obtaining H-1B guestworker visas are also considered business expenses, and when recouped by the employer are considered as deductions off of those workers "required

wage." *Kutty v. U.S. Dep't of Lab.*, 764 F.3d 540, 547-48 (6th Cir. 2014); *see also* 20 C.F.R. § 655.731 (payment of required wages must be made "free and clear"). By not disclosing that it was intending to charge its own business expenses to its workers—including expenses related to the preparation of visa applications, insofar as those expenses were included in Defendant's penalty—Defendant misrepresented that it intended to pay those workers the prevailing wage.

169.    These misrepresentations caused harm to Carmen and Amistoso.

170.    Had USCIS known that kickbacks to Health Carousel could be taken out of Carmen's offered wages, taking her wages far below promised prevailing wages, it would have required payment of Carmen's salary free and clear, without threatened kickbacks to Health Carousel. Instead, Carmen was ultimately required to kickback thousands of dollars to Health Carousel for its ordinary business costs.

171.    Had USCIS known that Heath Carousel included an illegal penalty provision that violates Ohio law and was not designed to estimate Health Carousel's actual damages, it would have required Health Carousel to only seek reimbursement of amounts permitted by Ohio law.

172.    Had Health Carousel disclosed its intention to bench and not pay healthcare workers before and between their assignments with Health Carousel clients, USCIS would have required that Health Carousel pay Carmen, Amistoso, and other healthcare workers for the entire period in which they were residing in the United States on Health Carousel-sponsored green card visas pursuant to Health Carousel's commitment to serve as a permanent and full-time employer. USCIS has repeatedly concluded that visa petitioners like Health Carousel may not "obtain alien workers so that it may maintain a pool of workers whose pay is conditional upon their placement with an end-user. By filing a petition pursuant to the [EB-2 or EB-3 visa categories] the petitioner is stating that it will employ the beneficiary full-time, and the petitioner must

guarantee the beneficiary a full-time wage and pay it even if full-time employment is unavailable."

173.    These misrepresentations were part of a pattern of misrepresentations made by Defendant to USCIS in potentially hundreds of visa petitions with the goal of obtaining green card workers, including Carmen and Amistoso.

## ADDITIONAL RICO ALLEGATIONS

174.    Defendant (Health Carousel LLC) and the distinct corporation Health Carousel Philippines, Inc., together with Defendant's recruiting brand Passport USA, constitute a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). In the alternative, these entities together with Health Carousel's clients constitute such an enterprise. Defendant and Heath Carousel Philippines in conjunction with Passport USA have for several years maintained an ongoing relationship. Through the relationship, Health Carousel Philippines recruited foreign healthcare workers and connected them to Defendant. Defendant then petitioned or applied for those workers' visas and employed them once they came to the United States. The entities have operated together under the brand Passport USA. Among other things, Health Carousel Philippines advertises the Passport USA Program to healthcare workers; it communicates with healthcare workers in the Philippines as they have questions about the recruitment and employment process; it serves as the go-between for Health Carousel and the healthcare workers in terms of coordinating travel, arrival dates, necessary paperwork, and preparing for embassy interviews; and it keeps Health Carousel informed on visa paperwork and processing status.

175.    Throughout this period, these entities have maintained the common purpose of recruiting, providing, processing, and obtaining inexpensive foreign healthcare workers to perform work in the United States.

176.     Those entities along with Health Carousel's clients in the United States have also maintained an ongoing relationship for several years under which Health Carousel Philippines has recruited foreign healthcare workers and connected them to Defendant. Defendant petitioned or applied for those workers' visas and employed them once in the United States, placing them at healthcare facilities owned and operated by Health Carousel's clients. Throughout this period, those entities have maintained the common purpose of recruiting inexpensive foreign healthcare workers to perform work in the United States.

177.     The enterprise is engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affect interstate commerce and frequently require travel and communications across state and international lines.

178.     Defendant has conducted or participated directly in the enterprise's affairs. Defendant has been directly engaged in the racketeering activity alleged here, including by providing material misrepresentations to the government regarding the employment of healthcare workers, making material misrepresentations to healthcare workers before they entered the United States, and maintaining policies designed to force those workers to continue working for it under threats of substantial harm. Defendant engaged in these activities to further the enterprise's purpose of recruiting and importing into the United States inexpensive foreign healthcare workers to work in its client's facilities.

