# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**NOVIE DALE CARMEN, *et al.*,**

      **Plaintiffs,**

                              **Case No. 1:20-cv-313**

      **v.**                            **JUDGE DOUGLAS R. COLE**

**HEALTH CAROUSEL, LLC,**

      **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on Defendant Health Carousel, LLC's (Health Carousel) Motion to Dismiss (Doc. 44) Plaintiffs Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores' Third Amended Complaint (Doc. 43). Health Carousel also moves to Strike Plaintiffs' Class Allegations (Doc. 45) and to Stay Discovery (Doc. 47). For the reasons discussed below, the Court **DENIES** Health Carousel's Motion to Dismiss (Doc. 44) and **DENIES** Health Carousel's Motion to Strike Class Allegations (Doc. 45). Finally, the Court **DENIES** Health Carousel's Motion to Stay (Doc. 47) **AS MOOT**.

## BACKGROUND

This is a putative class action. Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores bring this case on behalf of similarly situated immigrants that Health Carousel currently or previously employed. (3d Am. Compl., Doc. 43, #986). And this is not Defendant's first Motion to Dismiss in this case. On June 17, 2021, the Court issued an Opinion denying Health Carousel's combined Motion to Dismiss

Carmen's (first) Amended Complaint and Motion to Strike Class Allegations (Doc. 21). Later, Carmen amended her Complaint two more times, resulting in the now-operative Third Amended Complaint, filed on December 17, 2021. (Doc. 43).

The Third Amended Complaint removed some previously alleged facts, while also adding new allegations, two new plaintiffs (Amistoso and Flores), and five new causes of action. (*See id.*). In response, Health Carousel has now moved to dismiss the Third Amended Complaint, to strike class allegations, and to stay discovery while the Court considered these Motions. (Docs. 44, 45, 47).

The Court has already extensively detailed the general facts in its previous Opinion and Order. (Doc. 21, #598–608). Yet that was two years ago. So the Court will repeat those common allegations that appear in both the Amended Complaint and the Third Amended Complaint, before turning to note the differences.[1]

> Health Carousel is a recruiting and staffing company headquartered in Hamilton County, Ohio, that enlists foreign nurses, primarily from the Philippines, to work in healthcare facilities across the United States. The healthcare facilities that employ the nurses pay Health Carousel an amount in excess of the nurse's hourly wages. Health Carousel then pays the nurses the wages to which they are entitled, keeping the difference for itself. As the description suggests, the amount of return that Health Carousel generates for a given nurse depends on how many hours that nurse works through the auspices of the Health Carousel program.
>
> The nurses receive several benefits from Health Carousel in exchange for their participation in the arrangement. Beyond the obvious benefit of placing the nurses in a job, Health Carousel also sponsors the nurses' permanent U.S. resident visa petitions; pays related expenses, including examination, filing, and attorney's fees; pays airfare to the

---

[1] For purposes of Health Carousel's Motion to Dismiss, the Court assumes true all factual allegations stated in the Third Amended Complaint. Therefore, the Court presents these allegations as fact for now, but without prejudice to Health Carousel challenging them in future filings.

United States; provides free temporary housing in the United States; pays cash bonuses when participating nurses arrive in the United States; and provides medical benefits and life insurance.

Those benefits last, however, only while the nurse is employed through Health Carousel. So, for example, if a nurse is residing in Health Carousel-supplied housing, that nurse must leave such housing within 48-hours after her last shift as a Health Carousel employee. Health Carousel calls its business model the "Passport USA" program.

Each nurse executes two agreements as part of this business arrangement. The first is a form contract, the "Employment Contract," which each foreign nurse signs to initiate her employment relationship with Health Carousel. As this agreement is executed before Health Carousel begins the visa process, nurses will almost always sign this contract while still abroad.

As relevant to this case, the Employment Contract includes four provisions that set forth a participating nurse's obligations. First, the contract contains a "Commitment Period" provision. This term requires the participating nurse to work "for a period of time commencing upon the completion of [the nurse's] orientation … and becoming fully licensed and ending upon the later of (i) 36 months or (ii) 6,240 regular-time work hours." In other words, the period starts upon the later of orientation or licensure, and then continues for at least three years of 52-week-per-year, forty-hour work weeks (i.e., 3 x 52 x 40 = 6,240). Moreover, any hours of overtime do not count toward the 6,240-hour target. And, if a nurse takes any vacation, of course, that time off likewise will not accrue any hours in regard to the contractually-specified Commitment Period.

Second, each Employment Contract contains an "Exclusivity" provision. Here, a participating nurse acknowledges that Health Carousel will invest "a significant amount of time, effort, and money" into the participating nurse's licensing and visa processing. Based on that, the nurse agrees not to seek sponsorship or accept any employment in the United States from another company, without Health Carousel's written consent, before that nurse has fulfilled his or her obligations under the Employment Contract.

Third and relatedly, each Employment Contract contains a non-compete and non-solicitation clause. This term prohibits a nurse from "seek[ing] employment … with any other healthcare provider within 50 miles of [the nurse's] Client facilities for one year after [the date the nurse leaves Health Carousel if the nurse violated the terms of the

3

Employment Contract].” A nurse who left Health Carousel before the end of the Commitment Period, for example, would trigger this non-compete obligation.

Fourth and finally, each of Health Carousel's Employment Contracts contains a “Breach Obligation” provision. This clause states that, in the event of a given nurse's breach, “[the nurse] agree[s] that damages sustained by Health Carousel … are impossible, or at least very difficult, to estimate accurately and, for that reason, [the nurse] agree[s] that the [liquidated damages] amount is a reasonable forecast of fair compensation for any such breach.” The Employment Contract does not specify a dollar figure for the liquidated damages, but rather sets forth a list of expenses and potential lost profit items that both parties agree will be used to determine the liquidated damages amount in a given case. And rather than provide a precise computation, the term merely states, if the nurse breaches the Employment Contract, the nurse “shall pay the liquidated damages to be agreed upon and shall be settled amicably by the parties without prejudice of filing the case in the proper court.”

