### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**NOVIE DALE CARMEN,** *et al.*,

      **Plaintiffs,**

        **Case No. 1:20-cv-313**

    **v.**

        **JUDGE DOUGLAS R. COLE**

**HEALTH CAROUSEL, LLC,**

      **Defendant.**

### OPINION AND ORDER

This long-running case arose out of Defendant Health Carousel, LLC's (Health Carousel) practices in bringing foreign nationals into the United States to work as healthcare professionals. (*See generally* Third Am. Compl., Doc. 43). More specifically, "Health Carousel is a labor recruiter that hires nurses, physical therapists, and other healthcare workers primarily from the Philippines to work in healthcare facilities in the United States." (*Id.* at #985). Plaintiffs Novie Dale Carmen, Jerlin C. Amistoso, and Kersteen B. Flores are three Filipina healthcare professionals—two nurses (Carmen and Flores) and one physical therapist (Amistoso)—who formerly worked for Health Carousel. (*Id.* at #988). After leaving the company, they sued seeking to bring claims on behalf of themselves and other similarly situated persons for Health Carousel's alleged violations of five statutes: the Victims of Trafficking and Violence Protection Act of 2000 (TVPA), 18 U.S.C. § 1589, *et seq.*; Ohio's human trafficking law, Ohio Rev. Code § 2905.32; the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*; the Ohio Corrupt Practices Act

(OCPA), Ohio Rev. Code §§ 2923.31–36; and the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201, *et seq.* (*Id.* at #1026–38). The parties have since reached a proposed settlement as to all claims. Accordingly, they asked the Court to preliminarily approve (1) the settlement of the class action claims and (2) notice about opting into the FLSA settlement. (*See* Joint Mtn. for Preliminary Approval, Doc. 73). Then, at the Court's prompting, the parties amended the proposed Settlement Agreement and notices to clarify certain provisions, and filed a Joint Amended Motion for Preliminary Settlement Approval . (*See* Doc. 85). For the reasons discussed more fully below, the Court **GRANTS** the Joint Amended Motion for Preliminary Settlement Approval (Doc. 85), thereby **PRELIMINARILY CERTIFYING** two classes for settlement purposes only, **AUTHORIZING** notice to similarly situated employees of their right to opt in to the FLSA collective action, **PRELIMINARILY APPROVING** the Amended Settlement Agreement and notices as to the class claims, **PRELIMINARILY APPOINTING** class counsel and representatives, and **APPOINTING** a settlement administrator. And because the Joint Amended Motion for Preliminary Settlement Approval superseded the previously filed Joint Motion for Preliminary Settlement Approval (Doc. 73), the Court **DENIES** the Joint Motion for Preliminary Settlement Approval (Doc. 73) as **MOOT**.

# BACKGROUND

## A.    Nature of the Suit and Procedural Background[1]

Health Carousel is a recruiting and staffing company headquartered in Hamilton County, Ohio. (Doc. 43 ¶¶ 2, 16, 18, #985, 988–89; Answer, Doc. 67 ¶¶ 2, 16, 18, #1437, 1441–42).  It enlists foreign healthcare professionals, mainly from the Philippines, to work in healthcare facilities across the United States. (Doc. 43 ¶¶ 2, 16, 18, #985, 988–89; Answer, Doc. 67 ¶¶ 2, 16, 18 #1437, 1441–42). The healthcare facilities that employ those workers pay Health Carousel an hourly rate for the workers' services that exceeds the hourly rate that Health Carousel has agreed to pay them. (Doc. 43 ¶ 19, #989; Doc. 67 ¶ 19, #1442). Health Carousel then pays the workers the wages to which they are entitled, keeping the difference for itself. (Doc. 43 ¶ 19, #989; Doc. 67 ¶ 19, #1442). As the description suggests, the revenue that Health Carousel generates for itself based on a given healthcare professional depends on how many hours that person works through the auspices of the Health Carousel program, known as Passport USA. (Doc. 43 ¶ 25, #990; Doc. 67 ¶ 25, #1443). The participating healthcare workers, in addition to job placement, also receive various benefits during their employment with Health Carousel—visa sponsorship and related expenses, airfare to the United States, temporary housing, cash bonuses on arrival, medical benefits, and life insurance. (Doc. 1-2, #30, 36)

Each healthcare worker's employment relationship with Health Carousel is governed by three agreements. Four provisions of the Employment Contract—the

---

[1] Because the Court recounted the background in detail in its previous Opinions and Orders, (Doc. 21, #598–608; Doc. 63, #1391–1402), it recounts the background only briefly here.

first of those agreements—are particularly relevant here: (1) a "Commitment Period" provision, which requires the participating healthcare professional to work "for a period of time commencing upon the completion of [the nurse's] orientation … and becoming fully licensed and ending upon the later of (i) 36 months or (ii) 6,240 regular-time work hours," (Doc. 1-2, #31, 35, 38); (2) an "Exclusivity" provision, in which the healthcare worker agrees not to accept employment from another company without Health Carousel's written consent before fulfilling their obligations under the Employment Contract, (*id.* at #31); (3) a noncompete and non-solicitation clause that prohibits a healthcare professional from "seek[ing] employment … with any other healthcare provider within 50 miles of [the worker's] Client facilities for one year after [the date the worker leaves Health Carousel if the worker violated the terms of the Employment Contract]" (*id.* at #32); and (4) a "Breach Obligation" provision, under which a worker who breaches the Employment Contract would be responsible for liquidated damages that are calculated based on a list of expenses and potential lost profit items, (*id.*). The Addendum—the second of the three agreements—amends the "Breach Obligation" provision, instead setting fixed liquidated damages figures based on when the breach occurs in relation to the progress on the healthcare worker's visa application. (*Id.* at #29).

Upon arrival in the United States, a Health Carousel employee also receives and signs various agreements that, together, form a 183-page "Employee Handbook"—the third agreement. (Doc. 12-1). Among other things, the Handbook forbids healthcare workers from discussing the terms of their employment and

"gossip[ing]" at work. (*Id.* at #316). It also explains that the Commitment Period detailed in the Employment Agreement will not begin until the worker obtains full licensure, (*id.* at #340), and states that any liquidated damages amount will be "due immediately and in full on or before the last day" of the worker's employment, (*id.* at #282). And it states that Health Carousel will sue to recover any liquidated damages a breaching healthcare worker fails to pay, with the possibility of "obtain[ing] a judgment that will be enforceable abroad" should that person leave the country. (*Id.*).

