# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**NOVIE DALE CARMEN, et al.,**

      **Plaintiffs,**

            **Case No. 1:20-cv-313**

  **v.**

            **JUDGE DOUGLAS R. COLE**

**HEALTH CAROUSEL, LLC,**

      **Defendant.**

## OPINION AND ORDER

Before the Court are Plaintiffs' Motion for Attorneys' Fees, Costs, Service Payments, and Settlement Administration Expenses (Doc. 87) and the parties' Joint Motion for Final Settlement Approval (Doc. 91). For the reasons explained below, the Court **GRANTS** both motions in their entirety.

## BACKGROUND

### A.    Factual and Procedural Background

This is a case about wages and employment terms. Plaintiffs Novie Carmen, Jerlin Amistoso, and Kersteen Flores are Filipina healthcare professionals who came to the United States through Defendant Health Carousel, LLC's Passport USA Program. (*See generally* Am. Compl., Doc. 43). Because the Court discussed the Program, the claims, and the facts underlying them in detail in various earlier Opinions and Orders in this case (*see* Docs. 21, 63, and 86), a summary will suffice here.

Health Carousel is a recruiting and staffing company in the business of bringing foreign healthcare talent—primarily from the Philippines—to the United States. (*Id.* at #5838). Its Passport USA Program facilitates healthcare workers' entry to the United States, offering visa sponsorship, airfare, temporary housing, and other benefits. (*Id.*). In exchange for Health Carousel's efforts, Passport USA workers agree to work exclusively for Health Carousel for a specified term, called a "Commitment Period," which was measured in terms of hours the employee worked. (*Id.* at #5838–39). The agreement between Health Carousel and these workers effectively barred them from leaving the program during the Commitment Period: they couldn't accept alternative employment without Health Carousel's consent; if they left without such consent, they couldn't work within 50 miles of their original Health Carousel placement; and perhaps most prohibitively, they were subject to a "Breach Obligation" requiring them to pay liquidated damages if they left before completing the term. (*Id.*). On top of that, the Commitment Period didn't begin to run until the workers were fully licensed, and didn't include in its hours requirement any credit for overtime or orientation hours that the employees worked. That is, only regular time hours counted toward the Commitment Period. To make matters worse, Health Carousel barred its workers from discussing the terms of their employment with each other, instituting a gossip-ban at work. (*Id.* at #5839–40).

Chafing at Health Carousel's requirements, Plaintiffs sued, asserting claims under five statutes.[1] Three of the five are federal statutes: the Fair Labor Standards

---

[1] This case wasn't originally pleaded in the way it stands today. The initial Complaint (Doc. 6) asserted a different set of claims, brought by only one of the three named Plaintiffs now

2

Act (FLSA), 29 U.S.C. § 201 *et seq.*; the Victims of Trafficking and Violence Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*; and the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961. The remaining two are Ohio statutes: Ohio's human trafficking law, Ohio Rev. Code § 2905.32, and the Ohio Corrupt Practices Act (OCPA), Ohio Rev. Code §§ 2923.31–36.

Plaintiffs asserted four of the five claims—the two state statutory claims, along with the RICO and TVPA claims—on behalf of a putative class under Federal Rule of Civil Procedure 23. And they pursued the fifth claim—under the FLSA—on behalf of a putative collective (a procedural mechanism unique to claims under the FLSA, *see Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003 (6th Cir. 2023)).

After trading extensive discovery and engaging in mediation, the parties moved the Court to stay the then-pending deadlines while they finalized a settlement agreement. (Doc. 70; *see also* Doc. 86, #5841). They subsequently filed a proposed settlement agreement, (Doc. 73-1), amending it once to address the Court's concerns with some of the original proposal's terms, (Doc. 85-1; *see* 5/31/2024 Min. Entry).[2] The amended agreement proposed two overlapping settlement classes. The first, a Rule 23(b)(3) class—the "Group A Settlement Class"—seeks monetary relief and includes the following persons:

---

prosecuting this case. And two other amended complaints, (Docs. 11, 38), preceded the now-operative Third Amended Complaint (Doc. 43).

[2] The Court adopts the terms defined by the amended settlement agreement (*See* Doc. 85-1, #5741–48). Wherever a capitalized term appears in this Opinion and Order without an accompanying definition, its meaning can be found in the amended settlement agreement's Definitions section. (*Id.*).

> All healthcare workers who entered the United States through Defendant's Passport USA program at any point from March 16, 2010 to February 15, 2024, who do not submit a timely and valid written notice of intent to opt-out, and who as of February 15, 2024: (1) paid Health Carousel some or all "liquidated damages" for leaving before the end of their Commitment Period; (2) completed their Commitment Period; or (3) are current employees.

(Doc. 85-1, #5744–45). And the second, a Rule 23(b)(2) class—the "Group B Settlement Class"—seeks injunctive relief and is defined as follows:

> All healthcare workers who entered the United States through Defendant's Passport USA program at any point from March 16, 2010 to February 15, 2024, who do not submit a timely and valid written notice of intent to opt-out, and who as of February 15, 2024: (1) had left [Health] Carousel before the end of their Commitment Period and failed to pay Health Carousel any "liquidated damages"; or (2) are current employees.

(*Id.* at #5745).[3] The Court preliminarily approved the amended settlement agreement, preliminarily certified the proposed classes for settlement purposes, and directed that class members be noticed under Federal Rule of Civil Procedure 23(e)(1) and the FLSA's collective-action provision. (Doc. 86). It also scheduled a final fairness hearing for October 23, 2024. (*Id.*).

The parties' post-preliminary-approval notice plan was successful, as far as it went. (*See* Doc. 91, #6017–19 (describing the several communications channels used to send notice and their rates of success)). But it didn't go far enough: after the initial notice period closed, Health Carousel realized it had inadvertently omitted 110 class members from the notice regime. (*Id.* at #6019). So the Court approved a

---

[3] This Group B definition is outdated and no longer reflects the final form in which the Court certifies the class. *See infra* Part A.2. The Court includes it here only to lay out a thorough history of the case.

supplemental notice period to allow the parties to reach the inadvertently omitted class members before the final fairness hearing. (9/17/2024 Min. Entry). The two notice rounds yielded three opt-outs and three objectors. (Doc. 91, #6019).

The Court held a final fairness hearing on October 23, 2024. (10/23/2024 Min. Entry). There, the parties pressed their arguments that the proposed settlement was fair, reasonable, and adequate. (*See id.*). And while no objectors appeared, the Court raised two issues of its own. First, it seemed the class definitions' terms conflicted with the settlement agreement's structure. Namely, membership in Settlement Group B for healthcare workers who had left Health Carousel early was limited to those who had "failed to pay Health Carousel *any* 'liquidated damages.'" (Doc. 92, #6075 (emphasis added)). So if a premature departee had paid Health Carousel even a single dollar, it seemed they'd no longer be eligible for the debt relief accorded to Settlement Group B members. But the class notices described that both those who *did* "pa[y] Health Carousel any portion of the [liquidated damages]" *and* those who "did *not* pay … any portion" of it were entitled to debt relief. (Doc. 94, #6100 (emphasis added) (quoting Doc. 85-1, #5825)). So the class definition for Settlement Group B seemed out of step with the relief described in the class notices. The second issue related to this case's nature as a hybrid between a Rule 23 opt-out class and a FLSA opt-in collective and whether the procedural differences between the two required any additional analysis at the final-approval stage. The Court requested, and the parties provided, supplemental briefing on both issues (which will be discussed in greater depth below). (10/23/2024 Min. Entry; Docs. 92, 93, 94).