179.     Defendant has used the enterprise and the existence of distinct corporate entities within the enterprise to engage in the alleged racketeering activity. Though, Defendant has 25% ownership in Health Carousel Philippines, Health Carousel Philippines is a distinct corporate entity from Defendant. It is incorporated in the Philippines and is licensed by the POEA. Health Carousel Philippines has obtained such a license from the POEA, but Defendant does not have a

POEA license. Health Carousel Philippines' exclusively recruits healthcare workers in the Philippines and direct them to Defendant. Together Health Carousel Philippines and Defendant work to obtain U.S. labor certifications and visas for recruited foreign workers who then come to the United States and are employed by Defendant but not by Healthcare Philippines.

## CLASS ACTION ALLEGATIONS

180.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

181.     Plaintiffs assert claims on behalf of and seek to represent the following Classes:

**Healthcare Workers Class**: All healthcare workers who entered the United States through Defendant's Passport USA program within the statute of limitations.

**Healthcare Workers Visa Fraud Subclass:** All members of the Healthcare Workers Class who, within the statute of limitations, (1) paid Defendant's penalty for terminating employment early; and/or (2) Defendant did not pay during times after the worker entered United States through Defendant's Passport USA program when they were not assigned to a healthcare facility or were waiting for an assignment to begin.

182.     Plaintiffs reserve the right to amend and refine the class definitions above or add classes and/or subclasses as litigation progresses.

183.     Numerosity: The Classes are so numerous that joinder of all class members is impracticable. Defendant's social media posts indicate that it brings hundreds of healthcare workers per year into the United States through its Passport USA program. Further, at least twenty nurses in Pennsylvania alone—and likely far more nationwide—have paid Defendant's financial penalty in the past few years. Although the precise number of putative Class members is currently unknown, Plaintiffs believe that each Class includes more than forty members. These members can be identified based on Defendant's records, which would include information on the employees' placement, length of employment and commitment period, whether and how

much they were paid, and whether and how much they paid Defendant, among other things. Defendant's pattern of suing early-departing employees indicates that it scrupulously maintains this data.

184. Commonality: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

a) Whether Defendant obtains the labor of foreign healthcare workers by using serious harm or threats of serious harm in violation of the TVPA;

b) Whether Defendant's uniform practices surrounding the commitment period, monetary penalty, and conditions of work constitute attempted labor trafficking in violation of the TVPA;

c) Whether Defendant knowingly recruits healthcare workers and knowingly benefits by its violations of the TVPA and Ohio trafficking law;

d) Whether Defendant is engaged in an enterprise with Health Carousel Philippines, Inc. and/or Defendant's clients through which Defendant conducts racketeering activity that involves fraud in foreign labor contracting and visa fraud;

e) Whether Defendant knowingly misrepresents that it will employ its healthcare workers in full-time permanent positions, when in fact it intends to "bench" those workers and not pay them during periods in which they are not on active assignment for one of Defendant's clients;

f) The proper measure of damages; and

g) The proper measure of punitive damages.

185.    These common questions arise, in part, because of the uniform circumstances under which Plaintiffs and the Classes worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of being sued, suffering adverse immigration consequences, and facing financial harm.

186.    Typicality: Plaintiffs' claims are typical of the members of the Classes for precisely the reasons set forth above. Among other things, Defendant uses a uniform contract in its Passport USA program, and the contract between Carmen and Defendant and the contract between Amistoso and Defendant are typical of Defendant's form contracts. Further, Defendant treated Plaintiffs consistently with other class members, in accordance with its standard policies and practices. And Defendant's position is that the penalty in its contracts is a "liquidated damages" provision for each and every healthcare worker, regardless of individual circumstance.

187.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiffs and the Classes they seek to represent.

188.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant uses a uniform contract and uniform policies and practices, resulting in common violations of law. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not likely

37

present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum. To the extent any other litigation exists, it was more likely than not initiated by Defendant itself as part of its pattern of obtaining forced labor by suing its former workers.

189.     Common questions of law and fact also predominate as to Plaintiffs' claim that Defendant attempted to obtain forced labor in violation of law. Defendant attempted to keep every healthcare worker in its employ through the threats of severe penalties and litigation, as well as through conditions of employment. That attempt—regardless of whether an employee could eventually pay the severe monetary penalty or the degree to which they were misled and forced to work against their will—was the same and uniformly made as to each and every employee.