But the Employment Contract at issue here also includes an Addendum that further amends the Breach Obligation provision. Through the Addendum, the parties agree to a range of specifically identified liquidated damages figures. The applicable figure in each case depends on when the breach occurs in relation to the progress on the nurse's visa application. More specifically, the liquidated damages are set at: $1,000 if the breach occurs before Health Carousel filed for the visa; $10,000 if the breach occurs after filing but before issuance of the visa; and finally, $20,000 if the breach occurs after the issuance of the visa but before the end of the “Commitment Period.”). The Complaint further alleges that Health Carousel amended the Addendum over time to increase the liquidated damages figures for nurses who were recruited later—for example, raising the top amount from $20,000 to $35,000. Upon arrival in the United States, a nurse receives and signs various agreements that, together, form a 183-page “Employee Handbook.” (Employee Handbook). The Handbook mostly consists of Health Carousel's workplace policies and employee benefits information. Some of these policies simply notify Health Carousel employees of standard safety practices, like how to react in the case of a fire or how to safely transport a patient. Other policies provide rules that govern the nurse's workplace behaviors. For example, the Handbook prevents nurses from discussing the terms and conditions of their employment and prohibits “gossip” at work. Still other policies further describe the relationship between Health Carousel and the nurses. The Handbook, for instance,

4

explains that "[a]s long as [a nurse] remain[s] in good standing with Health Carousel, we will continue to be [that nurse's] advocate for immigration purposes."

The Handbook also revises some provisions in a nurse's earlier Employment Contract. Two of those revisions are relevant to Health Carousel's Motion. First, while the Employment Contract provides that a nurse's "Commitment Period" does not begin until the nurse obtains full licensure, the Handbook explains that "[s]ecuring and maintaining [a] licensure or certification is each [nurse's] responsibility." Second, the Handbook tweaks the Breach Obligation provision from the Employment Contract. The Handbook does not alter the liquidated damages figures, but it does use different language when describing other consequences that flow from a breach. Specifically, while the Employment Contract provides that the liquidated damages shall be "settled amicably," the Handbook drops that language and states only that any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment. Further, the Handbook indicates that Health Carousel will file suit and seek damages from any nurse who breaches the Employment Contract and fails to pay liquidated damages. The Handbook then warns nurses that if they "leave the country, Health Carousel can still obtain a judgment that will be enforceable abroad."

B. Health Carousel Employs Carmen.

Carmen is a citizen of the Republic of the Philippines. She worked there as an emergency-room nurse from approximately 2014 to 2018. "Lured" by the opportunity to come to the United States, in late-2014, Carmen contacted Health Carousel about its Passport USA programs. A few months later, on April 6, 2015, Carmen and Health Carousel executed an Employment Contract. Under the terms of that Contract, Carmen joined Health Carousel's Global Express Program.

In her Employment Contract, Carmen agreed to the (1) non-compete agreement; (2) Breach Obligation provision; and (3) Commitment Period. The Addendum in her agreement specified that Carmen would owe $20,000 in liquidated damages if "[e]arly termination occurs after the issuance of [her] visa but prior to completing [her] Commitment Period."

After Carmen executed her Employment Contract, nearly three years passed before she received the visa that she needed to enter the United States. Carmen arrived in this country on January 17, 2018. The

day after her arrival, Health Carousel presented Carmen with the Handbook, and required her to sign it at the time that she received it. Carmen alleges that many of the terms in the Handbook "surprised" her, including, for example, the Handbook's threat to litigate if Carmen breached the agreement. In any event, Carmen signed the Handbook and began working at The University of Pittsburgh Medical Center ("UPMC") in Muncy, Pennsylvania, less than a month later, i.e., the second week of February 2018. Carmen officially became a Health Carousel employee on her first day of work with UPMC Muncy.

When Carmen began at UPMC, she had not yet obtained her permanent nursing license from Pennsylvania, but instead was working under a temporary license. … Given that the Commitment Period provision in her Employment Contract only began to run when Carmen was fully licensed, Carmen's work before August 2018 did not count against her Commitment Period, although it did benefit Health Carousel.

C. Carmen Leaves Health Carousel.

Not long after Carmen began working for Health Carousel, she learned that her colleagues who were working directly for UMPC (i.e., not through Health Carousel) were earning more than her. Her salary, among other factors, led Carmen to conclude that she wished to terminate her employment with Health Carousel.

Carmen claims that the terms in Health Carousel's contracts, however, forced her to continue working. Her first, and apparently most pressing, concern was that Health Carousel would sue her for $20,000 in liquidated damages under the Breach Obligation provision of her Employment Contract if she left her position before the expiration of the Commitment Period. Second, Carmen alleges that she felt forced to continue working for Health Carousel because the non-compete in her Employment Contract limited her employment options.

Finally, Carmen claims that she hesitated to terminate her employment because the Handbook "implies" that any nurse who leaves before the end of the Commitment Period will suffer adverse immigration consequences. The relevant section of the Handbook states "[a]s long as you remain in good standing with Health Carousel, we will continue to be your advocate for immigration purposes." Carmen reasons that the opposite is also true: that if she leaves early, Health Carousel will try to send her back to the Philippines.

6

Despite her claimed fears, Carmen terminated her employment with Health Carousel in November 2019. At the time she quit, Carmen had worked for Heath Carousel for 22 months—i.e., since February 2018. As Carmen did not gain her full license until August 2018, only about sixteen of those months counted toward Carmen's three-year Commitment Period. When Carmen left, she borrowed $20,000 from her boyfriend to pay Health Carousel the liquidated damages for her early termination due under both the Employment Contract and the Handbook. Carmen alleges that she has experienced hardship, stress, anxiety, guilt, and depression as a result of having to borrow this money from her boyfriend. At some point after paying Health Carousel, Carmen moved to Hershey, Pennsylvania, where she found a nursing job that pays more than her old position at Health Carousel.

(Doc. 21, #598–608 (citations omitted)).

Carmen includes the same principal allegations in her Third Amended Complaint, but with a few key differences. First, Carmen once alleged that Health Carousel "slow-rolled" or otherwise interfered with her obtaining her license so it could extract more labor from her. (*Id.* at #605–06). Carmen has now dropped that allegation. (*Compare* Am. Compl., Doc. 11, #139–40, *with* Doc. 43). Second, Carmen now alleges that Health Carousel falsely reported in visa applications to the United States Citizenship and Immigration Services (USCIS) that Health Carousel would pay workers the prevailing wage after arrival. (Doc. 43, #1016–17). Third, Carmen alleges that in those same applications Health Carousel falsely reported that Plaintiffs had "full-time, permanent employment" awaiting them, despite knowing their work depended on matching immigrants with companies. (*Id.*). Fourth, Carmen provided additional facts relating to her claim that Health Carousel paid her beneath the prevailing wage—alleging Health Carousel paid her just $25.50 per hour, while her domestic-born coworkers received "almost $29 per hour." (*Id.* at #1007).

The Third Amended Complaint also added two additional named Plaintiffs—Amistoso and Flores. (*Id.* at #985). Similar to Carmen, both immigrated to the United States through Health Carousel's program, and both believe Health Carousel illegally exploited them. (*Id.* at #988, 991–1020). In addition, both signed initial contracts in the Philippines, and Health Carousel subjected both to a Commitment Period and a liquidated damages penalty if they did not complete their obligations. (*Id.*). And both claim Health Carousel isolated them, demanding they not discuss their contract with others. (*Id.* at #1004–05).