After leaving Health Carousel, Carmen sued bringing claims on behalf of herself and a putative class for Health Carousel's alleged violations of the TVPA and Ohio's human trafficking law. (Doc. 6, #111–15). After she amended her Complaint, (First Am. Compl., Doc. 11), Defendant sought to dismiss the First Amended Complaint or, in the alternative, to strike the class allegations, (Doc. 12). The Court held oral argument on that motion, (8/7/20 Min. Entry; Doc. 18 (transcript of argument)), which it ultimately denied, (Doc. 21). And Health Carousel answered the First Amended Complaint. (Doc. 25).

Carmen then amended her Complaint twice more, both times with Health Carousel's consent. (*See generally* Unopposed Mot. for Leave to File Second Am. Compl., Doc. 37; Unopposed Mot. for Leave to File Third Am. Compl., Doc. 42). The Second Amended Complaint added Amistoso as a named Plaintiff. (Doc. 38, #852). And it added claims for violating RICO, the OCPA, and the FLSA. (Doc. 38, #890–98). The Third Amended Complaint added Flores as a named Plaintiff. (Doc. 43, #988).

5

Although Health Carousel consented to the filing of the Third Amended Complaint, once it was filed, Health Carousel again sought to dismiss that complaint—or, in the alternative, to strike the class allegations. (*See generally* Doc. 44). It also sought to stay discovery while those motions were pending. (*See generally* Doc. 47). The Court once again denied both the motion to dismiss and the motion to strike. (Doc. 63, #1426). As a result, it also denied the motion to stay discovery as moot. (*Id.*). Health Carousel then answered the Third Amended Complaint. (Doc. 67).

Earlier this year, the parties moved to stay the deadlines in this case while they finalized the terms of a settlement agreement. (Doc. 70, #1525). The Court granted that motion. (1/9/24 Not. Order). And after the Court granted two motions to extend the deadline, (1/29/24 Not. Order (granting Doc. 71); 2/29/24 Not. Order (granting Doc. 72)), the parties jointly moved for preliminary settlement approval. (Doc. 73).[2] Health Carousel also sought to redact portions of two depositions containing confidential information, (Doc. 74), which the Court granted, (Order, Doc. 76). It has since filed both those redacted depositions. (*See* Redacted Dep. of Kersteen Flores, Doc. 81; Redacted Dep. of Novie Dale Carmen, Doc. 84).  Finally, following a telephone status conference, (*see* 5/31/24 Min. Entry), the parties jointly moved to amend their motion for preliminary settlement approval, attaching amended

---

[2] Because the Joint Amended Motion for Preliminary Settlement Approval supersedes and moots the original motion, *cf. Epps v. United States*, No. 1:23-cv-510, 2024 WL 2176877, at *3 (S.D. Ohio May 15, 2024) ("When Epps filed the First Amended Complaint (Doc. 5), she mooted the Complaint."), the Court denies the Joint Motion for Preliminary Settlement Approval (Doc. 73) as moot.

6

settlement documents. (Doc. 85). The matter is now before the Court on the Joint Amended Motion for Preliminary Settlement Approval. [3]

## B.    Terms of the Proposed Class Action and FLSA Settlement

As should be evident from the above description, while the parties are seeking to resolve putative class claims, the Court has not yet certified any class in the matter. Similarly, while the parties would like to settle FLSA claims, they have yet to provide notice to, or receive consents from, anyone as to those claims. Accordingly, before turning to the substance of the settlement, the Court describes the procedural mechanisms that the settlement proposes to address the creation of a settlement class, and to seek opt-in consents as to the FLSA collective action.

As to the former, the proposed Settlement seeks provisional certification for, and if approved would provide relief to, two Settlement Classes—which the Amended Settlement Agreement refers to as Group A and Group B. (Doc. 73, #1557; Doc. 85-1, #5744–45, 5758). The proposed Group A Settlement Class is defined as:

> [A]ll healthcare workers who entered the United States through Defendant's Passport USA program at any point from March 16, 2010[,] to February 15, 2024, who do not submit a timely and valid written notice of intent to opt-out, and who as of February 15, 2024: (1) paid Health Carousel some or all "liquidated damages" for leaving before the end of their Commitment Period; (2) completed their Commitment Period; or (3) are current employees.

---

[3] The parties attach an Amended Settlement Agreement and amended proposed notices to the Joint Amended Motion for Preliminary Settlement Approval. (Doc. 85, #5736). They also expressly incorporate the remainder of the Joint Motion for Preliminary Settlement Approval, including the attachments to that motion, by reference. (*Id.*). The Court therefore cites both the newly filed motion and the portions of the original motion that are incorporated by reference, as appropriate.

(Doc. 73, #1557; Doc. 85-1 ¶ 13, #5744–45). And the proposed Group B Settlement Class is defined as:

> [A]ll healthcare workers who entered the United States through Defendant's Passport USA program at any point from March 16, 2010[,] to February 15, 2024, who do not submit a timely and valid written notice of intent to opt-out, and who as of February 15, 2024: (1) had left Heath Carousel before the end of their Commitment Period and failed to pay Health Carousel any "liquidated damages"; or (2) are current employees.

(Doc. 73, #1557; Doc. 85-1 ¶ 14, #5745). As the definitions suggest, the groups overlap to some extent. The result is that anyone who entered the United States during the relevant time period (March 16, 2010, to February 15, 2024) and is still employed at Health Carousel would be a member of both the Group A and Group B Settlement Classes. Members of either group who do not opt out of the settlement will release claims based on "events occurring from the beginning of time through February 15, 2024[,] that were or could have been raised in this case given the facts alleged in the operative complaint." (Doc. 73, #1559; *see also* Doc. 85-1 ¶ 59, #5757–58 (cleaned up)).