That should have been the end of the matter (at least assuming that the Court would ultimately approve the settlement). But in a moment of déjà vu, the parties notified the Court that they had omitted another 69 class members from the two rounds of notice that had already gone out. (Doc. 97). So the Court approved a third round of class notice with a 30-day opt-out period. (Doc. 99). That window ended on January 17, 2025, and yielded no additional opt-outs or objectors.[4] So the Court needn't schedule another fairness hearing and can now decide the motions for final approval and attorneys' fees on the record before it.

## B.    Settlement Terms

The amended settlement agreement provides for two forms of relief: monetary and non-monetary. The contours of that relief warrant a summary.

### 1.    Monetary Relief

The amended settlement agreement provides for monetary relief to the Group A Settlement Class defined above. (Doc. 85-1, #5750–52). Health Carousel agreed to pay $6,050,000—the Gross Settlement Amount—into a common fund to settle Group A's claims. (*Id.* at #5750). That amount will be allocated between the Group A Settlement Class, class counsel, and the named Plaintiffs.

---

[4] The parties also notified the Court of one inadvertently misclassified—though not omitted—class member. (Doc. 101). That individual was in fact eligible to opt in to the FLSA portion of the settlement, but was not informed of that eligibility until March 2025. (*Id.* at #6355). The parties corrected that mistake and afforded the individual the opportunity to opt in, which he accepted. (*Id.* at #6356). So he will be treated identically to all the other timely FLSA opt-in class members. (*Id.*).

Start with the latter two cash recipients: class counsel and the class representatives (i.e., the named Plaintiffs). In the amended settlement agreement, class counsel stated their intention to "apply to the Court for an award of attorneys' fees not to exceed … one-third of the Gross Settlement Amount, litigation expenses … , [along with] costs [which will be paid to] the Settlement Administrator." (*Id.* at #5751). Then, on top of that, they intended to apply for "service payments" to be made to the class representatives. (*Id.* at #5752). They've since applied for all three of those things—attorneys' fees, litigation expenses (including administration costs), and service payments (collectively the Representation Expenses)—discussed in greater depth below. (*See* Mot. for Attys.' Fees, Doc. 87). The Representation Expenses are capped at $2,139,758 total: $2,016,666 for attorneys' fees, $80,000 for litigation expenses, and $43,092 for settlement administration. (*See* Doc. 85-1, #5751–52). Aside from those caps, though, the amended settlement agreement doesn't purport to commit the Court to awarding any specific amount to any sub-category of Representation Expenses.

The agreement refers to the remaining balance of the Gross Settlement Amount—that is, the Gross Settlement Amount less the Representation Expenses— as the Net Settlement Fund. The fund is to be distributed only to the Group A Settlement Class. But because the Net Settlement Fund's amount is speculative until the Court determines how much to award as Representation Expenses, the amended settlement agreement calculates payouts to class members in gross—that is, before factoring in possible Representation Expenses. (*See id.* at #5750–51). The agreement

then specifies three subgroups from among the Group A Settlement Class, the members of which are entitled to different gross payouts.

The first subgroup includes those Group A members who completed their contracts with Health Carousel as of February 15, 2024 (i.e., who completed the full Commitment Period and did not terminate early). (*Id.* at #5750). Each such individual is entitled to a gross payment of $2,000. (*Id.*).

The second subgroup includes those Group A members who are current employees of Health Carousel working in the United States as of February 15, 2024. (*Id.*). They're entitled to gross payments of $1,000 each. (*Id.*).

The third subgroup includes those former employees who terminated their contracts early (i.e., who did not complete the Commitment Period) and who "paid Health Carousel money in connection with terminating their employment" as of February 15, 2024. (*Id.* at #5750–51). This third subgroup is subdivided further into two camps: those who opt in to releasing their potential FLSA claims and those who don't. (*Id.*). The two camps will split "the pool of money remaining in the Net Fund after the allocations" to the first two subgroups are determined. (*Id.*). That remainder will be split between the two camps following a multi-step formula. First, it'll be divided proportionally between *all* members of the third subgroup based on the amount each individual paid to Health Carousel in liquidated damages. (*Id.*). And second, the non-FLSA-opt-in camp's payments will be rebalanced to decrease the pro rata amounts by 30% for those class members who decide not to release their FLSA

claims. (*Id.*). The parties estimate that these dollar amounts will range, on a net basis, from $300 to $4290, (*Id.*).

### 2. Non-Monetary Relief

The amended settlement agreement also sets out non-monetary relief for the Group B Settlement Class defined above. (*Id.* at #5748–50). The specific non-monetary relief assigned to any given Group B member depends on the subgroup (there are two) to which they belong.

The first subgroup encompasses those Group B members "who are *not* current employees" of Health Carousel. (*Id.* at #5748 (emphasis added)). They're entitled to a "full discharge of any disputed debt owed to Health Carousel related to their alleged breach of contract along with full discharge of any non-disputed debt for all loans owed to Health Carousel." (*Id.*).

The second subgroup encompasses those Group B members "who *are* current employees in the Passport USA program … as of February 15, 2024." (*Id.* at #5749 (emphasis added). If any current employee fails to complete their Commitment Period, "Health Carousel shall only be able to recover actual costs and expenses." (*Id.*). That is, as to these employees, Health Carousel will not seek to collect the full liquidated damages called for by the employment contract, should they leave early.

Aside from the debt relief extended to the Group B class, the amended settlement agreement also guarantees certain forward-looking programmatic changes to the Passport USA program—changes that no class member will enjoy. Namely, for three years following final approval, "all newly executed contracts" will

9

define the Commitment Period "to include all regular-time, overtime, and orientation hours," and the liquidated-damages provision will be replaced with a provision that entitles Health Carousel to recoup only actual costs and expenses in cases of breach (much like the relief awarded to the current employees in the Group B settlement class). (*Id.* at #5749–50).

## LEGAL STANDARDS

The unique nature of a Rule 23 class action as a representative form of litigation—where class members' rights are adjudicated in their absence—requires heightened judicial oversight. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810–11 (1985) (noting the multiple "safeguards provided for [absent class members'] protection"); Fed. R. Civ. P. 23.

Three specific dimensions of that supervisory role are implicated by the motions under consideration here. The first relates to class certification under Rules 23(a), 23(b)(2), and 23(b)(3). The second concerns final settlement approval under Rule 23(e). And the third applies to approval of attorneys' fees under Rule 23(g). Complex, multi-factor legal standards govern each inquiry. So to avoid needless repetition, the Court will discuss the specific contours of each doctrine—class certification, settlement approval, and attorneys' fees—as it goes through each.