190.     Plaintiffs intend to send notice to all members of the Classes to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendant's records.

## COLLECTIVE ACTION ALLEGATIONS

191.     Pursuant to the FLSA's collective action provision, 29 U.S.C. § 216(b), Plaintiff Carmen seeks to represent an FLSA Collective consisting of all healthcare workers employed by Defendant who paid Defendant a financial penalty and file a consent form to join this action.

192.     The proposed FLSA Collective members are similarly situated in that they have been subject to uniform practices by Defendant which violated the FLSA, including Defendant's mandatory liquidated damages contract provision, which operates as an unlawful kickback by requiring, or threatening to require, that employees pay back costs associated with the costs of Defendant's regular business expenses to the extent the payment reduces wages below the

38

statutory minimum wage as set for in the FLSA.

## <u>COUNT I</u>
### Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)
*on behalf of*
### Carmen, Amistoso, and the Healthcare Workers Class

193.    It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

194.    The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id.* § 1589(c)(2).

195.    Defendant obtained the labor of Carmen, Amistoso, and the Class members through threats of serious harm, through a scheme to make Carmen, Amistoso, and members of the Healthcare Workers Class believe they would suffer serious harm, and through threatened abuse of legal process, through the terms and administration of its contract with employees.

196.    Defendant kept Carmen, Amistoso, and the Class working for it against their will with the contract's term of indentured servitude, with an unenforceable monetary penalty masquerading as liquidated damages, with threats of litigation, with contractual provisions that caused employees to fear deportation, and with the other isolating and otherwise draconian employment terms, as described herein.

197.    Defendant's use of such means to obtain the labor of Carmen, Amistoso, and the

Class was knowing and intentional.

198.     Carmen, Amistoso, and the Class suffered damages because of Defendant's conduct. Those damages include the penalty Carmen and some of the Class paid to Defendant, as well as emotional distress and other damages.

199.     Carmen, Amistoso, and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT II
### Violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(b)
*on behalf of*
### Carmen, Amistoso, and the Healthcare Workers Class

200.     It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

201.     Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

202.     Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

203.     Carmen, Amistoso, and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

204.     Carmen, Amistoso, and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT III
### Violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1590(a)
*on behalf of*
### Carmen, Amistoso, and the Healthcare Workers Class

205.    It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

206.    Defendant knowingly and purposefully recruited Carmen, Amistoso, and Class members, as described herein, in violation of the TVPA.

207.    Carmen, Amistoso, and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

208.    Carmen, Amistoso, and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT IV
### Violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1594(a)
*on behalf of*
### Carmen, Amistoso, and the Healthcare Workers Class

209.    Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

210.    Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

211.    Carmen, Amistoso, and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages. The penalty amount is determinable from Defendant's records.

41

212. Carmen, Amistoso, and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

### COUNT V
**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962**
**(Fraud in Foreign Labor Contracting, 18 U.S.C. § 1351)**
*on behalf of*
**Carmen, Amistoso, and the Healthcare Workers Visa Fraud Subclass**

213. Defendant has engaged in the following knowing and material fraudulent representations to and concealments of material facts from healthcare workers with the intent to induce them to come to the United States, where they were ultimately indentured to Defendant for indeterminate periods of time at Defendant's choosing under threat of serious harm and abuse of legal process.

214. Defendant misrepresented the length of the commitment period to Plaintiffs and class members stating that their commitment periods would be for a certain number of months or a certain number of work hours, whichever was longer, without disclosing that it would be difficult to satisfy those work hours and entirely up to Defendant to determine when those hours were satisfied. For example, it did not disclose to Plaintiff Carmen that her commitment period would not begin for months and would be prolonged. Defendant did not disclose to Carmen or Amistoso that they would be required to work substantial overtime hours that would not count toward their commitment periods.

215. Defendant misrepresented the nature of its liquidated damages provision by, among other things, stating that disputes involving the liquidated damages provision would be resolved amicably. Only after coming to the United States did Plaintiffs and class members understand that Defendant would sue and threaten to sue workers for leaving work before the

end of their commitment period and not paying liquidated damages.