Beyond these similarities, Amistoso and Flores also had their differences. Amistoso, a native of the Philippines, worked for Health Carousel as a physical therapist in the Denver, Colorado region. (*Id.* at #1003). After arriving in the United States, Health Carousel had her undergo a three-month unpaid orientation, despite allegedly leading her to believe it would last two weeks. (*Id.* at #996). Moreover, despite working during this orientation, Amistoso's labor did not count toward her Commitment Period. (*Id.*). As with Carmen, Health Carousel had Amistoso sign the New Employee Binder upon arrival, which contained new terms absent from the Philippines contract. (*Id.* at #994). Yet unlike Carmen, Health Carousel paid Amistoso not by the hour but by patient visit. (*Id.* at #1009). Her alleged pay disparity is more striking—she claims to have been paid $45.56 per visit, while her domestic-born coworkers earned anywhere from $75 to $105 per visit. (*Id.* at 1008–09). Amistoso also claimed she had more experience than her counterparts, yet Health

Carousel paid her less because "she went to school in the Philippines and not in the United States." (*Id.* at #1009).

Health Carousel assigned Amistoso a mandatory 30-visit weekly target, all in-person and spread over a large geographic region. She claims she at times drove over 100 miles per day to administer care but did not receive compensation for her travel. (*Id.* at #1009). Then, when she got home, Amistoso allegedly worked into the night to finish paperwork from the day's visits, also receiving no compensation for this work. (*Id.*). Amistoso also claims she received no respite from her weekly visit goal. (*Id.*). For holidays and personal time, she simply had to make up her missed visits elsewhere.

According to Amistoso, this arrangement contradicted representations Health Carousel had made in the Philippines while recruiting her. (*Id.*). And when she later talked with Health Carousel personnel in this country about her concerns, they allegedly suggested that "if she was not still working for Health Carousel, she could not remain in the United States." (*Id.* at #1007).

Then in January 2020, the facility employing Amistoso downsized, ending her contract. (*Id.* at #1013). Health Carousel allegedly informed Amistoso that she would have to wait, without pay, until Health Carousel could find a new employer, and that her new job would likely require Amistoso to move outside Colorado. (*Id.* at #1013–14). With a new baby, Amistoso balked at moving, but Health Carousel insisted her only other alternative would be coughing up the $20,000 liquidated damages. (*Id.*). And Health Carousel provided Amistoso an accounting of its expected damages to

justify the $20,000 demand, which included about $8,000 in "back office administrative support fees." (*Id.*).

Ultimately, Amistoso refused to move and breached her contract. (*Id.* at #1014). But she did not have money to pay the liquidated damages. (*Id.*). Worried, Amistoso contacted Legal Aid, who sent a letter to Health Carousel contesting the liquidated damages provision's legality. (*Id.* at #1014–15). Since then, Health Carousel has allegedly not contacted Amistoso about the damages, and it appears Amistoso has not paid. (*Id.* at #1015).

Flores, a Registered Nurse, faced her own difficulties. (*Id.* at #992). Unlike Carmen and Amistoso, the Third Amended Complaint does not explicitly allege Flores received or signed the New Employee Binder upon arrival. (*See id.* at #994–95). But it does claim she "was subject to substantially the same rules upon her arrival" and "was also surprised by Health Carousel's policies and practices." (*Id.*). Health Carousel placed Flores with the West Virginia University Health System, and she underwent her unpaid orientation from November 12 through January 6. (*Id.* at #996). Flores claims her orientation period ended January 6, yet Health Carousel "objected and insisted Flores's time be classified as orientation time for an additional six days." (*Id.*).

After orientation, Flores began working long hours, only to realize that her overtime did not count toward her commitment period. (*Id.* at #1010). Flores also worried because Health Carousel had assigned her work she felt untrained to handle. (*Id.* at #1011). When she complained, Health Carousel ignored her. (*Id.*). Flores then

10

discussed breaching her contract with Health Carousel, and staff members allegedly "suggested to [her] that if she terminated her contract without paying the breach fee, she would have immigration-related problems." (*Id.* at #1007).

In September 2021, the facility employing Flores restructured, ending her contract. (*Id.* at #1015). Health Carousel told Flores she would receive daily "ad hoc" assignments with the West Virginia Health Care Systems. (*Id.*). Flores protested, believing she did not have the training to "provide care in the variety of units they attempted to place her." (*Id.*). But Health Carousel persisted. (*Id.*). Flores became despondent, taking off "three days of accrued personal time off." (*Id.*). After that, Health Carousel ended her contract and demanded $30,000 in liquidated damages immediately. (*Id.*). Flores, not having the money, offered $10,000 as full satisfaction. (*Id.*). Health Carousel accepted the money, but still demanded the additional $20,000. (*Id.*). The $20,000 remains outstanding. (*Id.*).

Collectively, Carmen, Amistoso, and Flores bring ten claims in their Third Amended Complaint. These are: (1) Violations of the Trafficking Victims Protection Act (TVPA) under 18 U.S.C. § 1589(a); (2) Violation of the TVPA under 18 U.S.C. § 1589(b); (3) Violation of the TVPA under 18 U.S.C. § 1590(a); (4) Violation of the TVPA under 18 U.S.C. § 1594(a); (5) Violation of Racketeer Influenced and Corrupt Organizations (RICO) Act under 18 U.S.C. § 1962 predicated on Fraud in Foreign Labor Contracting under 18 U.S.C. § 1351; (6) Violations of the RICO Act predicated on Visa Fraud under 18 U.S.C. § 1546; (7) Violations of the RICO Act predicated on Trafficking under 18 U.S.C. § 1590; (8) Violation of Ohio Corrupt Practices Act

11

(OCPA) under Ohio Rev. Code § 2923.32; (9) Violations as to Carmen of the Fair Labor Standards Act (FLSA) under 29 U.S.C. § 201 *et seq.*; (10) Violation of Ohio's Human Trafficking Law under Ohio Rev. Code § 2905.32. (*Id.* at #1026–37). Carmen had pled five in her Amended Complaint—only the RICO, OCPA, and FLSA claims appear for the first time.

On January 3, 2022, Health Carousel moved under Rule 12(b)(6) to dismiss the Third Amended Complaint. (Doc. 44). Health Carousel also moved to strike class allegations from the Third Amended Complaint, arguing Plaintiffs' allegations were not suited to class treatment. (*See* Doc. 45). Finally, three days later, Health Carousel moved to stay discovery while the Court considered these motions. (Doc. 47). All three are now ripe.

## STANDARD OF REVIEW

Plaintiffs press ten claims, and Health Carousel moves to dismiss all ten for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In resolving that motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted).