Meanwhile, as to the FLSA claim (which is not a class claim but rather a collective action claim), the Amended Settlement Agreement seeks the ability to send notice to similarly situated employees (or "Settlement Collective Member[s]," as the Amended Settlement Agreement terms them), who are defined as: "Group A Settlement Class Members who paid Health Carousel some or all 'liquidated damages' for leaving before the end of their Commitment Period." (Doc. 73, #1558; Doc. 85-1 ¶ 29, #5747). The Settlement Collective will then consist of all those who timely opt in by returning consents to join the FLSA portion of the settlement. (Doc. 73, #1558; Doc. 73-1 ¶ 29, #1620). In exchange for the benefits that they receive for

opting into the "Settlement Collective," these persons will "release their claims under the FLSA through February 15, 2024." (Doc. 73, #1559; *see also* Doc. 85-1 ¶ 60, #5758).

In terms of the monetary provisions, the Settlement requires Health Carousel to pay $6,050,000 into a common fund. (Doc. 73, #1559; Doc. 85-1 ¶¶ 12, 37, #5744, 5750). That amount represents roughly half of the aggregate amount that a subset of the proposed Group A Settlement Class members had previously paid to Health Carousel as "liquidated damages" for leaving their employment before the ends of their respective Commitment Periods. (Decl. of Anna Prakash (Prakash Decl.), Doc. 73-1 ¶ 29, #1610). All payments to class or collective members will come from that common fund (as further described below). (Doc. 73, #1559; *see also* Doc. 85-1 ¶¶ 12, 37, #5744, 5750). In addition, "[a]ll settlement administration expenses, service awards for the proposed Class Representative, and proposed Class Counsel's attorneys' fees and costs, if approved by the Court, will be paid from the common fund." (Doc. 73, #1559; *see also* Doc. 85-1 ¶¶ 12, 37, #5744, 5750). Importantly, "[i]f the number of Settlement Class Members who opt out exceeds 20% of the total number of class members, Health Carousel" has the right to terminate the Settlement, returning the parties to their positions as of December 21, 2023. (Doc. 85-1 ¶ 55, #5756).

Only Group A Settlement Class Members (including the subset of that group that opts in to the FLSA portion of the settlement) will receive financial relief. Group A employees who completed their contracts (i.e., stayed through the full Commitment

9

Period) with Health Carousel by February 15, 2024, (and thus are part of Settlement Group A, but not the FLSA action) will each receive an equal amount based on an initial gross allocation of $2,000 adjusted downward for court-awarded fees and expenses. (Doc. 73, #1559–60; Doc. 85-1 ¶¶ 37, 38(a), #5750). Those who are current Health Carousel employees working in the United States (and thus again are not part of the FLSA action)—a subset of Group A that is mutually exclusive with the subset eligible for the $2,000 payments—will receive a monetary award based on an initial allocation of $1,000 each, once again adjusted for fees and expenses. (Doc. 73, #1560; Doc. 85-1 ¶ 38(b), #5750). Finally, those Settlement Class members who actually paid Health Carousel liquidated damages (and thus qualify for inclusion in both Group A and the FLSA collective action) will split the rest of the fund. (Doc. 73, #1560; Doc. 85-1 ¶ 38(c), #5750–51). That split will be pro rata based initially on the amount each recipient had paid Health Carousel as "liquidated damages," but then rebalanced to decrease the otherwise applicable pro rata amount for a given worker by 30% if that employee is part of Settlement Group A (i.e., did not opt out of the class settlement), but did not affirmatively opt in to the FLSA portion of the settlement. (Doc. 73, #1560; Doc. 73-1 ¶ 38(c), #1623–24). Those who both are in Group A and opt in to the FLSA settlement, by contrast, will not have that reduction applied to their award.

Payments will be made automatically, via either (1) deposit into the bank account that Health Carousel last had on file for that employee, or (2) another payment method that a payee elects. (Doc. 73, #1567; Doc. 85-1 ¶¶ 70–71, #5761; *id.* at #5776 (proposed long form notice for current employees), 5797 (proposed notice for

former employees who paid liquidated damages), 5825 (proposed postcard notice)). And before any of these payments are made, the employer-side payroll taxes associated with each payment will be returned to Health Carousel, up to a cap of $20,000. (Doc. 73, #1560; Doc. 85-1 ¶ 38(c), #5750–51). Any money remaining after these payments will be deposited with the applicable state's unclaimed property fund after reminding Settlement Class and Collective Members that they need to claim their property and providing them reasonable time to do so. (Doc. 73, #1567; Doc. 85-1 ¶ 71, #5761).

Going forward, Health Carousel will also change how it handles both prospective and currently disputed debt collection. For Settlement Class Members who were not current employees as of February 25, 2024, Health Carousel will forgive any disputed debts related to "liquidated damages," as well as discharging non-disputed debt for all loans owed to Health Carousel. (Doc. 73, #1561; Doc. 85-1 ¶ 33, #5748). Those who are current employees, meanwhile, will owe Health Carousel only actual costs and expenses, rather than "liquidated damages," if they leave before the end of their Commitment Periods. (Doc. 73, #1561; Doc. 85-1 ¶ 35, #5749). That number will be capped at an amount calculated based on an itemized expense list, pro-rated according to the number of hours worked for Health Carousel as compared to that Settlement Class Member's Commitment Period, which Health Carousel will provide to the employee before beginning collection attempts. (Doc. 73, #1561; Doc. 85-1 ¶ 35, #5749).

Finally, Health Carousel will alter the documents governing its relationship with its employees, along with the signing process. For three years following final approval of the proposed Settlement, absent contrary legal obligations, all newly executed Passport USA contracts will (1) define the Commitment Period to include regular-time, overtime, and orientation hours, and (2) replace the liquidated damages provision with the terms described above. (Doc. 73, #1561; Doc. 85-1 ¶ 36, #5749–50). Health Carousel will also permanently remove its prohibition on "gossip"; advise prospective employees to consult an attorney regarding their contracts; notify such prospective employees that Health Carousel's offer is valid for 30 days from receipt and, if they request an extension, 30 days more; and provide a primer to prospective employees that explains their rights and obligations under their visas, including that their visas are not tied to a specific employer. (Doc. 73, #1561–62; Doc. 85-1 ¶¶ 31–32, #5748). And Health Carousel further commits to not communicating any potential negative immigration consequences to EB-2 and EB-3 visa holders who indicate an intention to leave before completing their Commitment Period (without admitting ever having made such representations in the past). (Doc. 73, #1562; Doc. 85-1 ¶ 34, #5748–49).