## LAW AND ANALYSIS

The parties jointly request the Court do two things to put this long-running case to bed: (1) finalize the preliminarily-approved Rule 23 classes, and (2) greenlight the preliminarily-approved agreement settling those classes' claims. (*See* Doc. 91).

And class counsel asks the Court to take a third step and approve their requested attorneys' fees, costs and expenses, and service payments to the class representatives. (*See generally* Docs. 87, 91).

## A.    Final Class Certification

For a case to proceed—or settle—as a class action, it must be certified as such. And to be certifiable, the proposed class(es) in the case must meet all four requirements set forth in Rule 23(a) and one of the three conditions set forth in Rule 23(b). *Smith v. Fifth Third Bank*, No. 1:18-cv-464, 2021 WL 11713313, at *5 (S.D. Ohio 2021).

The Court preliminarily certified the settlement classes in this case in its earlier Opinion and Order. (Doc. 86, #5850–59). Only a couple of things have changed since then: the parties agreed to drop the state-law claims from the proposed class settlement, (Doc. 91, #6022–23), and the Court uncovered a subtle wrinkle in the earlier class definitions at the final fairness hearing, (*see* Doc. 92, #6075). Although it turns out that neither of those developments affect the earlier class-certification analysis (nor, for that matter, the adequacy of notice and the ultimate fairness of the settlement proposal), the Court will address them briefly before turning to final certification.

### 1.    Dropped State-Law Claims

When it preliminarily certified the classes described above, the Court expressed some reservations. (*See* Doc. 86, #5849–50). Specifically, it noted that "it [was] not clear that the Court can certify a class as to [Plaintiffs'] state-law claims,

given the due process/extraterritoriality concerns that they create." (*Id.* at #5850). But it went ahead with preliminary certification anyways, since its task at the preliminary approval stage was only to determine whether it would "*likely* be able to … certify the class for purposes of judgment on the [settlement] proposal." Fed. R. Civ. P. 23(e)(1)(B); *see also Bailey v. Verso Corp.*, 337 F.R.D. 500, 505 (S.D. Ohio 2021) (noting that the court "need not make an affirmative determination of each factor" required for final certification at the preliminary certification stage). Even so, it directed the parties to "brief [the] issue when they seek final class certification … or, alternatively, to dismiss the Ohio-law claims and seek certification only on the federal claims." (Doc. 86, #5850 (cleaned up)).

Heeding that directive, the parties chose to seek final class certification "as to the federal TVPA and RICO claims only."[5] (Doc. 91, #6022–23 (emphasis omitted)). The Court interprets that move as a stipulation to dismiss the state-law claims under Federal Rule of Civil Procedure 15(a)(2).

While the dismissal of the state-law claims relieves any due process concerns about applying Ohio law to a potentially interstate class, it raises potential issues of its own.

---

[5] Although they disclaim class certification as to the state-law claims, the parties note that "the release language [in the settlement agreement] … releases those claims as they are part of the same 'factual predicate' with the [federal] claims pled in the complaint." (Doc. 91, #6023). So even though the classes here are no longer *formally* predicated in part on the state-law claims, the release provision still bars class members from asserting, in any future proceeding, those state-law claims that "share a factual predicate … [with the] claims asserted in the [s]ettlement [a]greement." *Does 1–2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 900 (6th Cir. 2019).

The first potential issue has more to do with the adequacy of notice than with class certification, but it bears mentioning here. Specifically, if the dismissal of the state-law claims would decrease the class size, it might render the earlier class-wide notices deficient insofar as they included payout estimates based on outdated numbers. *See UAW v. Gen. Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007) (explaining that a "notice must … fairly apprise the prospective members of the class of the terms of the proposed settlement so that [they] may come to their own conclusions about whether the settlement serves their interests." (quotation omitted)).

The second potential issue bears directly on class certification: if the class size was substantially reduced by the dismissal, it might no longer pass muster under the Rule 23(a) numerosity requirement.

Here, though, the Court can identify no such issue with the state-law claim dismissal. As the parties note, "there are no Settlement Class Members [who] would only have state and not federal TVPA and RICO claims"—that is, that there isn't a single person whose class membership depended on the state-law claims remaining in the case. (*Id.* at #6023). So neither the settlement notice's payout estimate, nor the class's numerosity, are affected by the dismissal of the state-law claims.

In sum, the dismissal of the state-law claims addresses the Court's earlier concerns about due process and extraterritoriality and raises no new issues standing in the way of final class certification or settlement approval.

### 2. Updated Class Definitions

As discussed above, the Court preliminarily certified two classes in this action: Group A and Group B. The former, a Rule 23(b)(3) class, was formed to pursue monetary relief: payments from Health Carousel. (Doc. 73, #1578). The latter, a Rule 23(b)(2) class, was formed to pursue injunctive, or non-monetary, relief: the release of the class members' debt owing to Health Carousel. (*Id.* at #1579–80).

At the final fairness hearing, the Court identified an inconsistency between Group B's definition and the rest of the settlement's terms. Namely, Group B included Health Carousel employees who'd terminated their contracts early and had "failed to pay Health Carousel *any* 'liquidated damages.'" (Doc. 92, #6075 (emphasis added)). The class notices, on the other hand, notified former employees that they'd *all* be entitled to relief of any outstanding debt owing to Health Carousel, without regard to whether they'd paid "any" liquidated damages. (*See* Doc. 94, #6100 (quoting Doc. 85-1, #5825)). Out of an abundance of caution, the Court asked the parties to clarify which meaning they intended: is debt relief limited to those who hadn't paid a dime of liquidated damages? Or does the relief extend more broadly, to all former employees with outstanding debts to Health Carousel for liquidated damages? (And, if the former, would it be fair for the settlement to privilege debtors who hadn't made any payments above those who had?) (*See* 10/23/2024 Min. Entry).

The parties clarified that they intended for the Group B definition to capture *all* former employees with outstanding liquidated-damages debt—not just the subset of those who hadn't made any payments toward that debt. So they stipulated to change the Group B definition by one word:

14

> All healthcare workers who entered the United States through Defendant's Passport USA program at any point from March 16, 2010 to February 15, 2024, who do not submit a timely and valid written notice of intent to opt-out, and who as of February 15, 2024: (1) had left Heath Carousel before the end of their Commitment Period and failed to pay Health Carousel **all** "liquidated damages"; or (2) are current employees in the Passport USA program. To be clear, anyone who has completed their Commitment Period as of February 15, 2024 is not considered a current employee under this Agreement.

(Doc. 92, #6075 (emphasis added)). The shift from "any" to "all" reconciles the Group B definition with the class notices by making clear that any former employee with any amount of outstanding debt is entitled to relief. The only former employees who aren't entitled to debt relief—and sensibly so—are those who *have* paid Health Carousel "all liquidated damages," and therefore have no remaining debt to forgive.

This change, much like the dismissal of the state-law claims, presents no new concerns for class certification. (*See also* Joint Supp. Brief, Doc. 94, #6097–106 (explaining why the one-word change doesn't present an obstacle to final certification)).