216.    Defendant not only misrepresented the nature of the relationship between Plaintiffs and the Class and their colleagues, but also between Plaintiffs and the Class and the hospitals where they worked. Only after coming to the United States did Plaintiffs and class members understand that Defendant maintained and enforced strict rules preventing its employees from communicating with each other or Defendant's clients about the terms and conditions of their employment.

217.    Defendant failed to tell Plaintiffs and class members that there may be periods when they were without an assignment or waiting for an assignment to start and that they would not be paid for that "benching" time, instead communicating to them that they would be full-time and permanent employees.

218.    Defendant failed to tell Plaintiffs and class members that healthcare workers its clients hired from the U.S. were paid more for less work than those workers Defendant recruited from outside the country and placed with its clients, instead suggesting to them in communications and in their visa petitions that they would be paid equally to similarly situated workers. These statements misrepresented to Plaintiffs and class members the nature of their employment and their pay relative to the workers working immediately alongside them, deceiving them into thinking they were accepting jobs for competitive wages in the United States.

219.    Defendant's scheme to defraud relied upon multiple repeated uses of the wires, including through email, telephone, and Internet or fax transmission of relevant visa petitions and paperwork. The scheme was reasonably calculated to deceive and defraud Plaintiffs and the Class.

220.     These fraudulent representations and concealments of material facts constitute repeated acts of fraud in foreign labor contracting under 18 U.S.C. § 1351 and wire fraud under 18 U.S.C. § 1343 that Defendant engaged in as part of its activities conducting or conspiring to conduct the enterprise's affairs.

221.     On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple acts indictable under 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

222.     The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies to recruit inexpensive foreign workers to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

223.     As described above, Defendant (Health Carousel LLC) and the distinct corporation Health Carousel Philippines, Inc., together with Defendant's recruiting brand Passport USA, constitute a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). In the alternative, these entities together with Health Carousel's clients constitute such an enterprise. Defendant is a "person" as defined by RICO, 18 U.S.C. § 1961(3).

224.     The fraudulent representations and concealments of material facts described above caused Plaintiffs and the Class to experience harm to business or property in the form of expenses related to moving to the United States without pay that they otherwise would not have incurred, penalty payments to Defendant, and reduced wages. Thus, Plaintiffs Carmen,

Amistoso, and class members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

**COUNT VI**
**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962**
**(Visa Fraud, 18 U.S.C. § 1546)**
*on behalf of*
**Carmen, Amistoso, and the Healthcare Workers Visa Fraud Subclass**

225.    Defendant has knowingly made numerous misrepresentations to USCIS with respect to Defendant's recruitment and employment of Carmen, Amistoso, and class members.

226.    Defendant knowingly mispresents on its Form I-140 petitions that its terms of employment comply with state law, when in fact its purported "liquidated damages" provision is an illegal penalty under state law because it is not an estimate of Defendant's damages. These misrepresentations constitute repeated instances of visa fraud in violation of 18 U.S.C. § 1546.

227.    Defendant knowingly misrepresents on its Form I-140 petition that it is seeking workers for full-time permanent employment when it knows there are periods of time when those workers, such as Carmen, Amistoso, and class members, will be "benched," i.e., between assignments and unpaid. These misrepresentations constitute repeated instances of visa fraud in violation of 18 U.S.C. § 1546.

228.    Defendant knowingly misrepresents on its Form I-140 that it pays its green card workers prevailing wage when in fact it does not offer or pay those wages free and clear because it seeks and recovers kickbacks from these workers to pay business expenses through its liquidated damages provision and "benches" workers without pay.

229.    Defendant's scheme to defraud relied upon multiple repeated uses of the wires, including through email, telephone, and Internet or fax transmission of relevant visa petitions and paperwork. The scheme was reasonably calculated to deceive and defraud Plaintiffs and the

Class.

230.    These fraudulent representations and concealments of material facts constitute repeated acts of fraud in foreign labor contracting under 18 U.S.C. § 1351 and wire fraud 18 U.S.C. § 1343 that Defendant engaged in as part of its activities conducting or conspiring to conduct the enterprise's affairs.

231.    On its own this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple acts indictable under 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

232.    The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies to recruit inexpensive foreign workers to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

233.    As described above, Defendant (Health Carousel LLC) and the distinct corporation Health Carousel Philippines, Inc., together with Defendant's recruiting brand Passport USA, constitute a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). In the alternative, these entities together with Health Carousel's clients constitute such an enterprise. Defendant is a "person" as defined by RICO, 18 U.S.C. § 1961(3).