That is so, however, only as to well-pled factual allegations. The Court need not accept "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, there must be "sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

The Court has already addressed the sufficiency of five of the ten claims in a previous Opinion denying a motion to dismiss. Although the Third Amended Complaint presents some different allegations, they do not change the outcome as to those claims. As for the new claims, the Court finds Plaintiffs have plausibly alleged each cause of action. Separately, the Court denies Health Carousel's Motion to Strike Class Allegations. And because the Court denies both these Motions, it also denies Health Carousel's Motion to Stay Discovery as moot.

### A. Plaintiffs Again Plausibly Allege Trafficking Victims Protection Act Claims.

Let's start with how we got here. When first examining Carmen's Amended Complaint (before Amistoso and Flores joined the suit), the Court found that she had plausibly alleged her four TVPA counts. (Doc. 21, #621). After finding Carmen's TVPA claims came down to whether she suffered the threat of a "serious harm," the Court set about defining how such harm could be shown. (*Id.* at #611). The Court noted that an employment contract, even if voluntarily entered, can at times result in illegally compelled labor. (*Id.* at #612–13). The Court highlighted that no one clause or term is dispositive but that a court should "consider all the surrounding circumstances" to determine whether the total effect is coercive. (*Id.* at #615). The Court further recognized that a "bait-and-switch" tactic could create coercive effects, where a party

is misled about the terms in a way that compels their labor. (*Id.* at #615–16). Then, the Court summarized:

> In short, it is not the existence or non-existence of an employment contract that controls. Rather, the key questions relate to the substantive terms of the alleged contract (e.g., are they too one-sided?), as well as the parties' conduct in the formation and performance of the agreement. Indeed, in some ways, it is not unlike the contractual unconscionability framework, which also has both a substantive and procedural component.

(*Id.* at #617).

Applying that framework, the Court found Carmen's Amended Complaint had plausibly alleged that she had suffered a risk of serious harm that compelled her labor. And the Court highlighted two bait-and-switch allegations. First, that Health Carousel impeded Carmen's ability to obtain her full license, in turn extending her Commitment Period. (*Id.* at #618). Second, that Health Carousel compelled her to work extensive overtime without counting those hours towards her Commitment Period. (*Id.*). Separately, the Court found that Carmen pled sufficient "allegations of substantive egregiousness" through the liquidated damages "penalty." (*Id.* at #619).

Fast forward to today. Now in the Third Amended Complaint, the Court concludes that Plaintiffs Carmen, Amistoso, and Flores have plausibly alleged their TVPA claims. They provide sufficient allegations that Health Carousel created a threat of "serious harm" to compel their labor. Many of the same allegations from the Amended Complaint remain, including allegations that Health Carousel forced the Plaintiffs to work excessive overtime and that Health Carousel used liquidated damages as a "penalty" to lock Plaintiffs in. (Doc. 43, #995, 998).

14

True, Carmen no longer alleges Health Carousel stalled her full licensure. Even without Plaintiffs' "stalling" allegation, though, Plaintiffs have still plausibly alleged a threat of serious harm. As the Court held previously, assessing a serious harm requires a holistic analysis. And looking at the surrounding circumstances here, the Court finds it plausible, based on the allegations in the now-operative Complaint, that Health Carousel subjected Plaintiffs to a threat of serious harm though its liquidated damages provision and working conditions.

This case in many ways mirrors *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019). There, the healthcare staffing company defendant contracted to pay the immigrant plaintiffs the prevailing wage upon their arrival. *Id.* at *2. Yet after arrival, the defendant failed to pay the prevailing wage, and threatened plaintiffs with a $25,000 liquidated damage penalty to ensure they continued to work. *Id.* at *18. On a motion for summary judgment, the *Paguirigan* court found the $25,000 liquidated damages "provision constitutes a threat of sufficiently serious financial harm." *Id.* Here too, Plaintiffs allege Health Carousel seeks to compel Plaintiffs' labor through the liquidated damages penalty.

In response, Health Carousel asks the Court to apply the Rule of Lenity. (Doc. 44, #1075). Health Carousel argues no prior caselaw gave it notice that its employment contracts violated the TVPA. (*Id.* at #1075–76). And as statutory language must have the same meaning in both criminal and civil contexts, Health Carousel says, the Court must hold that the statute cannot be applied in this "new"

context, even civilly. (*Id.* at #1076). The company summarizes, "[i]f there is any doubt whether liquidated damages could cause 'serious harm' under the TVPA, … the Court should apply the rule of lenity." (*Id.* at #1076).

The Rule of Lenity reflects the notion that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Yet the Rule of Lenity is triggered *only* when "after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.'" *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)).

Health Carousel, on the other hand, fashions its own conception of the Rule. In the company's view, the Rule demands that Plaintiffs identify an exact case match that put Health Carousel on notice—almost akin to the "clearly established" principle from qualified immunity. But that is not and never has been the law. The Rule is not triggered simply through a novel application of a criminal statute. After all, every statute has to be invoked for a first time. Rather, the Rule comes into play when a novel application implicates an unacceptable vagueness latent *within the statute itself*. Before invoking the Rule of Lenity, then, Health Carousel must first grapple with the TVPA's text and context. It did not.

Accordingly, the Court finds, again, that Plaintiffs have plausibly alleged sufficient facts to support their four claims under the TVPA. Again, that is not to suggest that Plaintiffs will succeed on those claims. But that is not the question now.

16

**B.    Plaintiffs Again Plausibly Allege An Ohio Human Trafficking Statute Claim.**

In its previous Opinion, the Court explained that Ohio's Human Trafficking statute "expressly contemplates that 'fraud,' which leads to 'compelled ... labor,' could establish a claim" and found that standard plausibly met. (Doc. 21, #622–23). But there, the Court focused on Carmen's claim that Health Carousel stalled her licensure. (*Id.*). Now, the Third Amended Complaint has dropped that allegation.

Still, the Court finds the Third Amended Complaint plausibly alleges Health Carousel used fraud to compel Plaintiffs' labor, although based on different allegations. Plaintiffs says that Health Carousel, while recruiting them to come to the United States, misled them about working conditions, pay rates, work expectations, hours, and overall length of service. (Doc. 43, #995–96, 1008, 1010–11). For example, Plaintiffs say they did not know Health Carousel would make them work overtime. Yet after arrival, Plaintiffs say they felt compelled to work overtime, for fear of otherwise being assessed the liquidated damages "penalty." (*Id.* at #986). And if Health Carousel in fact made material misrepresentations to Plaintiffs about their contractual obligation to work overtime or other material aspects of their employment, that may suffice to show the company violated Ohio's human trafficking statute.