## C.    Notice Plan

After a bid process, the parties selected Atticus Administration, LLC (Atticus), to administer the settlement. (Doc. 73, #1562–63; Doc. 85-1 ¶ 25, #5747). The Amended Settlement Agreement tasks the claim administrator (here, Atticus) with notifying the potentially affected parties of the settlement; processing consent forms,

requests for exclusion, and objections; disbursing settlement payments; maintaining a secure Settlement Website; and other administrative tasks. (Doc. 85-1 ¶¶ 12, 15, 21–22, 24, 30, 46–56, 69–71, #5744–48, 5753–57, 5761).

The first stage of the notice plan is a double-sided postcard notice. (Doc, 73, #1563–64; Doc. 85-1 ¶¶ 46–49, #5753–54; *id.* at #5825–26 (proposed postcard notice)). For those eligible to opt into the Settlement Collective, that postcard notice will include a detachable FLSA consent form. (Doc, 73, #1563–64; Doc. 85-1 ¶¶ 46–49, #5753–54; *id.* at #5825–26 (proposed postcard notice)). And that mailer will have information on what the Settlement Class and Settlement Collective members will receive, the Settlement Website, how to opt into the Settlement Collective, how to opt out of the Settlement Class, and how to object to the Settlement. (Doc, 73, #1563–64; Doc. 85-1 ¶¶ 24, 51, #5747, 5754–55; *id.* at #5775–5819 (proposed long form notices),5825–26 (proposed postcard notice)). Atticus will send those mailers and cause the website to go live within 21 days of the Court preliminarily approving the Settlement. (Doc. 73, #1564; Doc. 85-1 ¶¶ 12, 15, 21–22, 24, 30, 46–56, #5744–48, 5753–57).

The notice period, during which putative Class Members can (1) opt out of the Class, and (2) opt in to the FLSA portion of the Settlement (if applicable), will be 60 days. (Doc. 73, #1567; Doc. 85-1 ¶¶ 18–19, #5746). And the parties will seek final approval of the Settlement within 30 days of the notice period closing. (Doc. 73, #1567; Doc. 85-1 ¶ 68, #5760). If the Court grants final approval, Heath Carousel will implement the non-monetary relief provided in the Settlement, as well as paying the

monetary relief into the common fund within five days. (Doc. 73, #1567; Doc. 85-1 ¶ 69, #5761). And the Settlement Administrator will pay Settlement Class Members, Class Counsel, and Class Representatives within 14 days of receiving the funds. (Doc. 73, #1567; Doc. 85-1 ¶ 70, #5761). Finally, the Settlement Administrator will send reminders by both email and paper mail to Settlement Class Members for whom payment could not be made or who have not accepted payment. The reminder will notify the class members that their payments will be sent to the state's unclaimed property fund if they do not contact the Settlement Administrator or otherwise accept their payment within thirty days. (Doc. 73, #1567; Doc. 73-1 ¶ 71, #1633; *id.* at #1695–97 (proposed payment acceptance reminder notice)).

## JURISDICTION AND CHOICE OF LAW

The Court begins by addressing its jurisdiction. Subject-matter jurisdiction exists under 28 U.S.C. § 1331 because the action asserts claims under three United States statutes: the TVPA, the FLSA, and RICO. And the Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' related Ohio-law claims under the OCPA and Ohio's human trafficking law.

Deciding the source of law that justifies certification here is potentially more complicated. "No class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 1997). Here, the Employment Contract contains a choice of law provision specifying that Ohio law applies. (Doc. 1-2, #33). And Health Carousel's headquarters—from which it presumably made all decisions regarding its conduct that gave rise to this case—

14

are in Ohio, (Doc. 43 ¶ 16, #988; Doc. 67 ¶ 16, #1441), which likely means that choice of law provision is enforceable. But that doesn't help because the claims here, despite arising from contractual arrangements between the parties, do not sound in contract.

As to the federal claims, of course, no concerns arise, because the same substantive standard applies to all members of the class nationwide. But Plaintiffs are also asserting two Ohio-law claims (an OCPA claim (Count XIII) and an Ohio human trafficking claim (Count X)). And it is not clear that the Court can certify a class as to those state-law claims, given the due process/extraterritoriality concerns that they create. Specifically, for the Court to certify a class as to those claims, Plaintiffs must show "a significant contact or an aggregation of contacts" between the would-be class members and the State of Ohio as to these claims. *See Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *6 (S.D. Ohio Dec. 20, 2023) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818–23 (1985)) (cleaned up). For preliminary approval purposes, the Court will assume that the parties will be able to certify a class as to these claims. But the Court instructs the parties to brief this issue when they seek final class certification and settlement approval (or, alternatively, to dismiss the Ohio-law claims and seek certification only on the federal claims, which do not trigger these concerns).

## LAW AND ANALYSIS

### A. Provisional Class Certification for Settlement Purposes

With that out of the way, the Court now turns to the substance of the Joint Amended Motion for Preliminary Settlement Approval. Federal Rule of Civil

15

Procedure 23(e)(1)(B)(ii) directs a court to determine, at the preliminary settlement approval stage, whether it "will likely be able to … certify the class for purposes of judgment on the proposal." If a court determines that it will likely be able to certify the class for settlement approval, it conditionally certifies the class pending final approval in accordance with Federal Rule of Civil Procedure 23(e)(1)(B)(2).

> Rule 23 allows a class to be certified only if:
>
> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). And on top of the Rule 23(a) requirements, a class must satisfy one of the conditions of Rule 23(b). In this case, the parties point to Rule 23(b)(2) (for the Group B Settlement Class, which will receive only non-monetary relief) and Rule 23(b)(3) (for the Group A Settlement Class, which will receive only monetary relief). (Doc. 73, #1568). Rule 23(b)(2) applies to cases in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." And Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1. Numerosity, Commonality, Typicality, and Adequacy

The Court finds that all four Rule 23(a) requirements are met as to both proposed settlement classes. Start with numerosity. A matter can proceed as a class action only if the class is so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a). "[W]hile there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). And "[w]hen a class numbers in the hundreds or thousands, the impracticability of joinder is obvious." *Alexander v. Miller*, Case No. 3:20-cv-44, 2021 WL 1113146, at *5 (E.D. Ky. March 23, 2021) (quoting *Mich. State Univ. Faculty Ass'n v. Mich. State Univ.*, 93 F.R.D. 54, 56 n. 1 (W.D. Mich. 1981)); *see also Hunter v. Booz Allen Hamilton Inc.*, No. 2:19-cv-00411, 2023 WL 3204684, at *3 (S.D. Ohio May 2, 2023) (holding that 647 class members meets the numerosity requirement). Here "there are 3,772 putative Group A Settlement Class Members, and there are 1,707 putative Group B Settlement Class Members," constituting 4,034 total Class Members after accounting for overlap between Group A and Group B. (Doc. 73, #1569; *see also* Prakash Decl., Doc. 73-1 ¶ 28, #1608 ("There are approximately 3,772 putative Group A Settlement Class Members and approximately 632 putative Settlement Collective Members. There are approximately 1,707 putative Group B Settlement Class Members[,] … [and] approximately 1,445 Group B Settlement Class Members who are also Group A Settlement Class Members.")). Thus both classes are large enough to satisfy numerosity.