### 3. Rule 23 Class-Certification Requirements

With those minor developments out of the way, turn to the class-certification analysis under Rules 23(a) and 23(b). The Court already applied those Rules in depth in its earlier Opinion and Order preliminarily certifying the two classes—Groups A and B, described above—in this case. (Doc. 86, #5850–59). Because the intervening developments described above don't materially affect that analysis, the Court will only summarize it here.

15

### a.    Rule 23(a)

To be certifiable, a class must meet the four threshold requirements set out by Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a); *Smith*, 2021 WL 11713313, at \*5. The Court addresses each, with respect to both Groups A and B, in turn.

*Numerosity*. To be certifiable, a class must contain enough members to make "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[W]hile there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). And courts often find that "a class of 40 or more members is sufficient to meet the numerosity requirement." *Pansiera v. Home City Ice Co.*, 341 F.R.D. 223, 231 (S.D. Ohio 2022) (quotation omitted). After accounting for three opt-outs, there are at least 3,857 Group A members and 1,799 Group B members.[6] (Doc. 91, #6024). That's plenty.

*Commonality and typicality*. As the Court described previously, "[c]ommonality requires that the class's claims 'depend upon a common contention' that is 'of such a nature that it is capable of class-wide resolution[.]'" (Doc. 86, #5852–53 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011))); *see* Fed. R. Civ. P. 23(a)(2). Similarly, the typicality requirement focuses on the "[class] representative's interests," which must be "aligned with those of the represented

---

[6] These numbers don't reflect the 69 additional members who were noticed after the parties filed the member counts in their final approval motion. Absent any update from the parties, the Court isn't aware of how many of those 69 fall into Group A, Group B, or both. In any case—even without considering those 69 people—both proposed classes are large enough to satisfy the numerosity requirement. *See Pansiera*, 341 F.R.D. at 231.

group … [such that] the named plaintiff will also advance the interests of the class members." (*Id.* at #5853 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012))); *see* Fed. R. Civ. P. 23(a)(3). In short, commonality requires the class members' claims to jibe with each other, and typicality requires the named plaintiffs' claims to jibe with the class's.

Here, the claims are common across the class and the named plaintiffs' allegations are typical of those claims. Every class member "was subject to the same allegedly coercive practices and contractual terms." (Doc. 91, #6024). So "the core questions in this case could be answered [using] common proof"—that is, with evidence shared by every class member. (*Id.* at #6025). That means commonality is satisfied. (*See also* Doc. 86, #5853 (finding commonality preliminarily satisfied for the same reason)). On top of that, the named Plaintiffs' "claims arise from the same set of facts" as the class members'. (*Id.*). So, for the same reasons as the Court explained at the preliminary stage, the named Plaintiffs' claims typify claims that are common to the class. (Doc. 86, #5853); *see also Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2018 WL 4347799, at *10 (E.D.N.Y. Sept. 12, 2018) (certifying a class of nurses recruited from the Philippines making similar allegations).

*Adequacy.* Finally, the named Plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Class representatives adequately represent the rest of the class when they (1) share common interests with the absent class members, and (2) vigorously prosecute the interests of the class through qualified counsel." (Doc. 86, #5854 (quotation omitted)); *see also Senter v. Gen. Motors*

17

*Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). The first prong is satisfied here because the class representatives are seeking—and, through settlement, have obtained—relief that benefits the entirety of both settlement classes. (*See* Doc. 86, #5854). And the second prong is satisfied because the class representatives, supported by competent class counsel, have vigorously litigated this case for over four years. As just one example of their zeal, each Plaintiff has been deposed at considerable personal inconvenience. (*See* Mot. for Attys' Fees, Doc. 87, #5886 (describing the logistical and emotional burdens of each Plaintiff's deposition)). And that's not the extent of their participation in the long-running discovery underlying this case—each of them produced hundreds, even thousands, of documents to the other side. (*Id.* at #5885–86). And nothing from the many proceedings to this point lead the Court to doubt class counsel's declarations about their competency and expertise. (*See* Doc. 91, #6027–28 (collecting declarations)).

In short, both settlement groups satisfy all the requirements imposed by Rule 23(a). But that's only half the battle. They must also satisfy one of the three conditions set by Rule 23(b). So that is where the Court turns its attention next.

### b. Group A: Rule 23(b)(3) Requirements

As discussed above, the Court preliminarily certified the Group A Settlement Class under Federal Rule of Civil Procedure Rule 23(b)(3). (Doc. 86, #5855–56). For the same reasons, Group A merits final certification as a Rule 23(b)(3) class.

A proposed class can proceed under Rule 23(b)(3) if it satisfies two requirements (above and beyond those set out by Rule 23(a)): predominance and

superiority. *Caddell v. Campbell*, No. 1:19-cv-91, 2023 WL 3725101, at *1–2 (S.D. Ohio May 30, 2023).

Start with the former. Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This inquiry is "similar to, though more stringent than, Rule 23(a)(2)'s 'commonality' requirement." *Caddell*, 2023 WL 3725101, at *2 (cleaned up). To evaluate predominance, the Court must "first characterize the issues in the case as common or individual and then weigh which predominate." *Martin v. Behr Dayton Thermal Products, LLC*, 896 F.3d 405, 413–14 (6th Cir. 2018) (cleaned up).

Here, the parties note—just as they did at the preliminary certification stage—that "each Group A Settlement Class Member was subject to a similar recruitment process and similar contract terms." (Doc. 91, #6028; *see also* Doc. 86, #5855 (quoting Doc. 73, #1577)). Consider each of the subgroups within Group A (described earlier in connection with the amended settlement agreement's terms). The first subgroup—former employees who completed their contracts—did so under common terms, including the liquidated damages provision. (Doc. 91, #6028). The second subgroup—current employees as of February 15, 2024—are currently working under similar terms. (*Id.*). And the third subgroup—those who left Health Carousel early and paid any portion of their liquidated damages—were all subject to the same liquidated-damages clause. (*Id.*). The ubiquity of the contract term at issue here satisfies the

Court that "questions of law or fact common to class members predominate" all others. Fed. R. Civ. P. 23(b)(3).

Now move to superiority, which requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Caddell*, 2023 WL 3725101, at *2 (quoting Fed. R. Civ. P. 23(b)(3)). The superiority requirement aims to "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (cleaned up) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 509 (1997)). To decide whether the class action mechanism is superior in pursuing those aims, the Court considers the effectiveness of the class action mechanism, the "risk of prejudice to the rights of those who are not directly before the court," and "the value of individual damage awards, as small awards weigh in favor of class suits." *Martin*, 896 F.3d at 415–16 (quotation omitted).[7]

This case's characteristics weigh heavily in favor of prosecution by class action. As the parties note, the class members are "recent immigrants … who may not choose to spend resources and time on individual litigation at this stage of their lives here." (Doc. 91, #6029). So compared to individual litigation—which might not arise at all, given the class members' relatively unique position in this country—the class action

---

[7] When evaluating superiority, courts also usually evaluate whether the juice of a class action is worth the squeeze of extra judicial resources required to oversee it. *See Martin*, 896 F.3d at 415–16. But in situations like this one, where the class is being certified for settlement purposes only, "a district court need not inquire whether the case, if tried, would present intractable management problems[.]" *Amchem*, 521 U.S. at 620.

mechanism is the effective choice. The relatively modest monetary awards also demonstrate the class mechanism's superiority to individual litigation, since each Group A member's recovery is likely small enough to make individual litigation cost-prohibitive. (*Id.*); *see also Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007) (noting that "a small possible recovery would not encourage individuals to bring suit, thereby making a class action a superior mechanism for adjudicating [the] dispute"). Moreover, the parties aren't aware of any Group A members who would prefer to prosecute their claims individually. (*Id.*).