234.    Plaintiffs Carmen, Amistoso, and class members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c). Plaintiffs and the Class experienced injury to business or property in the form of unpaid wages, reduced wages, payments of expenses related

to coming to the United States, and the payment of penalties to Defendant as a consequence of Defendants' racketeering activity. The United States government requires employers petitioning for visas to truthfully disclose information about the terms and conditions of employment applicable to potential visa holders to guard against harms caused by Defendant's misconduct, including harm to visa holders and to the domestic labor market.

### COUNT VII
**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962
(Trafficking, 18 U.S.C. § 1589)**
*on behalf of*
**Carmen, Amistoso, and the Healthcare Workers Class**

235.    For the reasons described above, Defendant engages in multiple repeated violations of trafficking and attempted trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. § 1590. Defendant engages in that conduct as part of its activities conducting or conspiring to operate the affairs of the enterprise with the goal of furthering the enterprises purposes of obtaining and supplying inexpensive foreign healthcare workers to United States healthcare providers.

236.    On its own this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple acts indictable under 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

237.    The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies to recruit inexpensive foreign workers to the United States and

47

keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

238.    As described above, Defendant (Health Carousel LLC) and the distinct corporation Health Carousel Philippines, Inc., together with Defendant's recruiting brand Passport USA, constitute a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). In the alternative, these entities together with Health Carousel's clients constitute such an enterprise. Defendant is a "person" as defined by RICO, 18 U.S.C. § 1961(3).

239.    Plaintiffs Carmen, Amistoso, and class members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c). Related to these violations, Plaintiffs and the Class experienced injury to business or property in the form of unpaid wages, reduced wages, payments of expenses related to coming to the United States, and the payment of penalties to Defendant as a consequence of Defendants' racketeering activity.

**COUNT VIII**
**Violation of Ohio Corrupt Practices Act (OCPA), Ohio Rev. Code § 2923.32**
*on behalf of*
**Carmen, Amistoso, and the Healthcare Workers Class**

240.    The enterprise alleged here is an enterprise pursuant to OCPA.

241.    Defendant is a "person" as defined by OCPA pursuant to Ohio Rev. Code Ann. § 2923.31. Defendant's multiple and repeated commissions of various felonies, including 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), form a pattern of corrupt activities through which Defendant conducted or participated in the affairs of the enterprise in violation of OCPA.

242.    The pattern is part of a related and continuous scheme of misconduct over the past

several years designed to use lies to recruit inexpensive foreign workers to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

243.    Plaintiffs and the Class were injured or threatened with injury by these violations of OCPA including through the payment of expenses related to moving to the United States, the payment and threatened payment of penalties to Defendant, and unpaid and reduced wages.

**COUNT IX**
**Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.***
*on behalf of*
**Carmen and the FLSA Collective**

244.    Plaintiffs incorporate the above allegations by this reference.

245.    Pursuant to 29 U.S.C. § 216(b), Carmen has consented in writing to be join this Fair Labor Standards Act action as a plaintiff. Her written consent is attached to this complaint as Exhibit A.

246.    In 2018 and 2019, Defendant was Carmen's employer pursuant to the Fair Labor Standards Act.

247.    In 2018 and 2019, Carmen was an employee pursuant to the Fair Labor Standards Act.

248.    Defendant violated 29 U.S.C. § 206 by failing to pay Carmen and others similarly situated the applicable minimum wage during the last work week employed by Defendant.

249.    The violations resulted from Defendant's unlawful demand that Carmen compensate Defendant pursuant to its unenforceable "liquidated damages" provision, which includes expenses related to Defendant's ordinary cost of conducting business. Rather than paying Carmen "free and clear," Defendant's demands would require Carmen to return the entirety of her final pay checks, which results in sub-minimum wage compensation.