Health Carousel otherwise only responds with recycled arguments the Court has already considered and rejected in its prior Opinion. Thus, the Court finds Plaintiffs have plausibly stated a claim under the Ohio Human Trafficking statute.

17

C.      **Plaintiffs Plausibly Allege RICO Claims.**

Now for Third Amended Complaint's novel claims, starting with Plaintiffs' three RICO claims. A civil RICO plaintiff starts with four core elements they must show as to the defendant: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); 18 U.S.C. § 1962(c). As part of that, a plaintiff must also show "(1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Grow Michigan, LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022). Covered predicate acts are listed in 18 U.S.C. § 1961(1), and include the three predicate acts on which Plaintiffs rely here: Fraud in Foreign Labor Contracting (18 U.S.C. § 1351); Visa Fraud (18 U.S.C. § 1546); and Trafficking (18 U.S.C. § 1590). (Doc. 43, #1029–35). "[T]he term 'enterprise' denotes any legal entity, such as a corporation, or 'any union or group of individuals associated in fact although not a legal entity.'" *Grow Michigan*, 50 F.4th at 594 (citing 18 U.S.C. § 1961(4)).

The RICO statute sweeps broadly so courts construe it liberally. *Sedima*, 473 U.S. at 497–98. But its scope is not unlimited. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 568 (6th Cir. 2013). For example, RICO only allows recovery for commercial-based injuries to "business or property." 18 U.S.C. § 1964(c); *see also Jackson*, 731 F.3d at 562. Finally, a plaintiff must show but-for and proximate cause between the predicate act and their injury. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).

Plaintiffs say that Health Carousel (and its affiliates) carry out a business plan that routinely violates multiple federal criminal statutes. (Doc. 43, #1029–35). Off the bat, it appears to the Court—and no party disputes—that Health Carousel is an enterprise operating in interstate commerce. Instead, the parties mainly contest whether Plaintiffs plausibly allege the following three elements: (1) that Health Carousel committed the requisite predicate acts; (2) that Plaintiffs suffered a RICO injury; and (3) that Health Carousel proximately caused said RICO injury. Ultimately, the Court agrees that Plaintiffs plausibly allege each of these elements.

### 1. Plaintiffs Plausibly Allege Health Carousel Committed Predicate Acts.

Plaintiffs' RICO predicates can be grouped into two categories: fraud-based and trafficking-based. Start with the two fraud-based predicate acts: Fraud in Foreign Labor Contracting under 18 U.S.C. § 1351 and Visa Fraud under 18 U.S.C. § 1546. The two statutes prohibit largely the same conduct, but differ in the person to whom the defendant directs the misrepresentations. Fraud in Foreign Labor Contracting focuses on alleged misrepresentations to the foreign worker:

> (a) Work Inside the United States.--Whoever knowingly and with intent to defraud recruits, solicits, or hires a person outside the United States or causes another person to recruit, solicit, or hire a person outside the United States, or attempts to do so, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment shall be fined under this title or imprisoned for not more than 5 years, or both.

18 U.S.C. § 1351. Visa Fraud, on the other hand, covers, in part, situations where the defendant misrepresents material facts on immigration forms submitted to the government. 18 U.S.C. §1546.

19

Plaintiffs have plausibly alleged Health Carousel committed both. Plaintiffs contend that Health Carousel misrepresented its intent to pay Plaintiffs the prevailing wage upon their arrival in this country, and that it made this representation both to the Plaintiffs and to immigration officials. As to the former, Plaintiffs claim Health Carousel told them, before they signed on, to expect to be paid the prevailing wage. (Doc. 43, #1029–30). Indeed, their contracts state: "Health Carousel will pay you an hourly wage rate in accordance with United States Department of Labor prevailing wage guidelines and the premium rate provided by state or federal law for all authorized and properly documented overtime worked for the Client facility(ies)."[2] (Doc. 1-2, #36). And, as to the latter, Plaintiffs say Health Carousel made a similar guarantee in their Form I-140 applications for Plaintiffs' visas to the USCIS. (Doc. 43, #1032–34).

But, according to Plaintiffs, Health Carousel never intended to pay Plaintiffs the prevailing wage upon arrival in the United States, and Plaintiffs' pay in fact fell well below the wages their peers earned.[3] (*Id.* at #1007–10, 1016–17). And while the Court applies the heightened fraud pleading standard of Rule 9(b) to these fraud

---

[2] Plaintiffs attached a contract to their initial Complaint. Health Carousel has never contested the accuracy of the contract. Although Plaintiffs did not re-attach the contract to the Third Amended Complaint, there seems little justification to disregard the contract simply because it was not needlessly re-submitted.

[3] Health Carousel argues that Carmen has not alleged "Health Carousel paid her less than the hourly rate promised in her Employment Contract." (Doc. 44, #1059). But the Employment Contract states that Carmen will be paid the prevailing wage, and Plaintiffs do indeed contend that they received below prevailing wage. (Doc. 43, #1007). Of course, the Court for now takes no position on whether Plaintiffs' compensation actually fell below the prevailing wage.

predicates, *see Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017), Plaintiffs have met that standard here. They present the actual contractual terms containing the alleged misrepresentations.[4] Indeed, Plaintiffs appear to say the contract terms and visa applications themselves contained fraud because Health Carousel had no intention to follow through on them. This specificity puts Health Carousel on notice of its alleged fraud.[5] *See U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (recognizing the "overarching purpose [of Rule 9(b)] is to ensure that a defendant possesses sufficient information to respond to an allegation of fraud").

Moving on, Plaintiffs have also plausibly alleged Health Carousel committed Trafficking. That statute criminalizes:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

---

[4] To state a fraud claim with particularly under Rule 9(b), "a plaintiff, at a minimum, to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1385 (W.D. Mich. 1992)).

[5] Granted, this means Plaintiffs must be able to hold Health Carousel liable for fraudulent representations made within contractual terms. In the common law fraud context, courts are divided as to whether a misrepresentation within a contract can give rise to a fraud cause of action. *Compare NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 308–09 (7th Cir. 2018) ("The general rule in New York is that 'a fraud cause of action ... does not arise where the alleged fraud merely relates to a breach of contract."), *with Sofka v. Thal*, 662 S.W.2d 502, 507 (Mo. 1983) (en banc) (noting that under Missouri law, a "promise accompanied by a present intent not to perform is ... sufficient to constitute actionable fraud" (emphasis omitted)). Yet Fraud in Foreign Labor Contracting makes no direct reference as to whether the "materially false or fraudulent pretenses, representations, or promises" can be made in the terms of a contract itself. *See* 18 U.S.C. § 1351. But analogizing the common law, the Court concludes that fraud arises if contractual promises are made with "a present intent not to perform." *See Sofka*, 662 S.W.2d at 507.