Commonality and typicality are also satisfied. Commonality requires that the class's claims "depend upon a common contention" that is "of such a nature that it is

17

capable of class[-]wide resolution" such that determination of the contention's "truth or falsity" will resolve a central issue to the claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Similarly, "a necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (cleaned up).

Here, the "challenge[d] conduct stem[s] from nearly identical contractual arrangements between Health Carousel and the Settlement Class Members[,] … [each of whom] was recruited from outside of the United States as a healthcare worker." (Doc. 73, #1570). Accordingly, as the parties correctly point out, "there are numerous common questions of law and fact that … are apt to drive the resolution of this litigation." (*Id.* at #1571). That is enough to satisfy both commonality and typicality. *See Young*, 693 F.3d at 543 (holding that both commonality and typicality were satisfied where "Plaintiffs allege both a single practice or course of conduct … that gives rise to the claims of each class member and a single theory of liability"); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2018 WL 4347799, at *10 (E.D.N.Y. Sept. 12, 2018) (certifying a class of nurses recruited from the Philippines and making similar allegations); *Miller v. Charter Nex Films - Delaware, OH, Inc.*, No. 2:18-cv-1341, 2020 WL 2896913, at *4 (S.D. Ohio June 2, 2020).

Lastly, the named Plaintiffs have "fairly and adequately protect[ed] the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives adequately represent the rest of the class when they (1) share common interests with the absent class members, and (2) vigorously "prosecute the interests of the class through qualified counsel." *Hunter*, 2023 WL 3204684, at *4 (quotation omitted). As to the first, the named Plaintiffs are seeking relief that will benefit absent class members. As such, they share common interests.[4] As to the latter, the named Plaintiffs have prosecuted this case for more than four years to obtain relief for the rest of the class. During that time, all three named Plaintiffs were deposed, (Decl. of Beth Bryan (Bryan Decl.), Doc. 73-2, #1752; Decl. of Novie Dale Carmen (Carmen Decl.), Doc. 73-4, #1784; Decl. of Jennifer Amistoso (Amistoso Decl.), Doc. 73-5, #1786; Decl. of Kersteen Flores (Flores Decl.), Doc. 73-6, #1788), and class counsel successfully defended the viability of the underlying legal theories against three motions to dismiss, (Docs. 5, 12, 44). The Court therefore finds that the class representatives, through their counsel, have adequately protected the interests of the class. Accordingly, the Court finds that all the Rule 23(a) factors have been satisfied for purposes of provisional class certification at this stage.

---

[4] Plaintiffs have noted that they intend to later apply for service awards for the named Plaintiffs. (Doc. 85-1 ¶ 41, #5752 ("The Class Representatives, through Class Counsel, intend to apply to the Court for service awards in an amount not to exceed $10,000 for Novie Carmen, and in an amount not to exceed $5,000 each for Jerlin Amistoso and Kersteen Flores.")). The Court makes no ruling on the appropriate amount for any such awards now, as the question is not currently before the Court. But the Court does note that it will deny any application for excessive incentive awards that constitute "windfalls for the class representative[s]." *Hawes*, 2024 WL 2125640, at *6.

### 2. Predominance and Superiority Under Rule 23(b)(3)

The Court likewise finds that Settlement Class Group A meets Rule 23(b)(3)'s requirements—(1) that the questions common to the class "predominate over any questions affecting only individual members"; and (2) that a class action is superior to other adjudication methods—for purposes of provisional settlement approval.

To evaluate predominance, the Court must first determine which issues of fact or law are common to the class and then weigh their predominance against individual questions which vary from class member to class member. *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413–14 (6th Cir. 2018). Factors relevant to that balancing test include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; [and] (B) the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3).

Here, as the parties correctly note, " [e]ach Group A Settlement Class Member was subject to a similar recruitment process and similar contract terms," including the "liquidated damages" provision. (Doc. 73, #1577). And resolution of each Class Member's case turns on common issues arising as a result of those contract terms. That is enough to satisfy the predominance requirement at this stage.

As to superiority, the Court considers the difficulties of managing a class action, the alternative adjudication methods to a class action, and the nature of the class claims. *See Martin*, 896 F.3d at 415–16 (6th Cir. 2018) (citation omitted). Any manageability difficulties are irrelevant at this stage where the Court has already managed over four years of litigation and provisionally certifies the class for

settlement purposes only. Alternative adjudication methods—presumably individual suits by individual claimants—would be inferior to class adjudication, especially given the substantial overlap of issues between class members and the quantum of each claimant's potential damages here. While the settlement amounts contemplated here are larger than in many class actions, individual trials would still be more costly for both the judicial system and Health Carousel than a single settlement resolving all Class Members' claims. And Plaintiffs would suffer too, as the relatively small value of individual damages would likely dissuade many potential Class Members from suing. *See id.* (small value individual damages relevant to superiority). And the nature of the claims, which arise from similar recruitment processes and contractual terms, lends itself nicely to resolution on a class-wide basis. Class adjudication is thus superior to all other methods at this stage.

### 3. Injunctive and Declaratory Relief Under Rule 23(b)(2)

For similar reasons, the Court also finds that provisional certification is appropriate for the Group B Settlement Class. "The key to the [Rule 23](b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (cleaned up). The steps Health Carousel is taking to provide non-monetary relief by way of forgiving disputed debt apply to the class as whole. That satisfies Rule 23(b)(2), just as it satisfies Rule 23(a). *See Diaz v. Hillsborough Cnty. Hosp. Auth.*, 165 F.R.D. 689, 695 (M.D. Fla. 1996) ("The requirement that the defendant act on grounds

generally applicable to the 23(b)(2) class is encompassed in the commonality requirement of Rule 23(a).").