For those reasons, the Court finally certifies the Group A Settlement Class for settlement purposes only.

### c.    Group B: Rule 23(b)(2) Requirements

Now turn to the Group B Settlement Class, which the Court preliminarily certified under Federal Rule of Civil Procedure 23(b)(2). (Doc. 86, #5856–57). And again, for the same reasons as before, the Court finally certifies Group B.

As the Court noted at preliminary certification, "[t]he key to the Rule 23(b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." (*Id.* at #5856 (cleaned up) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 360)). And as the parties note, Health Carousel "is taking action that would apply to Group B Settlement Class Members as a whole by forgiving alleged debt … and changing its practices … going forward." (Doc. 91, #6030). The universality of that relief satisfies Rule 23(b)(2), warranting final certification for settlement purposes of the Group B Settlement Class.

## B.     Final Settlement Approval

With final class certification sorted out, turn to the settlement agreement itself. Class-action settlements can proceed "only with the court's approval." Fed. R. Civ. P. 23(e). Settlement approval takes three (and a half) steps. Court must: (1) preliminarily approve the proposed settlement; (2) distribute notice of the proposed settlement to the class; and (3) hold a fairness hearing. *Smith v. Fifth Third Bank*, No. 1:18-cv-464, 2021 WL 11713313, at *2 (S.D. Ohio Aug. 31, 2021) (quoting *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *1 (S.D. Ohio Jan. 26, 2011)). The Court has done those three things. (*See* Doc. 86 (preliminarily approving the settlement agreement and approving notice to class members); 10/23/2024 Min. Entry (final fairness hearing)). So all that's left is for the Court to "determine whether the proposed settlement is fair, reasonable, and adequate." *Smith*, 2021 WL 11713313, at *2.

The final determination of fairness, reasonableness, and adequacy, is "more an art than a science." *Id.* But it's an art with some guiding principles. Rule 23(e) directs courts to consider whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

   (i)    the costs, risks, and delay of trial and appeal;

   (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

22

> (iv)   any agreement required to be identified under Rule 23(e)(3); and
>
> (D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *10 (S.D. Ohio Dec. 20, 2023).[8] In addition to the Rule 23(e) factors, the Court will evaluate the three objections filed during the initial notice period. (Docs. 88, 89, 90). And aside from the Rule 23 considerations and the objections thereto, the Court will take a brief detour to address the (non)impact that the presence of the FLSA collective has on its analysis.

### 1.    Adequacy of Representation

The adequacy-of-representation inquiry at the final-approval stage "mirrors the adequacy prong … that the Court analyzed when certifying the class" above. *Hawes*, 2023 WL 881499, at *11. But it's also more specific: the question at this point focuses on the class representatives' and class counsels' "adequacy … *in relation to the settlement terms and notice process*." *Id.* (emphasis added).

Here, the settlement terms and notice process both affirm that class counsel and the named Plaintiffs adequately represented the class.

---

[8] Before Rule 23 was amended in 2018, it "required a court to find only that the settlement was 'fair, reasonable, and adequate,' with no elaboration as to what factors were relevant to that finding." *Hawes*, 2023 WL 8811499, at *10. So courts in the Sixth Circuit made that determination by applying the seven factors laid out in *UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007). But as this Court has explained elsewhere, the *UAW* factors "fold[] into" the factors now elaborated by Rule 23 after the 2018 amendments. *Hawes*, 2023 WL 8811499, at *10. So given that redundancy, the Court will refer only to the Rule 23 factors in its analysis here.

Look first to the initial notice process. The Court is satisfied that its comprehensive, tiered approach to reaching every class member demonstrates class counsel's adequacy. Every individual putative class member was noticed individually using "two reliable methods that [were] reasonably calculated to provide actual notice[.]" (Doc. 86, #5865 (citing Doc. 85-1, #5775–819)). And when some of the mailed notices were returned as undeliverable, the Settlement Administrator employed a professional search firm to trace those putative class members' true addresses. (*See* Bryn Decl., Doc. 91-2, #6061). On top of the affirmative notice methods, the court-appointed Settlement Administrator set up a website and a toll-free phone line for putative class members to find pertinent information. (*Id.* at #6062). In total, the notices are estimated to have reached 98.7% of the settlement class. (Doc. 91, #6045).

On top of the initial notice process, the parties' candor about the need for subsequent notice periods supports an adequacy finding. They conferred with the Court twice to notify it of inadvertently omitted putative class members and to request additional notice periods to rectify those omissions, despite the resulting delay and likely expense. (9/17/2024 Min. Entry; 12/18/2024 Min. Entry; *see also* Order, Doc. 99).

And the amended settlement agreement's hard-won terms also support class counsels' and class representatives' adequacy. The Court described the essential terms above, so it suffices here to note that those terms are the result of dogged, zealous advocacy by class counsel and the class representatives, who spent many

24

hundreds of hours litigating the case and negotiating the settlement. (Prakash Decl., Doc. 73-1, #1604–08; Seligman Decl., Doc. 73-7, #1790–91).

## 2. Arm's Length Negotiations

This settlement agreement appears to have been negotiated not merely at arm's length, but rather at a distance far greater than that. The parties note that, at the time they entered mediation, they had "just completed contentious discovery and were not optimistic about settlement." (Doc. 91, #6033). Indeed, by the time they entered mediation, the case had been live for over three years and the parties had litigated two motions to dismiss and various other disputes. (*See* Doc. 91, #6011 (noting that the parties mediated in December 2023, over three years after the first Complaint's filing); Op. & Order, Doc. 21 (denying Defendant's first motion to dismiss); Op. & Order, Doc. 63 (denying Defendant's second motion to dismiss)).

After yet more negotiations following the mediation session, the parties finally arrived at the amended settlement agreement now before the Court. (*See* Doc. 91, #6033). Its terms, just like the process required to draw them up, aren't the product of collusion between the parties. For starters, no portion of the Gross Settlement Amount can revert to Health Carousel. (*Id.*). And on the flipside, class counsel and the class representatives didn't get a "clear sailing provision" out of Health Carousel (which would've guaranteed that the latter wouldn't oppose the former's requested Representation Expenses). (*Id.*). So neither side of this dispute scored any settlement terms that would indicate their agreement is anything but the end product of a hard-fought battle.

25

### 3.    Adequacy of Relief

The Court determines the adequacy of relief accorded by the amended settlement agreement by reference to "(1) the costs, risks, and delay of trial and appeal; (2) the effectiveness of any proposed method of distributing relief to the class; and (3) the terms of any proposed award of attorney's fees."[9] *Hawes*, 2023 WL 8811499, at *11 (cleaned up) (quoting Fed. R. Civ. P. 23(e)(2)(C)).