250.    Defendant's payment demands to Carmen and others similarly situated their

federally mandated minimum wages were willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

251.    Plaintiffs and others similarly situated are entitled to recover their unpaid wages plus an additional equal amount in liquated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

**COUNT X**
**Violation of Ohio's Human Trafficking Law, Ohio Rev. Code § 2905.32**
*on behalf of*
**Carmen, Amistoso, and the Healthcare Workers Class**

252.    Plaintiffs incorporate the above allegations by this reference.

253.    It is a violation of Ohio's human trafficking law to "knowingly recruit . . . or knowingly attempt to recruit . . . another person if . . . [t]he offender knows that the other person will be subjected to involuntary servitude." Ohio Rev. Code § 2905.32(A)(1). Victims of a violation may bring a civil claim against the trafficker. Ohio Rev. Code § 2307.51.

254.    Ohio's human trafficking law does not require physical force in order to find a violation. Rather, a victim need only have been compelled in some way, including by duress, fear, or intimidation.

255.    Defendant knowingly recruited Carmen, Amistoso, and Class members knowing that they would be subjected to involuntary servitude, in violation of Section 2905.32, as described herein.

256.    Carmen, Amistoso, and the Class suffered damages because of Defendant's conduct. Those damages include the penalty Carmen and the Class paid to Defendant, as well as emotional distress and other damages.

257.    Carmen, Amistoso, and the Class are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the

costs of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray for relief as follows:

a) determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3);

b) designating Plaintiffs as representatives for the Classes and designating Plaintiffs' counsel as counsel for the Classes;

c) issuing proper notice to the Classes at Defendant's expense;

d) declaring that Defendant committed violations of the TVPA, RICO, FLSA, OCPA, and Ohio's human trafficking law;

e) awarding damages as provided by the TVPA, RICO, FLSA, OCPA, and Ohio's human trafficking law, including punitive damages;

f) awarding reasonable attorneys' fees and costs as provided by law; and

g) granting further relief, in law or equity, as this Court may deem appropriate and just, including all relief authorized by Ohio Rev. Code § 2923.34.

Respectfully submitted,

Dated: November 12, 2021

**BARKAN MEIZLISH DEROSE COX, LLP**

By: /s Robert E. DeRose
Robert E. DeRose (OH Bar No. 0055214)
bderose@barkanmeizlish,com
4200 Regent Street, Suite 210
Columbus, OH 43219
Phone: (614) 221-4221
Fax: (614) 744-2300

51

Dated: November 12, 2021

**NICHOLS KASTER, PLLP**
By: /s Nicole J. Schladt
Anna P. Prakash, MN Bar No. 0351362*
aprakash@nka.com
Nicole J. Schladt, MN Bar No. 0400234*
nschladt@nka.com
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

**DONATI LAW**
Bryce Ashby, TN Bar No. 026179*
bryce@donatilaw.com
1545 Union Avenue
Memphis, TN 38104
Phone: (901) 209-5500

**TOWARDS JUSTICE**
Valerie Collins, MD Bar*
valerie@towardsjustice.org
David H. Seligman, CO Bar No. 49394*
david@towardsjustice.org
PO Box 371680
PMB 44465
Denver, CO 80237-5680
Phone: (720) 295-1672

**GUPTA WESSLER, PLLC**
Jennifer Dale Bennett, CA Bar No. 296726*
jennifer@guptawessler.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Phone: (415) 573-0336
Fax: (202) 888-7792

* admitted *pro hac vice*

*Attorneys for Plaintiffs and the Putative Classes*

52

# EXHIBIT A

---

## HEALTH CAROUSEL
## PLAINTIFF CONSENT FORM

---

1.  I consent to make a claim under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* against my former employer, Health Carousel ("Defendant") and any other related individuals, entities, or subsidiaries, to recover unpaid minimum wages.

2.  During my last work week employed by Defendant, I received less than minimum wage for the hours I worked because of the large "kickback" of money to Defendant.

3.  If this case does not proceed collectively, then I also consent to join any subsequent action or matter to assert these claims against Defendant.

4.  I understand that I may withdraw my consent to proceed with my claims at any time by notifying the attorneys handling this matter.

Date:  __11/12/2021__          _____
                              Signature

                              <u>Novie Dale Carmen</u>
                              Print Name

---

**Information Below Will Be Redacted in Filings with the Court.  Please Print or Type.**

**Return this form by**        **Nichols Kaster, PLLP, Attn: Nicole J. Schladt**
**fax, email or mail to:**      **Fax: (612) 215-6870**
                               **Email: forms@nka.com**
                               **Address: 4700 IDS Center, 80 S. 8th Street, Minneapolis, MN 55402**
                               **Web:  www.nka.com**