18 U.S.C. § 1590. Notably, "in violation of this chapter" includes the TVPA allegations described above. As Health Carousel plausibly violated Plaintiffs' rights under the TVPA, Plaintiffs have adequately pled the predicate act of Trafficking. (Doc. 43, #1035).

### 2. Plaintiffs Plausibly Allege RICO Injuries.

As noted, only injuries to business or property constitute a RICO injury. 18 U.S.C. § 1962(c). Injuries, even monetary injuries, that "'aris[e] directly out of' a personal injury" fall outside RICO's scope. *Jackson*, 731 F.3d at 565. Rather, "[p]laintiffs must allege a 'proprietary type of damage' to establish a RICO claim." *Id.* at 569. This can include "lost wages," but only if they arise from such a "proprietary" (non-personal injury) harm. *Id.*

Plaintiffs have, at minimum, alleged a RICO injury from Health Carousel denying them their contractual right to a prevailing wage. In the Employment Contracts, Health Carousel bound itself to pay Plaintiffs the prevailing wage. (Doc. 1-2, #36). And Plaintiffs claim their pay fell below that level—violating the Employment Contracts. (*See, e.g.*, Doc. 43, #1007). That plausibly alleges a RICO injury. *See Jackson*, 731 F.3d at 569.

Health Carousel responds in two ways. First, it protests that Plaintiffs cannot claim an injury in an unknown wage differential. (Doc. 44, #1085–86). Health Carousel also says wage differences, like those here, are a common part of life and so cannot be a RICO injury. (*Id.*). Neither argument works. To start, Health Carousel agreed to pay Plaintiffs "in accordance with United States Department of Labor

prevailing wage guidelines." (Doc. 1-2, #36). The Department of Labor, in turn, defines "prevailing wage" as "the average wage paid to similarly employed workers in a specific occupation in the area of intended employment."[6] If Health Carousel failed to meet that standard, as alleged, then any damages presumably can be calculated by reference to that definition. True, Plaintiffs may (or may not) need expert testimony to establish exactly what that is, depending on the nature of the proof otherwise available. But the need for expert testimony does not render those damages too speculative for recovery. And Plaintiffs are not "just" underpaid workers. Taking Plaintiffs' allegations and the reasonable inferences that follow from them at face value, Health Carousel violated provisions of its contract with the Plaintiffs—provisions meant to induce them to uproot their lives and travel halfway around the world.

### 3. Plaintiffs Plausibly Allege Health Carousel Caused Their RICO Injuries.

Lastly, RICO plaintiffs must show the predicate act was both a but-for and proximate cause of their injuries, with "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp.*, 559 U.S. at 9. Stemming from § 1964(c)'s "by reason of" language, proximate cause exists where "the defendant's racketeering offense 'led directly to the plaintiff's injuries.'" *Grow Michigan*, 50 F.4th at 594 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). Merely foreseeing that the injury may occur is not enough. *Id.* Similarly, "derivative or

---

[6] *See Prevailing Wage Information and Resources*, U.S. Dep't of Labor (last visited August 8, 2023), https://www.dol.gov/agencies/eta/foreign-labor/wages.

passed-on" indirect injuries cannot meet the proximate cause threshold. *Id.* at 595. Rather, courts generally require the most "immediate victims of an alleged RICO violation" to bring claims where they have an incentive to sue. *Id.* at 596 (quoting *Anza*, 547 U.S. at 460)); *Hemi Grp.*, 559 U.S. at 11–12. Such a requirement helps avoid the "risk of duplicative injuries," as well as the danger of extending the RICO statute beyond its appropriate context. *Grow Michigan*, 50 F.4th at 594 (quoting *Anza*, 547 U.S. at 459)). Courts generally decline "to go beyond the first step" in determining causation. *Hemi Grp.*, 559 U.S. at 10.

Plaintiffs say, among other things, that Health Carousel intentionally refused to compensate them at the prevailing wage. Plaintiffs also allege that Health Carousel furthered its scheme through the multiple predicate acts discussed. To Plaintiffs, Health Carousel defrauded the Plaintiffs by lying about its intention to pay them the prevailing wage, defrauded the USCIS by lying about the same, and transported Plaintiffs into the country to have them work for less than the prevailing wage. (Doc. 43, #986, 1007, 1035). Finally, they contend they "are the best situated to bring suit based on Health Carousel's racketeering" and in the "best position to 'to gather information about [Health Carousel's] conduct.'" (*Id.* (quoting *Alix v. McKinsey & Co.*, 23 F.4th 196, 208 (2d Cir. 2022)).

Plaintiffs have plausibly alleged that Health Carousel's predicate acts proximately caused their RICO injury. First, Health Carousel (again allegedly) committed each predicate act as essential steps furthering its scheme to underpay Plaintiffs and generate profit for itself. Put another way, Health Carousel's Fraud in

24

Foreign Labor Contracting persuaded Plaintiffs to immigrate, its Visa Fraud got them into the country, and its Trafficking delivered them to the site where the alleged exploitation occurred. Plaintiffs are also the most natural RICO plaintiffs to recover on their prevailing wage injury. As parties to the Employment Contract, they are the most "immediate victims," making them best suited to recover for any violation of those contracts. *See Grow Michigan*, 50 F.4th at 595. Finally, Health Carousel has little danger of duplicative judgments. Although Health Carousel potentially could have exposure to criminal liability based on the predicate acts (if they in fact occurred), no other victims besides Plaintiffs and the putative class appear likely to recover financially in RICO. *See id.*

In fact, this case in some ways resembles *Bridge v. Phoenix Bond & Indem. Co.* 553 U.S. 639 (2008). In *Bridge*, the Supreme Court examined a RICO claim where a contractor defrauded a county government by improperly submitting multiple bids for the right to buy tax liens. *Id.* at 642–43. A losing bidder sued the contractor under RICO, predicating its claim on the mail fraud against the county. *Id.* The Court ultimately held the competitor's RICO claim could proceed because first-person reliance is not an element of mail fraud, although it can help to show proximate causation. *Id.* at 648–49. In so doing, the Court recognized the flexible concept of proximate cause did not always require first-person reliance, and that a RICO claim may proceed even where the predicate act was directed toward a governmental third party. *Id.* at 659. Here too, Plaintiffs' Visa Fraud allegation can further their RICO claim even though Health Carousel allegedly defrauded the United States. As *Bridge*

recognized, Plaintiffs need not show they personally relied on the Visa Fraud to show proximate cause, so long as the USCIS relied.