*          *          *

In short, the Court provisionally finds that common questions of fact predominate for the Group A Settlement Class, and that a class action is superior to other adjudication methods, thus satisfying Rule 23(b)(3). And it provisionally finds that the Group B Settlement Class satisfies the requirements of Rule 23(b)(2). The Court accordingly provisionally certifies the Group A and Group B Settlement Classes proposed in the Amended Settlement Agreement. (*See* Doc. 85-1 ¶¶ 13–14, #5744–45). And it provisionally appoints Novie Dale Carmen, Jerlin Amistoso, and Kersteen Flores as Class Representatives. More specifically, it provisionally appoints Carmen as the Class Representative for Group A and provisionally appoints Amistoso and Flores as Class Representatives for Group B. (*See* Doc. 73, #1573 ("Group A Settlement Class Members work under Health Carousel contracts … that are substantially similar to … Carmen's contract[.] … Amistoso and Flores are in the same situation as Group B Settlement Class Members who left before the end of their Commitment Period but did not pay … 'liquidated damages.'")).

It also provisionally appoints Plaintiffs' counsel—Nichols Kaster, PLLP; Towards Justice; Donati Law; Gupta Wessler; and Barkan Meizlish—as Class Counsel, pursuant to Federal Rule of Civil Procedure 23(g). In appointing class counsel, the Court must consider: counsel's work "in identifying or investigating potential claims"; their "experience in handling class actions, other complex

22

litigation, and the types of claims asserted in the action"; their "knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." Fed R. Civ. P. 23(g)(1)(A). Class counsel also "must fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(4), and the Court may consider "any other matter pertinent to" their ability to do so, Fed. R. Civ. P. 23(g)(1)(B).

Plaintiffs' counsel here clear the threshold for provisional appointment as Class Counsel. The attorneys involved in this case have submitted declarations that both describe the extensive work they have already done in this matter and represent to the Court that they will continue to zealously represent the class if appointed as Class Counsel. (Prakash Decl., Doc. 73-1, ¶¶ 18–26, #1604–08; Decl. of David Seligman (Seligman Decl.), Doc. 73-7 ¶ 5, #1790–91; Decl. of Robert DeRose (DeRose Decl.), Doc. 73-8 ¶¶ 15–19, #1799; Decl. of Bryce Ashby (Ashby Decl.), Doc. 73-9 ¶¶ 13–15, #1841; Decl. of Jennifer Dale Bennet (Bennett Decl.), Doc. 73-10 ¶ 11, #1847). And those submissions also include documentation of counsel's extensive experience with class action litigation. (Prakash Decl., Doc. 73-1, #1711–50 (documenting Nichols Kaster's qualifications); Seligman Decl., Doc. 73-7 ¶¶ 1–4, 6–26, #1790–95 (describing the qualifications of Towards Justice); DeRose Decl., Doc. 73-8 ¶¶ 1–14, #1796–99, #1803–1807 (describing Barkan Meizlish's qualifications); Ashby Decl., Doc. 73-9 ¶¶ 1–12, #1838–41 (describing Donati Law's qualifications); Bennett Decl., Doc. 73-10 ¶¶ 1–10, #1842–47, #1849–50 (describing Gupta Wessler's qualifications)). Upon reviewing counsel's submissions, the Court is satisfied that

23

they have been actively involved in this case, and that they are experienced advocates who will continue "fairly and adequately represent[ing] the interests of the class," Fed. R. Civ. P. 23(g)(4), upon appointment. Accordingly, the Court provisionally appoints Plaintiffs' counsel as Class Counsel.

## B.    Fairness of the Proposed Settlement

Having provisionally certified the classes and provisionally appointed Class Counsel and Class Representatives, the Court next turns to the fairness of the proposed settlement itself. Unlike most settlements, class action settlements require court approval under Federal Rule of Civil Procedure 23(e). Before final approval, the Court must hold a hearing on the proposed settlement and find that the settlement is "fair, reasonable, and adequate." *Id.* Factors that the Court must consider when determining whether a settlement is "fair, reasonable, and adequate" include:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

*International Union*'s list of relevant factors predates amendments to Rule 23 in 2018. Before the amendments, Rule 23 required a court to find only that the settlement was "fair, reasonable, and adequate," with no elaboration as to what factors were relevant to that finding. The 2018 amendments to that rule, however, now instruct the Court to consider whether:

24

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:
 (i) the costs, risks, and delay of trial and appeal;
 (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
 (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
 (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Comparing the two sets of factors reveals (perhaps not surprisingly) considerable overlap. *International Union* Factor 1 folds into whether the proposal was "negotiated at arm's length." Factors 2–4 involve what is essentially a detailed inquiry into the "costs, risks, and delay of trial and appeal." Factors 5–6 assess the opinions of class counsel, named plaintiffs, and absent class members—a substantially similar consideration as to whether the "class representatives and class counsel have adequately represented the class." Factor 7, lastly, is a broadly formulated factor designed to ensure the adequacy of representation, the absence of fraud or collusion, and the equitable treatment of class members—something the totality of Rule 23(e)(2) ensures.

At the preliminary approval stage, the Court must determine whether the Settlement is likely to clear the hurdle of final approval. Fed. R. Civ. P. 23(e)(1)(B). Because the *International Union* factors are largely subsumed in the 2018 amendments to Rule 23, the Court will not separately analyze each *International*

*Union* factor to conduct that analysis. Rather, it will evaluate the settlement under the four factors identified in Rule 23(e)(2), which also encompass the *International Union* factors. As described more fully below, applying those factors, the Court provisionally finds that this class action settlement is "fair, reasonable, and adequate."

### 1.  Adequacy of Representation

Rule 23(e)(2)(A) instructs the Court to consider whether the class representatives and class counsel have "adequately represented the class." This provision mirrors the adequacy prong of Rule 23(a) that the Court analyzed when certifying the class. But Rule 23(e)(2)(A), as a preliminary settlement approval requirement, requires the Court to consider adequacy of representation in relation to the Settlement terms and notice process.