Start with the costs and risks of continued litigation. With admirable candor, the parties admit that "the case law is mixed on issues of certification and merits" with respect to each of the claims in this case. (Doc. 91, #6038–39 (collecting cases)). So there is considerable risk of protracted litigation going forward—for both sides. Indeed, class counsel frontloaded its anticipation of a post-certification appeal by including in its ranks "a renowned appellate firm." (*Id.* at #6040). And class counsel notes that it has already spent nearly $80,000 on out-of-pocket litigation expenses and incurred over $1,000,000 in fees (which the Court assumes to be a reference to their lodestar calculation). (*Id.*). When all's said and done, the parties estimate that they wouldn't reach trial until fall of 2026 and would anticipate subsequent appeals. (*Id.*). All of that—the risk to either side of losing on the merits, ever-ballooning costs and fees, and the time it'd take to run the procedural gamut—weighs in favor of approving this settlement. *See Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 899 (6th

---

[9] A fourth factor—"any agreement required to be identified under Rule 23(e)(3)"—is irrelevant here, since the parties identified no such agreement. (Doc. 91, #6044); *see Hawes*, 2023 WL 8811499, at *11 n.21.

Cir. 2019) (agreeing with the district court's finding that the risk of long and protracted litigation counseled in favor of final approval).

The proposed method of distributing relief to the class also favors final approval. In terms of monetary relief, "payments will be made via direct deposit to the last bank account Health Carousel had on file for each Class Member." (Doc. 91, #6041). And if any class member desires otherwise, they could request an alternative from the Settlement Administrator. (*Id.*). And on the non-monetary side, the debt relief is "automatic because Health Carousel will simply cease collection," and the programmatic changes are already in progress. (*Id.*). The simplicity of the relief in this case favors final approval.

And finally, the terms of any proposed attorneys' fees don't present any bar to final approval of the amended settlement agreement itself. The agreement, after all, doesn't hinge on any specific award of attorneys' fees, referring only to the fact that class counsel might seek fees to be awarded at the Court's discretion out of the common fund. (*See generally* Doc. 85-1). And in any event, as discussed in greater depth below, the attorneys' fees class counsel *did* eventually request are fair and reasonable.

### 4. Equitable Treatment Among Class Members

Although the amended settlement agreement doesn't "treat members strictly *equally*, it does treat them *equitably*"—that is, to the extent it differentiates between class members, it does so on fair and reasonable bases. *Hawes*, 2023 WL 8811499, at *12.

27

Recall the terms for monetary relief to Group A, discussed above. That relief is divvied up based on the "differences among [Group A members'] claims and [the] scope of their release, … as well as the type and extent of alleged injuries." (Doc. 91, #6036 (cleaned up) (quoting Fed. R. Civ. P. 23 (advisory committee notes to 2018 amendments))). Namely, the first subgroup—former employees who completed their terms of employment with Health Carousel by February 15, 2024—are entitled to gross payments of $2,000 each. The second subgroup—current employees who were working in the United States as of February 15, 2024—are entitled to gross payments of $1,000 each. And the third subgroup—former employees who *didn't* complete their contractual terms *and* who paid Health Carousel some amount of liquidated damages—are entitled to payments proportional to the amount they paid to Health Carousel (decreased by 30% for those who refuse to release their potential FLSA claims). While the settlement agreement does not specify what the "proportion" will be, the overall common fund amount apparently represents approximately 50% of the liquidated damages amounts that Group A settlement class members paid to Health Carousel. (Doc. 91, #6013). Of course, the payments to first and second subgroups (along with any award of attorneys' fees, costs and expenses, and service payments) will come off the top before the proportional payments to the remaining class members, so the ultimate proportion will be less than 50%.

That arrangement treats the Group A settlement class members equitably between each other. The first subgroup receives the higher guaranteed gross payment, ostensibly because they stuck out their employment terms under the

allegedly onerous contract provisions. The second subgroup receives a lower guaranteed gross payment, but still receives money as they've been laboring—and continue to do so—under those allegedly onerous terms (terms that will be nixed under the settlement's non-monetary relief). The third subgroup, meanwhile, receives a variable payment that is directly tied to the amount that they paid to Health Carousel and the extent to which they release their potential FLSA claims—the more they paid, the higher they get paid; and the more they release, the more they receive. That strikes the Court as roughly equitable, given the various types of alleged harms the Group A settlement class members have suffered.

The terms of non-monetary relief also treat the Group B class members equitably between each other.[10] One subgroup—former employees of Health Carousel—are entitled to a full debt relief. And the second subgroup—current employees as of February 15, 2024—are guaranteed not to incur any "liquidated damages" if they breach their contract and leave Health Carousel's employ early. So those *with* disputed debt are forgiven, and those who *might* incur what would've otherwise been a disputed debt are guaranteed that any such debt will be limited to Health Carousel's actual expenses, rather than liquidated damages.

In other words, as the parties correctly state, "the objective criteria driving the method of allocation for monetary and non-monetary relief are whether [a class member] (1) paid money; (2) allegedly owe[s] money; (3) completed their contract; and

---

[10] The programmatic changes called for by the amended settlement agreement are irrelevant to the equity analysis, since the benefits of those changes inure only to *future* Health Carousel employees, none of whom are members of either Group A or Group B.

29

(4) are current employees." (Doc. 91, #6038). The amended settlement agreement's use of those objective criteria to differentiate between class members and the recovery they'll receive is fair and equitable. (*See id.* at #6036–38 (collecting cases)).

### 5.    Objections

With the four Rule 23(e) factors squared away, the Court must address the three objections filed by dissatisfied class members. (Docs. 88, 89, 90). Those three objections are materially identical and disagree with the amended settlement agreement's terms on two grounds. Neither of their arguments convinces the Court to reject the amended settlement agreement.

First, the objectors take issue with the fact that the programmatic changes Health Carousel agreed to institute for *future* employees don't extend retroactively to *current* employees. (Doc. 88, #5991; Doc. 89, #5993; Doc. 90, #5995). They argue that "[i]t appears unfair for us current employees that we are not granted [] such privilege that we believe we deserve." (*See, e.g.*, Doc. 88, #5991). Essentially, the objectors seek to have their overtime and orientation hours counted toward their contractual commitment periods, in line with future employees. The parties reject that objection as "unworkable." (Doc. 91, #6047). Such a retroactive change would require Health Carousel to "renegotiate contracts with its clients for current employees who are already working for those clients," which it can't guarantee. (*Id.*). An example illustrates. Say a current Health Carousel employee (like each of the objectors) is contracted out to a healthcare facility for a total commitment of 100 hours. Under the terms of that employee's contract with Health Carousel, those 100 hours don't include

30

overtime or orientation hours. And based on that understanding, Health Carousel's contractual obligation to the healthcare facility requires it to provide a healthcare worker for 100 regular-time hours. But let's say that the current employee has already spent 20 hours on orientation. If the programmatic changes were to apply retroactively, then Health Carousel's commitment to the healthcare facility would be rendered unworkable: instead of providing 100 regular-time hours, Health Carousel can now only make good on 80 (since the 20 orientation hours now count toward the employee's commitment to Health Carousel). Such a requirement would be nearly impossible to implement, so the Court overrules this first ground for objection.