Health Carousel resists this outcome, pointing to decisions from the Fourth and Fifth Circuit: *Molina-Aranda v. Black Magic Enters. LLC*, 983 F.3d 779 (5th Cir. 2020), and *Walters v. McMahen*, 684 F.3d 435 (4th Cir. 2012). In both, the defendants allegedly lied to immigration officials about immigrant workers' anticipated pay upon arrival in the country. *Molina-Aranda*, 983 F.3d at 784–85; *Walters*, 684 F.3d at 444. Those courts held that fraudulent statements to immigration officials did not proximately cause the eventual harm to the immigrants after arrival. *Molina-Aranda*, 983 F.3d at 784–85; *Walters*, 684 F.3d at 444. The *Molina-Aranda* court, for example, relying heavily on *Walters*, stated that "[p]laintiffs' allegations ... do not support a conclusion that their underpayment injuries were directly caused by the ... alleged fraud in obtaining the H-2B visas. Rather, their complaint shows that the injury was caused by the alleged underpayments which were not required by the alleged fraud." 983 F.3d at 784–85.

The Court is not convinced. *Walters* involved a very different set of facts. There, the plaintiffs were local workers at the same facility at which the foreign workers were employed. 684 F.3d at 437–38. They claimed that the employer's failure to pay the foreign workers in accordance with the promises it made in the H-2B paperwork had a carry-over impact of depressing wages for the local workers, as well. *Id.* at 438. That extra step between the fraud (relating to one set or workers) and the

pay (for a different set of workers) makes causation more attenuated then here. So *Walters* can be distinguished.

True, the facts of *Molina-Aranda* appear far closer to the facts Plaintiffs allege in this matter. There as here, the *Molina-Aranda* plaintiffs were the immigrant workers themselves. 983 F.3d at 784–85. But in this Court's view, the *Molina-Aranda* court adopted too narrow a reading of RICO's flexible causation standard. After all, RICO penalizes illicit *schemes*, furthered through predicate acts. And as the Supreme Court clarified in *Bridges*, the RICO plaintiff need not be the target of the predicate act to recover. Thus, visa fraud on immigration officials, committed as part of a scheme to import and underpay immigrant laborers, strikes the Court as causally linked with the injury those laborers suffer when they immigrate and are underpaid.

Beyond that, even taking *Molina-Aranda* and *Walters* at face value, those cases concerned fraudulent statements made *to immigration officials*. Thus, they have little bearing on whether Plaintiffs meet proximate cause as to their RICO claims predicated on Fraud in Foreign Labor Contracting and Trafficking.

**D.    Plaintiffs Plausibly Allege An Ohio Corrupt Practices Act Claim.**

The Ohio Corrupt Practices Act states:

> No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

Ohio Rev. Code § 2923.32(A)(1). The statute is modeled after the federal RICO statute. *Portnoy v. Nat'l Credit Sys., Inc.*, 837 F. App'x 364, 372 (6th Cir. 2020). Thus, much like in the federal context, "a plaintiff must show the following: (1) the 'conduct

of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses;' (2) 'the prohibited criminal conduct of the defendant constitutes a pattern;' and (3) the 'defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise.'" *Id.* (quoting *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E. 2d 696, 708 (Ohio Ct. App. 2009). Moreover, the predicate crimes must "be related and pose a threat of continued criminal activity." *Morrow*, 915 N.E. 2d at 708. And here as well, a plaintiff must show the defendant's illicit conduct was a but-for and proximate cause of their injury. *Bradley v. Miller*, 96 F. Supp. 3d 753, 774 (S.D. Ohio 2015).

Drawing on the analysis above, the Court finds that Plaintiffs have plausibly stated a claim under the OCPA. Plaintiffs have alleged Health Carousel operated an enterprise through illegal conduct designed to import and exploit underpaid foreign labor. (Doc. 43, #1035–36). Plaintiffs claim they have been harmed by, among other things, "reduced wages"—beneath what Health Carousel contractually agreed to. (*Id.*). And as discussed above, Health Carousel's alleged predicate acts proximately and directly caused this injury. (*Id.*).

Health Carousel responds that Plaintiffs failed to cite the specific provision of the OCPA they intend to proceed under, and that Plaintiffs have failed to adequately allege Health Carousel engaged in any criminal activity. (Doc. 44, #1094–95). Not so. Plaintiffs' Third Amended Complaint makes clear which provision they proceed under by using the language of the statute: "Defendant's multiple and repeated commissions of various felonies … form a pattern of corrupt activities through which

Defendant conducted or participated in the affairs of the enterprise in violation of OCPA." (Doc. 43, #1035–36). This suffices for notice pleading. And the Court has already determined that Plaintiffs have adequately alleged Health Carousel committed criminal activity to further its enterprise. Therefore, Plaintiffs' OCPA claim has been plausibly alleged and may proceed.

**E.    Carmen Plausibly Alleges A Fair Labor Standards Act Claim.**

Under the FLSA, an employer must compensate an employee with at least the minimum wage. 29 U.S.C. § 206(a). To be considered "paid," wages must be "paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. Wages will not be "free and clear" where an employer directly or indirectly deducts "kick-backs" intended for the employer's benefit. *Id.*; *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 531 (6th Cir. 2017); *Parker v. Battle Creek Pizza, Inc.*, 600 F. Supp. 3d 809, 812 (W.D. Mich. 2022) ("[E]mployers cannot shift business expenses to their employees if doing so drops the employees' wages below minimum wage."). And likewise, an employer may not demand illegal kickbacks even after a paycheck is delivered. *See Stein*, 873 F.3d at 531.

Examples of potentially illegal deductions or demands include costs to acquire the tools of trade for the employer's business, safety implements for workers, electricity used for commercial purposes, taxes and insurance on commercial buildings, and employer-required uniforms. 29 C.F.R. § 531.3, 531.32. On the other hand, an employer may lawfully deduct or demand reimbursement of expenses for items that primarily benefit the employee, like employee meals from a company

restaurant, employee housing, and some commuter transportation. *See id.* § 531.32. Accordingly, where the employer demands liquidated damages for an employee's breach of an employment contract, courts assess how those damages are calculated to determine whether they constitute permissible or illicit recoveries. *See, e.g.*, *Gordon v. City of Oakland*, 627 F.3d 1092, 1095–96 (9th Cir. 2010) (not counting contractual damages as a kickback because the damages recuperated employee training expenses); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) (same).

The parties disagree about whether the relocation costs from the Philippines to the United States count as expenses incurred for the employer's benefit or for the employee's benefit. Courts disagree too. *Compare Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1248 (11th Cir. 2002), *with Castellanos-Contreras v. Decatur Hotels, LLC*, 601 F.3d 621, 400–01 (5th Cir. 2010). Contributing to the confusion, the U.S. Department of Labor appears to have changed its view on this issue over the past decades in the context of temporary work visa laborers. *Compare* 73 Fed. Reg. at 78041, *with* 75 Fed. Reg. at 6915, *and Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 898–99 (9th Cir. 2013). Of course, Plaintiffs became permanent residents, not temporary workers, so that may matter, as well. In any event, the Court finds that it unnecessary to wade into that debate at this time.