The record shows that class representatives and counsel have adequately represented the rest of the class. Both sides' counsel have represented that they have invested many hours diligently litigating the case and negotiating the settlement. (Prakash Decl., Doc. 73-1 ¶¶ 19–26, #1604–08; Seligman Decl., 73-7 ¶ 5, #1790–91). And the Settlement terms reinforce this conclusion. No portion of the common fund will revert to Health Carousel, while the up to $20,000 that Health Carousel will receive to pay employer-side payroll taxes will go to the government. (Doc. 85-1 ¶ 38(c), #5750–51). That resolution, which involves benefits and concessions for both sides, suggests counsel for each side zealously advocated for their clients during negotiations.

## 2. Arm's Length Negotiations

The Court is also satisfied based on counsel's representation that the settlement was negotiated at arm's length. (Bryan Decl., Doc. 73-2 ¶¶ 6–12, 14–15, 24, #1752–53, 1755; Prakash Decl., Doc. 73-1 ¶¶ 32–33, #1611). Each party entered mediation with separate sets of goals, and each side extracted concessions from the other. The Court therefore presumes the settlement negotiations were not plagued by fraud or corruption. *See Todd S. Elwert, Inc. DC v. All. Healthcare Servs., Inc.*, 2018 WL 4539287, at \*2 (S.D. Ohio Sep. 21, 2018).

## 3. Adequacy of Relief

Rule 23(e)(2)(C) asks whether "the relief provided for the class is adequate." To assess the adequacy of relief, the Court considers: (1) "the costs, risks and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees."[5] *Id.*

Under that framework, the relief provided here is adequate. Group A will receive "approximately 50% of the total 'liquidated damages' Class Members paid Health Carousel," while Group B will receive "non-monetary relief valued at approximately $8,300,000 and additional programmatic changes." (Doc. 73, #1586). That is substantial value for all Class Members.

The adequacy of the settlement's proposed relief is further evidenced when considered against the costs of continued litigation. At the time the parties negotiated

---

[5] The parties identified no agreements (other than the Amended Settlement Agreement) that are relevant to the Court's consideration, so the fourth adequacy of relief prong is not relevant. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

27

the Settlement, they had completed class certification discovery along with undertaking significant discovery relating to Plaintiffs' individual claims. (Doc. 73, #1556–57). But there were significant costs yet to be incurred in taking the matter to trial. So the likely costs of completing discovery and preparing for and undertaking trial, compared to the possibility of marginally better recovery for the class, reinforce the conclusion that the Settlement provides adequate relief. And the putative Class Members are already known and will receive their share of the Settlement without having to complete a claims process, thus ensuring that the award will be fully distributed to the class.

Lastly, the proposed attorneys' fees award does not weigh against the adequacy of the class recovery. The Court need not opine on whether it will approve the attorneys' fees awards, as the parties have not agreed to a clear-sailing provision for any of the awards. All the Amended Settlement Agreement says is that class counsel *will* seek them. So any unreasonableness as to the amount class counsel ends up seeking can be addressed in connection with final approval.

### 4. Equitable Treatment Among Class Members

That brings the Court to the final factor it must consider. The settlement does not technically treat all class members equally. But while the distribution scheme may not treat members strictly *equally*, it does treat them *equitably*. Certain members of Group A will receive more based on whether they are currently working for Health Carousel, and whether they paid Health Carousel liquidated damages. Those are objectively reasonable bases for different awards which reflect the different

28

levels of harm Class Members allegedly experienced, along with the relative strength of the case each might bring individually. Accordingly, because "[i]t is reasonable to allocate the settlement funds to class members based on … the strength of their claims on the merits," the Court provisionally finds that the distribution scheme treats class members equitably. *Grady v. RCM Tech., Inc.*, 671 F. Supp. 3d 1065, 1082 (C.D. Cal. 2023) (citation omitted).

Separately, any incentive award for the named Plaintiffs may bear on the question of equitable treatment. *Hawes*, 2023 WL 8811499, at *12–13. But as the Court noted above, the Amended Settlement Agreement itself does not say that the named Plaintiffs are seeking a specific amount of incentive awards. Rather, it says that class counsel will seek such awards, and that any awarded amount will come out of the common fund. (Doc. 85-1 ¶¶ 40–41, #5751–52). So the only question at this point—in assessing whether the Settlement treats class members equitably—is whether the inclusion of potential incentive awards *categorically* renders a settlement agreement inequitable and invalid under Rule 23. And as the Court discussed at length in an opinion it recently issued in another class action, it does not. *Hawes*, 2023 WL 8811499, at *13 ("The Court is persuaded by the consensus of authority and finds that Rule 23's equitable treatment requirement does not prohibit—indeed, it may be furthered—by appropriate incentive awards to class representatives."). So the Court concludes that the Amended Settlement Agreement clears this final hurdle, which means notice should be provided to the Settlement Class.

## C.     The Class Action Notice Plan

The Court therefore turns to the adequacy of the notice plan. In the Sixth Circuit, "for any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008) (cleaned up). And the notice must also be "reasonably calculated to reach interested parties" to satisfy Due Process requirements. *Id.* at 514 (cleaned up). Moreover, Rule 23(c)(2)(B) dictates that the notice describe: "the nature of the action"; "the definition of the class certified"; "the class claims, issues, or defenses"; that any class member may enter an appearance through an attorney or opt out; "the time and manner for requesting exclusion"; and "the binding effect of a class judgment on members under Rule 23(c)(3)."

The Court determines that the notice proposed here is "the best notice practicable under the circumstances." For starters, all putative Class Members are already known and will receive individual notice. Moreover, the proposed notice plan employs two reliable methods that are reasonably calculated to provide actual notice to class members. *See, e.g.*, *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 290 (6th Cir. 2016) (finding a "dual email and postcard mailing approach targeting individual class members" to be appropriate). And the proposed notice materials detail all the information required by Rule 23(c)(2)(B) in simple language that is easy to understand. (*See* Doc. 85-1, #5775–5819 (proposed long form notices), 5834–35 (proposed FLSA reminder notice)). That includes clear information on the process, timeline, and implications of opting out of the settlement. (Doc. 85-1, #5775–5819,

5834–35). Additionally, the Court determines that Atticus is an experienced Settlement Administrator that is well qualified to administer the proposed notice plan. (*See* Doc. 73, #1562–63; Decl. of Christopher Longley (Longley Decl.), Doc. 73-3, #1756–58, 1760–78).