Second, the objectors take issue with the amount of monetary relief guaranteed to current employees. Instead of the $1,000 gross payments (estimated to be $628 after attorneys' fees, costs and expenses, and service payments), the objectors claim entitlement to "the difference that the healthcare facilities paid [to Health Carousel] for our services versus the hourly wages that Health Carousel actually paid us." (Doc. 88, #5991, Doc. 89, #5993, Doc. 90, #5995). In other words, the objectors demand disgorgement of all Health Carousel's profits from the Passport USA Program. But, as the parties note, disgorgement isn't an available remedy under the statutes on which Plaintiffs rely. (Doc. 91, #6048 (noting that RICO doesn't provide for the remedy of disgorgement)); *see also* 18 U.S.C. § 1595 (providing for "damages and reasonable attorneys fees"—not disgorgement—under the TVPA); 29 U.S.C. § 216(b) (providing for a variety of damages under the FLSA, not including disgorgement). For that reason, the Court overrules the objectors' second ground.

In sum, because the objectors' two requested alterations ask for the impossible (practically and legally), the Court overrules their objections.

### 6. FLSA Collective

That leaves one last issue for the Court to address: whether final approval is affected by this case's nature as a "hybrid" between a Rule 23 opt-out class action and an FLSA opt-in collective action. It is not.

As the Sixth Circuit has explained, Rule 23 class actions and FLSA collective actions are two distinct procedural mechanisms. *Clark*, 68 F.4th at 1009 (explaining that "class actions under Rule 23 are fundamentally different from collective actions under the FLSA." (quotation omitted)). One of the many differences, as this Court has explained elsewhere, is that district courts are neither required nor authorized to review FLSA settlements. *Gilstrap v. Sushinati LLC*, 734 F. Supp. 3d 710, 715–16, 721–22 (S.D. Ohio 2024).

At first blush (but not upon deeper inspection), the amended settlement agreement in this case seems to muddy the line between Rule 23 classes and FLSA collectives. It proceeds primarily under Rule 23. (*See generally* Doc. 85-1). But it also includes a provision, described above, enhancing the monetary award for Group A class members who opt in to releasing their potential FLSA claims (and who otherwise qualified for that specific monetary award category).

But at this point, there *is no* FLSA collective in this case. As the Sixth Circuit explained in *Clark*, "[t]he sole consequence of conditional certification [of a FLSA collective]"—which is all this Court ventured to do in its preliminary approval order—

32

"is the sending of court-approved written notice to employees." *Clark*, 68 F.4th at 1009 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)); (Doc. 86, #5866–67). Other employees become part of the collective action—"as opposed to mere recipients of notice"—only after they opt in *and* the district court conclusively determines that they merit membership in the collective under the relevant standard. *Id.*

So the proper way to understand the amended settlement agreement in this case is not as a hybrid between a Rule 23 class settlement and a FLSA collective settlement. Instead, the agreement under review here settles only those claims brought under the Rule 23 class mechanism. To be sure, one of its provisions allows eligible class members to obtain a higher reward for *releasing*—not settling—any potential claim they may have—whether individually or as a member of a collective action—under the FLSA. But that term doesn't transform a settlement pursued by a provisionally (and now finally) certified Rule 23 class into one earned by membership in a non-existent FLSA collective.

## C.    Attorneys' Fees,[11] Service Awards, and Costs

Along with final approval, class counsel and the class representatives move for attorneys' fees, costs and expenses, and service payments. (Doc. 87).

---

[11] Before wading into Class Counsel's fee petition, the Court pauses to stake its position on "one of the burning legal questions of our generation": the proper apostrophe placement (if any) in the phrase "attorneys' fees." *Est. of Gentry v. Hamilton-Ryker IT Sols., LLC*, No. 3:19-cv-320, 2023 WL 5018432 (S.D. Tex. Aug. 7, 2023). As the Sixth Circuit has noted, courts "find ['attorney fees,' 'attorney's fees,' and 'attorneys' fees'] used interchangeably, nay, promiscuously," in legal texts. *Stallworth v. Greater Cleveland Regional Transit Authority*, 105 F.3d 252, 253 n.1 (6th Cir. 1997). But in noting the problem, it also identified a context-based solution: "some may [] prefer ['attorneys' fees'] in contexts in which there is clearly

1.     **Attorneys' Fees and Costs and Expenses**

Class counsel requests three sums of money to be drawn from the Gross Settlement Amount before its disbursement to the class: attorneys' fees of $2,016,666; litigation costs of $77,137.77; and settlement administration expenses of $43,092. (Doc. 87, #5914). The Court addresses each in turn.

a.     **The Attorneys' Fees Sought By Class Counsel Are Reasonable**

Start with attorneys' fees. Courts "may award reasonable attorneys' … that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[W]hen class counsel's efforts create a substantial common fund for the benefit of the class, they are … entitled to payment from the fund based on a percentage of that fund." *Smith*, 2021 WL 11713313, at *7 (cleaned up). Putting two and two together, then, class counsel in cases like this are entitled to a percentage of the common fund, and that percentage must be reasonable.

What constitutes a "reasonable" percentage of the common fund is determined with reference to the following factors: "(1) the value of the benefit rendered to the plaintiff class (i.e.[,] the results achieved); (2) the value of the services on an hourly basis [i.e., the lodestar]; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the

---

more than one attorney referred to." *Id.* (quoting Bryan A. Garner, *A Dictionary of Modern Legal Usage* 91 (2d ed. 1995)). Since the fees at issue here are sought by a *group* of Class Counsel—that is, by more than one firm—the Court will use the plural possessive unless quoting an authority that opts otherwise.

professional skill and standing of counsel involved on both sides." *Id.* (citing *Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974)). Based on those factors, "attorneys' fees awards typically range from 20 to 50 percent of the common fund." *Id.* And that amount usually ranges from "1.3 to 4.5" times the lodestar (or hourly value of the attorneys' services). *Id.*

Class counsel's fee request here falls well within these conventional ranges. In percentage terms, class counsel requests a third of the Gross Settlement Amount. (Doc. 87, #5899). In absolute terms, that's $2,016,666. (*Id.* at #5914). Comparing that to class counsel's lodestar amount—in support of which they provide detailed records, (*see* Prakash Decl., Doc. 87-1, #5920–29)—of $1,016,562[12] yields a multiplier of 1.98. (Doc. 87, #5906). At risk of stating the obvious, a 33% award yielding a multiplier of 1.98 falls between the "typical[] range [of] 20 to 50 percent" and the "typical [] multiplier … [of] 1.3 to 4.5." *Smith*, 2021 WL 11713313, at *7.