That is because Carmen alleges she worked 51 hours her final week and received $1,300 as a result. Upon terminating her employment, Health Carousel demanded, and Carmen paid, $20,000 in liquidated damages. So the narrow question

before the Court (for now) appears to be whether any portion of the $20,000 liquidated damages was intended to recoup expenses incurred for Health Carousel's benefit. (Doc. 44, #1095–96).

Health Carousel says no, claiming its liquidated damages merely recoup expenses it incurred for the immigrant employees' benefit, "including visa fees, attorney's fees, airfare, an 'arrival bonus,' and temporary housing while the professional locates her permanent housing." (Doc. 44, #1053). Yet when demanding liquidated damages from Amistoso, Health Carousel provided a line-item justification for the $20,000 figure —including $8,000 for "back office administrative support fees." (Doc. 43, #1014). And although Amistoso never paid, Carmen did. In effect, Carmen seeks to incorporate this break-down of expenses, suggesting that $8,000 of the $20,000 she paid compensated Health Carousel for its internal operating costs.

For pleading, that is enough. Carmen has plausibly alleged that $8,000 of her liquidated damages covered Health Carousel's own operating expenses. And as Carmen only received $1,300 her final week, an $8,000 kickback would reduce her net pay below zero. Of course, she will still need to prove that this same breakdown applies to her. And separately, Health Carousel may eventually show, with additional facts, that the company *properly* demanded "administrative support fees"—i.e., that these fees derived from services for Carmen's benefit, not Health Carousel's. But at least for now, Carmen has nudged this claim into the realm of plausibility.

**F.    The Court Denies Health Carousel's Motion to Strike Class Allegations.**

As noted, Health Carousel previously moved to strike class allegations. (Doc. 12). The Court denied that Motion in its prior Opinion. (Doc. 21, #624–30). Now, Health Carousel again moves to strike class allegations from the Third Amended Complaint. (Doc. 45).

In making that argument, Health Carousel faces an uphill battle. That is because a court can only strike class allegations where, "from the face of the … complaint[,] … it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 575 (M.D. Tenn. 2020) (quoting *Schilling v. Kenton County*, No. 10-cv-143, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011)). Without that showing, a court should deny the motion and allow discovery to proceed. *See id.* (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996)).

To begin, Health Carousel has failed to even discuss why Plaintiffs' RICO and OCPA claims and Carmen's FLSA claim should not proceed with class allegations. At most, Health Carousel claims Plaintiffs' RICO claims are "dubious." (*Id.* at #1135). Without an affirmative showing from Health Carousel, the Court declines to hold that it would be impossible for Plaintiffs' RICO, OCPA, and FLSA claims to be certified in a class action.

As to the TVPA claims, Health Carousel argues that common issues will not predominate over individual issues and that a class action is not a superior method of adjudicating the claims. (*See* Doc. 45). Let's start with predominance. Under

32

Federal Rule of Civil Procedure 23(b)(3), before certifying a class, the district court must find that common issues of law or fact "predominate over any questions affecting only individual members." Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins.,* 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fid. Nat. Title Ins.,* 646 F.3d 347, 352–53 (6th Cir. 2011)).

But "[a] plaintiff class need not prove that each element of a claim can be established by classwide proof." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 858 (citing *Amgen, Inc. v. Connecticut Ret. Plans & Tr. Fund*, 568 U.S. 455, 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

The Court finds it at least possible that common issues will predominate. To start, multiple issues seem to lend themselves to common resolution. For example, the putative class members claim to have entered largely uniform contracts with Health Carousel. (Doc. 43, #990). Plaintiffs allege these contracts created uniform compulsion from the liquidated damages clauses, isolation, and fear of deportation—

resulting in a supposedly common fear of "serious harm." (*Id.* at #1026). And Plaintiffs allege the putative class members uniformly experienced forced overtime. (*Id.* at #995). These allegations provide a relevant foundation for a common resolution of the TVPA claims.

True, Health Carousel is correct that some differences exist within the class. Carmen, Amistoso, and Flores each left Health Carousel on different terms, and only Carmen paid liquidated damages. (*Id.* at #1011–16). Each worked different roles in different conditions, with Carmen and Flores at a single site and Amistoso traveling between patients. (*See id.* at #1009). But the Court cannot say at this stage that these differences *necessarily* predominate over any common issues. While discovery may change that, the Court maintains its view that it is at least possible that Plaintiffs will be able to make the necessary predominance showing.

Health Carousel also says a class action is not a superior method of adjudicating the Plaintiffs' claims. (Doc. 45, #1139). There, Health Carousel argues, "[e]ach putative class member has a compelling incentive to pursue individual claims" and "[t]hese allegedly high-value and individualized claims are best left to each individual." (*Id.* at #1139–40).

Health Carousel may be on to something. The superiority analysis "aims to 'achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (quoting *Amchem*, 521 U.S. at 615). "Use of the class

34

method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *In re Whirlpool*, 722 F.3d at 861. Potentially small individual recoveries to class members support the use of class treatment. *See Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007).

But again, the Court cannot say, based solely on the pleadings and as a matter of law, that a class action is not superior to individual actions. For example, as immigrants, the class members are likely unfamiliar with the American legal system. *See, e.g.*, *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2018 WL 4347799, at *10 (E.D.N.Y. Sept. 12, 2018). And Plaintiffs specifically allege Health Carousel currently employs some putative class members and does not permit them to speak about their contract terms with anyone. (Doc. 43, #986). Some putative class members may interpret that directive as barring them from seeking legal advice or bringing their own action to vindicate their rights.

Accordingly, the Court cannot say it would be "impossible to certify the class as alleged." And finally, as the Court has denied Health Carousel's other requested relief, the Court also denies its Motion to Stay as moot.

## CONCLUSION

The Court is not today saying that Plaintiffs will ultimately prevail on their claims. Nor is the Court saying they won't. And the Court does not pronounce that this case is definitely amenable to class treatment, or that it isn't. Rather, the Court merely finds that Plaintiffs have alleged enough to render their claims plausible and

open the doors to discovery, including discovery intending to show whether this case should proceed as a class action. What follows from that is a question for another day.

For the above reasons, the Court **DENIES** Health Carousel's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 44) and **DENIES** Health Carousel's Motion to Strike Class Allegations (Doc. 45). Finally, the Court **DENIES** Health Carousel's Motion to Stay Discovery (Doc. 47) **AS MOOT**.

**SO ORDERED.**

August 9, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**