Accordingly, the Court approves the proposed notice plan. And it appoints Atticus, a well-qualified and experienced claims administrator, as Settlement Administrator. The Settlement Administrator will commence providing notice no later than July 9, 2024. If a Settlement Class Member wishes to exclude himself or herself from the Agreement, the Settlement Class Member must file a request for exclusion no later than sixty (60) days after the Settlement Administrator mails the postcard notices, in the manner set forth in the Amended Settlement Agreement, (Doc. 85-1 ¶ 54, #5755–56), and described in the notice materials. All Settlement Class Members who do not timely submit a valid request for exclusion will be bound by the Final Approval and Judgment and enjoined from bringing or prosecuting any action relating to the claims released under the Settlement.

## D.    Distribution of FLSA Settlement Notice[6]

That leaves one last matter: the distribution of FLSA settlement notice. "[C]lass actions under Rule 23 are fundamentally different from collective actions

---

[6] This case is a so-called "hybrid action" involving both class action claims and FLSA claims. *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 509–10 (2d Cir. 2020). Although the Sixth Circuit has not yet spoken on the issue, "the courts of appeals that have addressed the issue invariably have held that hybrid actions are permissible." *Gilstrap v. Sushinati, LLC*, No. 1:22-cv-434, 2024 WL 2197824, at *7 n.7 (S.D. Ohio May 15, 2024). And the Court is only approving *notice of the opportunity to opt in* to the FLSA settlement, not approving the *substance* of the FLSA settlement. The Court is satisfied that it has the authority to approve the FLSA notice plan as part of its general authority to manage its docket, though the Court

under the FLSA. Specifically, unlike a Rule 23 class action, an FLSA collective action is not representative—meaning that all plaintiffs in an FLSA action must affirmatively choose to become parties by opting into the collective action." *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1009 (6th Cir. 2023) (cleaned up). Accordingly, "other employees become parties to an FLSA suit (as opposed to mere recipients of notice) only after they opt in and the district court determines— not conditionally, but conclusively—that each of them is in fact similarly situated to the original plaintiffs." *Id.* (cleaned up). Prior to that final determination, "for a district court to facilitate notice of an FLSA suit to other employees, the plaintiffs must show a 'strong likelihood' that those employees are similarly situated to the plaintiffs themselves." *Id.* at 1011. That inquiry turns on whether plaintiffs' "claims are unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 403 (6th Cir. 2017) (cleaned up).

The putative Settlement Collective Members here satisfy the standard for preliminary FLSA Settlement notice distribution for many of the same reasons the Court determined provisional class certification was appropriate. The Group A Class Members who are eligible to opt into the Settlement Collective are all former employees who paid Health Carousel liquidated damages. (Doc. 73, #1581; Doc. 85-1 ¶ 29, #5747). And because Plaintiffs' FLSA claims turn on the payment of liquidated

---

would exceed its authority if it were to approve the substance of the FLSA Settlement. *Id.* at *13 ("The Court possesses no authority to approve or to reject an FLSA settlement to which the parties have agreed.").

damages, (Doc. 73, #1581), all former employees who paid such damages to Health Carousel have claims "unified by [a] common theor[y] of [the] defendant[']s[] statutory violations." *Monroe*, 860 F.3d at 403 (cleaned up). The Court therefore concludes that Plaintiffs have shown a "strong likelihood" that the prospective Settlement Collective Members are similarly situated to the named Plaintiffs, and that notice of the FLSA Settlement is appropriate. *See Clark*, 68 F.4th at 1009; *Isaacs v. Landmark Recovery of Louisville, LLC*, No. 3:23-cv-00210, 2023 WL 6096730, at *10 (M.D. Tenn. Sept. 18, 2023) ("Plaintiffs are similarly situated if they can demonstrate that they suffered from a single, FLSA-violating policy instituted by the employer defendant[.]" (cleaned up)). Accordingly, it also authorizes the Settlement Administrator to distribute notice of the FLSA Settlement in the manner prescribed in the Amended Settlement Agreement.

## CONCLUSION

For the above reasons, the Court **GRANTS** the Joint Amended Motion for Preliminary Settlement Approval (Doc. 85), and thereby:

1. **PROVISIONALLY CERTIFIES**, for settlement purposes only, the Group A and Group B Settlement Classes, as defined in the proposed Amended Settlement Agreement, (Doc. 85-1 ¶¶ 13–14, #5744–45).

2. **PRELIMINARILY APPROVES** the Amended Settlement Agreement (Doc. 85-1) as it applies to the class claims.

3. **AUTHORIZES** the distribution of the parties' Postcard, Reminder, and Long Form Notices in accordance with the Notice Plan outlined in the

Amended Settlement Agreement. The parties may make non-substantive changes before distribution and posting, including to include applicable deadlines and contact information.

4. **PROVISIONALLY APPOINTS** Nichols Kaster, PLLP; Towards Justice; Donati Law; Gupta Wessler; and Barkan Meizlish as Class Counsel.

5. **PROVISIONALLY APPOINTS** Novie Dale Carmen as Class Representative for the Group A Settlement Class and **PROVISIONALLY APPOINTS** Jerlin Amistoso and Kersteen Flores as Class Representatives for the Group B Settlement Class.

6. **APPOINTS** Atticus Administration LLC as Settlement Administrator.

7. **ORDERS** that Settlement Class Members shall have sixty (60) days from when the initial notice is sent to opt out of the Settlement Class, and that those who are eligible to join the Settlement Collective shall have sixty (60) days from when initial notice is sent to opt in to the FLSA Settlement.

8. **ORDERS** that any Settlement Class Members who do not timely opt out of the Settlement in the manner provided in the Amended Settlement Agreement will be bound by the terms of the Settlement upon final approval of the same.

9. **SCHEDULES** the Final Approval Hearing for October 23, 2024, at 11:00 a.m., in Courtroom 805.

Further, in light of the filing of the amended motion (Doc. 85), the Court

**DENIES** the earlier motion for approval (Doc. 73) as **MOOT**.

    **SO ORDERED.**

June 18, 2024
**DATE**
                                    **DOUGLAS R. COLE**
                                    **UNITED STATES DISTRICT JUDGE**