---

[12] Class counsel provides two lodestar amounts: one calculated using the hourly billing rates in effect at the time of billing, and another using the rates currently in effect. (*See* Doc. 87-1, #5922). Perhaps because of this dispute's duration, the two amounts differ substantially— the more time elapses, the more likely hourly rates are to change (and in this case, to increase). The lodestar using the rate at the time of billing comes out to $1,016,562, while the lodestar using the current rate comes out to $1,150,206—an increase of approximately 13%. (*See id.*). And courts can use "[c]urrent rates … to compensate for the delay in payment" during particularly lengthy litigation. *See In re UnumProvident Corp. Derivative Litig.*, No. 1:02-cv-386, 2010 WL 289179, at *6 (E.D. Tenn. Jan. 20, 2010). This is arguably such a case, since litigation has been ongoing for nearly five years. *See Bank One, N.A. v. Echo Acceptance Corp.*, 595 F. Supp. 2d 798, 802 (S.D. Ohio 2009). Even so, class counsel used the lower lodestar to calculate its requested multiplier. That presents an even stronger case for approval, since the lower lodestar yields a higher (though not by much) multiplier, which is still at the lower end of the typical multiplier range of 1.3 to 4.5. *Smith*, 2021 WL 11713313, at *7.

Additionally, the *Ramey* factors all weigh in favor of approval. First, the value of the benefit obtained for the class exceeds the $6,050,000 Gross Settlement Amount; it also includes the nearly $8,300,00 of disputed debt Health Carousel agreed to forgive, as well as the intangible value of the future programmatic changes Health Carousel will implement. (Doc. 87, #5899). The quantifiable aggregate benefit alone—the monetary awards plus the amount of forgiven outstanding debt—totals $14,350,000, or "nearly 50%" of what class counsel approximated a jury would award at trial. (*Id.* at #5901). Courts have found that far lower percentages adequately support a fee petition. (*See id.* (collecting cases)).

Second, the requested award "[e]ncourag[es] qualified counsel to bring inherently difficult and risky but beneficial class actions [that] benefit[] society." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 534 (E.D. Mich. 2003). Class counsel represents that this case "involves uniquely vulnerable workers who may have limited resources and knowledge of their rights under the American legal system as new immigrants." (Doc. 87, #5907–08). The Court is satisfied that the requested fee adequately awards class counsel for pursuing difficult litigation on behalf of a subgroup potentially unfamiliar with their rights. And at the same time, it doesn't improperly overcompensate class counsel so as to create a societally detrimental incentive for lawyers to profiteer off of such suits.

Third, class counsel's skill in the face of this case's complexity supports their requested fee award. As described at various points in this Opinion and Order, the claims at issue here were hotly contested at every turn and required multiple rounds

36

of briefing, discovery, and settlement negotiation. And based on the proceedings to date, the Court has no reason to doubt class counsel's representation that they are "experienced class action litigators." (Doc. 87, #5908–11).

Finally, as discussed above, the lodestar multiplier is typical, as is the requested fee percentage when compared to other cases taken on contingency. (*See also* Doc. 87, #5902–07).

### b. The Costs and Expenses Sought By Class Counsel Are Reasonable

Atop their attorneys' fees, class counsel request reimbursement for the costs and expenses they incurred over the course of this litigation. They provide a detailed accounting of those expenditures in their motion, which can be broken down into two buckets: $77,136.77 for out-of-pocket costs like travel, local counsel, and the like; and $43,092 for the Settlement Administrator's expenses. (*Id.* at #5911–14). Upon reviewing the breakdown of the out-of-pocket costs, the Court finds that they were all reasonably necessary to adequately prosecute this action. And the Settlement Administrator's expenses are "well in line with amounts approved under similar circumstances." (*Id.* at #5914 (citing cases)). For those reasons, the Court finds class counsel's request for costs and expenses in addition to their attorneys' fees to be reasonable.

### 2. Service Payments

The fee petition also requests special payments to the class representatives above and beyond what they'll already receive as class members under the amended settlement agreement's terms. In other words, they seek what are called "service

payments" to reward each class representative for shouldering certain work in advancing their absent classmates' interests. (*See* Doc. 87, #5893–94). Specifically, Plaintiffs request $10,000 for Plaintiff Novie Dale Carmen, and $5,000 each for Plaintiffs Jerlin Amistoso and Kersteen Flores. (*Id.* at #5894). Those are reasonable amounts given their contributions to this litigation.

"Courts in this District have noted that service awards are efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Smith*, 2021 WL 11713313, at *8 (cleaned up). But this Court has cautioned that such awards can raise problems in light of the requirement that a "class action settlement must treat *all* class members (including class representatives) equitably relative to each other." *Hawes*, 2024 WL 2125640, at *6 (emphasis added). Specifically, while service payments can be appropriate to reward "meaningful work" that the representative performed "on behalf of a class," they must not "operate as a bounty for bringing suit," as the latter would "unjustly enrich class representatives at the rest of the class's expense[.]" *Id.* at *6–7 (emphasis omitted). In short, compensating class representative for their efforts is appropriate, but amounts in excess of that raise concerns.

Here, the requested service payments are perhaps a close call. Carmen, who is set to receive $10,000, was admittedly part of this case from the outset, meaning she has participated at some level for nearly five years. And she both produced documents and then later traveled (at some inconvenience) for a deposition. (Doc. 87, #5894–95). But class counsel estimates she spent about 40 or so hours on the case, and her own

estimate is only 100 hours for all of her activities leading up to her deposition in October 2023. (*Id.*). That means her service award, even crediting her estimate of time, would amount to about $100/hr—some four times her regular rate of pay as a nurse. (*See* Doc. 84, #5118). Roughly the same math appears to apply to the requested service payments for the other two. The Court acknowledges that work as a plaintiff may be more distasteful than one's chosen profession, but even so, a 400% premium seems like a lot to compensate for that. At the same time, the individual class members' recoveries here are substantial, so that the requested service awards here are not as disproportionate to the individual class members' recoveries as is sometimes the case. *See Hawes*, 2024 WL 2125640, at *6–7 (discussing examples of more markedly disproportionate service payments). And being out front on a case like this, which involves suing your (former) employer, admittedly may carry some professional consequences. Those are legitimate considerations, as well. *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187–88 (W.D.N.Y. 2005).

At bottom, the Court concludes that it will approve the requested service fee awards. But in doing so the Court stresses, again, that class counsel must take care to justify such awards in terms of the benefit that the class representatives provided to the class, along with any costs (economic or non-economic) that they incurred due to their efforts.

## CONCLUSION

For the foregoing reasons, the Court:

1. **RETAINS JURISDICTION** over this case to the extent necessary to enforce the terms of the amended settlement agreement. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994);

2. **FINALLY CERTIFIES** the Settlement Classes, for settlement purposes only, as defined in the amended settlement agreement and as amended by the parties' stipulation;

3. **FINALLY APPROVES** the terms of the amended settlement agreement as fair, equitable, and reasonable;

4. **DIRECTS** the parties to carry out the agreement's terms as written and promptly make the required payments to the class members, class representatives, and class counsel;

5. **AWARDS** attorneys' fees of $2,016,066, litigation costs of $77,136.77, and settlement administration expenses of $43,092 to class counsel;

6. **AWARDS** service payments to the class representatives in the amounts requested; and

7. **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket.

    **SO ORDERED.**

March 24, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**